UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

GANNON KEN VAN DYKE,

*Defendant.*

26 Cr. 156 (MMG)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GANNON KEN VAN DYKE'S MOTION TO DISMISS**

SEAN S. BUCKLEY
Deputy United States Attorney
Southern District of New York

Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray

Assistant United States Attorneys

- *Of Counsel*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 2

BACKGROUND ........ 4

I. Factual Overview ........ 4

A. Polymarket ........ 4

B. Gannon Ken Van Dyke ........ 5

C. Van Dyke's Insider Trading Scheme ........ 6

II. The Indictment and Prosecution ........ 7

ARGUMENT ........ 7

III. Applicable Law ........ 8

A. Motions to Dismiss ........ 8

B. CEA and Swaps ........ 9

IV. Counts One Through Three Adequately Allege Misconduct in Connection with a Swap ........ 9

A. The Text of the CEA Reaches the Swaps Alleged in the Indictment ........ 10

B. Van Dyke's Policy and Legislative History Arguments Do Not Overcome the Statutory Text ........ 14

C. The CEA's Application Here Does Not Offend Due Process ........ 19

V. Section 6(c)(1) and Rule 180.1 Are Not Unconstitutional ........ 23

VI. The Indictment Properly Alleges Wire Fraud ........ 27

A. The Wire Fraud Count, as Pleaded, is Legally Sufficient ........ 28

B. Confidential Military and Law Enforcement Operational Information is Property ........ 30

C. The Money Van Dyke Obtained From Counterparties is "Money" or "Property" ........ 35

D. The Indictment Adequately Pleads Specific Intent ........ 39

E. The Rule of Lenity and Due Process Do Not Require Dismissal ........ 39

CONCLUSION ........ 40

# TABLE OF AUTHORITIES

Page(s)

Cases

*Azima v. Dechert LLP*, No. 22 Civ. 8728 (PGG) (JW), 2024 WL 4665106 (S.D.N.Y. Sept. 26, 2024) ..... 36

*Barton v. Barr*, 590 U.S. 222 (2020) ..... 12

*Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905) ..... 16

*Carpenter v. United States*, 484 U.S. 19 (1987) ..... 32, 35

*CFTC v. Gorman*, 587 F. Supp. 3d 24 (S.D.N.Y. 2022) ..... 23

*CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996 (N.D. Ill. 2015) ..... 24

*CFTC v. Oystacher*, 203 F. Supp. 3d 934 (N.D. Ill. 2016) ..... 23

*Chapman v. United States*, 500 U.S. 453 (1991) ..... 19

*City of Chicago v. Morales*, 527 U.S. 41 (1999) ..... 21

*Costello v. United States*, 350 U.S. 359 (1956) ..... 8

*DiPierre v. United States*, 564 U.S. 70 (2011) ..... 39

*Duncan v. Walker*, 533 U.S. 167 (2001) ..... 11

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ..... 21

*In re Classic Energy LLC*, CFTC No. 19-50, 2019 WL 4915492 (Sept. 30, 2019) ..... 25

*In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895 (D.N.M. 2023) ..... 17

*In re Freepoint Commodities LLC*, CFTC No. 24-02, 2023 WL 8785812 (Dec. 14, 2023) ..... 25

*In re Motazedi*, CFTC No. 16-02 ..... 25

*In re Ruggles*, CFTC No. 16-34, 2016 WL 5682206 (Sept. 29, 2016) ..... 25

*In re Schultz*, CFTC No. 20-76, 2020 WL 5876731 (Sept. 30, 2020) ..... 25

*In re Tippett*, CFTC No. 23-03, 2022 WL 17090923 (Nov. 16, 2022) ..... 25

*In re Trafigura Trading*, CFTC No. 24-08, 2024 WL 3225331 (June 17, 2024) ..... 25

*In re Webb*, CFTC No. 21-09, 2021 WL 2534960 (June 14, 2021) .......... 25

*Jordon v. New York Mercantile Exch.*, 571 F. Supp. 1530 (S.D.N.Y. 1983) .......... 16

*KalshiEX LLC v. Johnson*, No. 26 Civ. 1715 (PHX/MTL), 2026 WL 1223373 (D. Ariz. May 5, 2026) .......... 10, 18

*Kalshiex LLC v. Orgel*, No. 3:26 Civ. 34, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) .......... 11

*KalshiEX, LLC v. Flaherty*, 172 F.4th 220 (3d Cir. 2026) .......... 10

*KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025) .......... 18

*Kelly v. United States*, 140 S. Ct. 1565 (2020) .......... 29, 37

*Kousisis v. United States*, 605 U.S. 114 (2025) .......... 37, 38

*Lackey v. Stinnie*, 604 U.S. 192 (2025) .......... 10

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .......... 25, 26

*Lorillard v. Pons*, 434 U.S. 575 (1978) .......... 23

*Loughrin v. United States*, 573 U.S. 351 (2014) .......... 37

*Maracich v. Spears*, 570 U.S. 48 (2013) .......... 39

*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007) .......... 17

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982) .......... 15

*New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42 (2d Cir. 2020) .......... 23

*Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75 (1998) .......... 16

*Pasquantino v. United States*, 544 U.S. 349 (2005) .......... 29

*Pulsifer v. United States*, 601 U.S. 124 (2024) .......... 12

*Salman v. United States*, 580 U.S. 39 (2016) .......... 25

*SIFMA v. CTFTC*, 67 F. Supp. 3d 373 (D.D.C. 2014) .......... 9

*Smith v. United States*, 508 U.S. 233 (1993) .......... 39

*Taggart v. Lorenzen*, 587 U.S. 554 (2019) .......... 23

*United States v. Alfonso*, 143 F.3d 772 (2d Cir. 1998) ........ 28

*United States v. Berroa*, 856 F.3d 141 (1st Cir. 2017) ........ 37

*United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022) ........ *passim*

*United States v. Blumeyer*, 114 F.3d 758 (8th Cir. 1997) ........ 36

*United States v. Chastain*, 145 F.4th 282 (2d Cir. 2025) ........ 29

*United States v. Christopher*, 142 F.3d 46 (1st Cir. 1998) ........ 36

*United States v. Clark*, 2025 WL 801358 (5th Cir. Mar. 13, 2025) ........ 23

*United States v. Daugerdas*, 837 F.3d 212 (2d Cir. 2016) ........ 8

*United States v. Dawkins*, 999 F.3d 767 (2d Cir. 2021) ........ 9, 13

*United States v. DiCristina*, 726 F.3d 92 (2d Cir. 2013) ........ 19

*United States v. DiGilio*, 538 F.2d 972 (3d Cir. 1976) ........ 33

*United States v. Evans*, 844 F.2d 36 (2d Cir. 1988) ........ 36

*United States v. Fowler*, 932 F.2d 306 (4th Cir. 1991) ........ 32

*United States v. Friedman*, 445 F.2d 1076 (9th Cir. 1971) ........ 32

*United States v. Gatto*, 986 F.3d 104 (2d Cir. 2021) ........ 37

*United States v. Girard*, 601 F.2d 69 (2d Cir. 1979) ........ 26, 29, 30

*United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016) ........ 36

*United States v. Halloran*, 821 F.3d 321 (2d Cir. 2016) ........ 21

*United States v. Jeter*, 775 F.2d 670 (6th Cir. 1985) ........ 32

*United States v. Jones*, 677 F. Supp. 238 (S.D.N.Y. 1988) ........ 33

*United States v. Juwa*, 508 F.3d 694 (2d Cir. 2007) ........ 8

*United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995) ........ 36

*United States v. Lambert*, 446 F. Supp. 890 (D. Conn. 1978) ........ 30

*United States v. Little*, 2017 WL 1743837 (S.D.N.Y. May 3, 2017) .......... 22

*United States v. Litvak*, 808 F.3d 160 (2d Cir. 2015) .......... 29

*United States v. Martinez*, No. 22 Cr. 251 (LJL), 2023 WL 2118081 (S.D.N.Y. Feb. 17, 2023) .......... 36

*United States v. McMillan*, 600 F.3d 434 (5th Cir. 2010) .......... 36

*United States v. Milani*, 739 F. Supp. 216 (S.D.N.Y. 1990) .......... 21

*United States v. Minnesota*, No. 26 Civ. 2661 (KMM/DTS), 2026 WL 2150211 (D. Minn. July 27, 2026) .......... 10, 12

*United States v. Morison,* 604 F. Supp. 655 (D. Md. 1985) .......... 31, 32

*United States v. Morison*, 844 F.2d 1057 (4th Cir. 1988) .......... 32

*United States v. O'Hagan*, 521 U.S. 642 (1997) .......... 23, 35

*United States v. Parce*, 789 F.3d 83 (2d Cir. 2015) .......... 38

*United States v. Perez*, 575 F.3d 164 (2d Cir. 2009) .......... 8

*United States v. Phillips*, 155 F.4th 102 (2d Cir. 2025) .......... 10, 19

*United States v. Phillips*, 690 F. Supp. 3d 268 (S.D.N.Y. 2023) .......... 22

*United States v. Porat*, 76 F.4th 213 (3d Cir. 2023) .......... 36

*United States v. Ramsey*, 2021 WL 4244284 (E.D. Pa. Sept. 17, 2021) .......... 37

*United States v. Rodrigues*, No. 22-CR-00391 (PMH), 2024 WL 113744 (S.D.N.Y. Jan. 10, 2024) .......... 33

*United States v. Sampson*, 898 F.3d 270 (2d Cir. 2018) .......... 29

*United States v. Schulte*, 436 F. Supp. 3d 747 (S.D.N.Y. 2020) .......... 33

*United States v. Seidling*, 737 F.3d 1155 (7th Cir. 2013) .......... 36

*United States v. Shvartsman*, 722 F. Supp. 3d 276 (S.D.N.Y. 2024) .......... 19, 21, 22

*United States v. Stavroulakis*, 952 F.2d 686 (2d Cir. 1992) .......... 28, 38

*United States v. Velastegui*, 199 F.3d 590 (2d Cir. 1999) .......... 8

*United States v. Walters*, 910 F.3d 11 (2d Cir. 2018) .......... 9

*United States v. Wedd*, 993 F.3d 104 (2d Cir. 2021) .......... 8, 28

*United States v. Weigand*, 482 F. Supp. 3d 224 (S.D.N.Y. 2020) .......... 36

*United States v. Williams*, 553 U.S. 285 (2008) .......... 19

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) .......... 22

Statutes and Other Authorities

7 U.S.C. § 1a(47)(A)(ii) .......... 9, 10

7 U.S.C. § 1a(47)(A)(iii) .......... 12

7 U.S.C. § 1a(47)(A)(iv) .......... 13, 22

7 U.S.C. § 2(h)(7) .......... 15

7 U.S.C. § 7a-2(c)(5)(C) .......... 11, 12

7 U.S.C. § 9(1) .......... 9, 22, 23

7 U.S.C. §§ 6c(a)(3)-(4) .......... 10

Pub. L. No. 106-554 .......... 17

Pub. L. No. 111-203 .......... 9, 24

17 C.F.R. § 180.1 .......... 23

*Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Man*ipulation, 76 Fed. Reg. 41,398 (CFTC July 14, 2011) .......... 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

GANNON KEN VAN DYKE,

*Defendant.*

26 Cr. 156 (MMG)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT GANNON KEN VAN DYKE'S MOTION TO DISMISS**

The Government respectfully submits this memorandum of law in opposition to defendant Gannon Van Dyke's motion to dismiss Indictment 26 Cr. 156 (MMG). *See* ECF Doc. 23 (defense memorandum of law).[1]

## PRELIMINARY STATEMENT

The Indictment charges Gannon Van Dyke in five counts arising from his scheme to misappropriate classified military information and profit from it. Van Dyke now demands this Court spare him trial on these allegations, arguing most of the charges against him are "novel," the rest have been "squarely rejected" by the Court of Appeals, and all offend Due Process. (Mot. 1-2). None of these claims has merit.

Van Dyke's arguments range from the Constitution to the Commodity Exchange Act but rarely grapple with the bread-and-butter of a motion to dismiss: the Indictment itself. Here, the Indictment contains the essential elements of five counts, describes the core criminality of Van

[1] "Mot." refers to the defendants' memorandum in support of their motion. "ECF Doc." refers to an entry on the docket of this case. "Ind." refers to the Indictment in this case. Unless otherwise noted, quotations omit internal quotation marks, citations, and alterations.

Dyke's offenses, and states the approximate time and place of the offense. The Federal Rules of Criminal Procedure require nothing more to reach a jury.

Nor does the Indictment break new legal ground. The core theory of the Indictment is that Van Dyke took information that he had pledged to keep confidential and, though he was duty-bound not to do so, he used it to make a personal profit. That theory of criminality is not new. The U.S. Supreme Court, the U.S. Court of Appeals for the Second Circuit, and numerous judges in this District have repeatedly dealt with this type of misconduct and for decades have labeled it fraud under a multitude of statutes. When, as here, a defendant is alleged to have monetized embezzled information through a trading market, the crime is popularly known as insider trading. The public broadly recognizes insider trading is wrong and, as alleged in Indictment, Van Dyke knew it, too.

Van Dyke's motion looks past the legal theory of the case to focus instead on how Van Dyke committed the crime, seizing on the fact that the Indictment alleges that Van Dyke traded swaps in the form of event contracts. That Van Dyke made his illicit profits through trading event contracts on a prediction market as opposed to trading options contracts on a stock market is legally significant only because it makes the Commodity Exchange Act, which forbids fraud in connection with "swaps," rather than the Exchange Act, which forbids fraud in connection with the purchase and sale of securities, the appropriate statute of prosecution. Van Dyke, however, spends page after page arguing that this Court should not consider event contracts to be swaps, though the Indictment alleges them to be. In doing so, he ignores statutory language that squarely defines "swap" to include contracts like those traded by Van Dyke, and he resorts to policy arguments about why Congress could not have meant what it said. When he is not inviting the Court to rewrite the law, Van Dyke advances hypotheticals, edge cases, and ongoing litigation over state gaming laws—even though this Court need not decide any of those issues to deny Van Dyke's motion.

Van Dyke's attack on the wire fraud count is equally misguided. Van Dyke claims the alleged scheme did not involve "property" because, he says, secret military information cannot be "property" under the wire fraud statute. But while Van Dyke purports to tether this claim to "binding precedent," he cites none and overlooks decades of decisional law that hold against him. Not for nothing, Van Dyke's position also defies common sense. The notion that the Government may not protect classified military information as property is incredible and, not surprisingly, Van Dyke himself previously acknowledged that the confidential information he received was, and would remain, the property of the U.S. Government. To compound his problems, Van Dyke also ignores that the Indictment alleged his scheme obtained a second form of property—trading profits—and he advances no basis to reject that theory.

In the end, Van Dyke apparently envisions himself at the frontier of "innovative technologies" because he committed an old crime on a new platform and begs this Court for lenity as the "government, the public, and the private sector take time to consider" prediction markets. (Mot. 2). But Congress forbade fraud in connection with swaps decades ago, Courts have consistently held that conduct, such as that alleged against Van Dyke, is a form of fraud, and the Indictment alleges that Van Dyke's scheme involved both swaps and property. Because the Indictment alleges all that it must, the next step is trial.

## BACKGROUND

### I. Factual Overview

#### A. Polymarket

Polymarket is a prediction marketplace headquartered and operated in Manhattan, New York. Polymarket facilitates the trading of binary event contracts about whether or to what extent a future event will occur. Each market is framed as a Yes/No question, such as "Will X happen?" and pairs a YES share with a NO share. At resolution, the share on the correct side pays $1.00; the

other pays $0.00. Shares trade between $0.00 and $1.00, and the share price reflects the market's real-time assessment of the probability that an event will occur. (Ind. ¶¶ 7-8).

In or about late 2025, Polymarket began offering binary event contracts related to whether U.S. intervention in Venezuela would, or would not, occur. (Ind. ¶ 9). For example, in or about September 2025, Polymarket posted a market offering event contracts regarding the likelihood of "US forces in Venezuela by" certain dates, including September 6, 2025; October 31, 2025; November 30, 2025; December 31, 2025; January 31, 2026; or March 31, 2026. In or about November 2025, Polymarket posted a market offering event contracts regarding the future likelihood of Maduro being "out" of or removed from power in Venezuela by certain dates, including November 30, 2025; December 31, 2025; January 31, 2026; February 28, 2026; March 31, 2026; or December 31, 2026. (Ind. ¶ 9).

**B. Gannon Ken Van Dyke**

The defendant was a Master Sergeant in the U.S. Army Special Operations Command and was stationed at Fort Bragg, a military base located in Fayetteville, North Carolina. (Ind. ¶ 2). At various times, the defendant signed non-disclosure agreements associated with sensitive, nonpublic, classified information he learned through his employment with the U.S. Army. For example, the Indictment alleges that on or about December 8, 2025, the defendant signed a nondisclosure agreement regarding "Western Hemisphere Operations," pursuant to which the defendant acknowledged that, due to his association with the U.S. Army's Special Operations Command, he may be granted access to "information, material, and plans, which concern the security of the United States." (Ind. ¶ 4). Van Dyke acknowledged that the United States Government placed "special confidence and trust" in him. Under that agreement, Van Dyke promised, among other things, to "never divulge anything marked as SCI [Sensitive Compartmented Information] or that [he] know[s] to be SCI to anyone." The defendant further

acknowledged that "all information" to which he may "obtain access . . . is now and will remain the property of the United States Government." (Ind. ¶ 4).

### C. Van Dyke's Insider Trading Scheme

The defendant was involved in the planning and execution of Operation Absolute Resolve and, as a result, he had access to sensitive, non-public, classified information about that operation. (Ind. ¶ 5). As alleged, Van Dyke illicitly used non-public, classified information about Operation Absolute Resolve to trade event contracts on Polymarket related to U.S. military operations in Venezuela and Maduro's removal from power. (Ind. ¶¶ 10-11).

On or about December 26, 2025, the defendant created a Polymarket account, and between on or about December 27, 2025, and on or about January 2, 2026—while the defendant was involved in the planning and execution of Operation Absolute Resolve—the defendant purchased approximately $33,934 worth of "YES" shares on Maduro- and Venezuela-related markets. (Ind. ¶ 9). At the time, Operation Absolute Resolve had not been publicly announced, and the shares Van Dyke purchased were significantly out-of-the-money. (Ind. ¶¶ 11-12). For example, on or about December 30, 2025, the defendant purchased approximately 13,769 "YES" shares of the market "Maduro out by . . . January 31, 2026" at a volume-weighted average price of approximately $0.09 per share, reflecting a 9% probability that the contract would resolve in the defendant's favor. (Ind. ¶¶ 11(b)).

In the predawn hours of January 3, 2026, U.S. special forces apprehended Maduro and his wife at a residence in Caracas, Venezuela. The President of the United States announced the operation in a social media post on or about January 3, 2026, at approximately 4:21 a.m. EST. (Ind. ¶ 13). Following the President's public announcement, Polymarket resolved several Maduro- and Venezuela-related event contracts to "YES" at $1.00 per share, including the markets "Maduro

out by . . . January 31, 2026," and "US forces in Venezuela by . . . January 31, 2026." (Ind. ¶ 15). As a result, Van Dyke realized a net profit of more than $400,000 on his trades. (Ind. ¶ 15).

## II. The Indictment and Prosecution

In April 2026, a grand jury returned Indictment 26 Cr. 156 (MMG), charging the defendant in five counts:

(1) The unlawful use of confidential government information in connection with a swap transaction, in violation of Title 7, United States Code, Sections 6c(a)(3) and 13(a)(5);

(2) Theft of confidential government information to enter a swap transaction, in violation of Title 7, United States Code, Sections 6c(a)(4)(C) and 13(a)(5);

(3) Fraud in connection with a commodity or swap, in violation of Title 7, United States Code, Sections 9(1) and 13(a)(5), and Title 17, Code of Federal Regulations, Section 180.1;

(4) Wire fraud, in violation of Title 18, United States Code, Section 1343; and

(5) Engaging in a monetary transaction in property derived from a specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

The offenses alleged in Counts One through Three form part of the Commodity Exchange Act ("CEA").

On July 31, 2026, Van Dyke filed the Motions, seeking to dismiss each count of the Indictment. Van Dyke principally contends that his trades did not involve "swaps," and thus cannot be the subject of prosecution under the CEA, and did not involve "property," and thus cannot be the subject of prosecution for wire fraud. Van Dyke also contends that Due Process cannot tolerate his prosecution because it represents a novel and unexpected application of an ambiguous statute.

## ARGUMENT

The Indictment alleges Van Dyke committed five offenses. In so doing, the Indictment tracks Congress's language, touches on each essential element of every count, and alleges facts that, if proven at trial, would amount to a crime. As to the CEA counts, Van Dyke's arguments that he may avoid trial largely rest on an artificially narrow reading of the term "swap." But Van

Dyke's interpretation runs counter to the letter of the law and relies on policy claims rejected by Congress. And his effort to reprise these same arguments as Due Process problems is equally misguided. As to the wire fraud count, Van Dyke boldly contends that military operational information cannot be protected "property," but ignores decades of contrary precedent. Because the Indictment alleges all that is legally required, the motions must be denied.

## III. Applicable Law

### A. Motions to Dismiss

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged" and must, for each count, "give the official or customary citation of the law that the defendant is alleged to have violated." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient under Rule 7 and the Fifth Amendment "as long as it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and (2) enables the defendant to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Wedd*, 993 F.3d 104, 120 (2d Cir. 2021).

To satisfy these requirements, "an indictment need do little more than to track the language of the statute charged and state the time and place . . . of the alleged crime." *Id*. That is, it need only describe the "core of criminality to be proven at trial," not "the particulars of how a defendant effected the crime." *United States v. Daugerdas*, 837 F.3d 212, 225 (2d Cir. 2016).

When considering a motion to dismiss an indictment, "the facts alleged by the government must be taken as true." *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999). The law is well settled that "[a]n indictment returned by a legally constituted and unbiased grand jury . . . if valid on its face, is enough to call for trial of the charges on the merits." *Costello v. United States*, 350 U.S. 359, 365 (1956). It is not proper to weigh the sufficiency of the evidence underlying the indictment, unless the Government has already made "a full proffer of the evidence it intends to

present at trial." *United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009). This rule exists because indictments are "not meant to serve an evidentiary function," but rather, "to acquaint the defendant with the specific crime with which he is charged, allow him to prepare his defense, and protect him from double jeopardy." *United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007). Accordingly, "at the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *United States v. Dawkins*, 999 F.3d 767, 780 (2d Cir. 2021). "That is something [courts] do after trial." *Id.* Dismissal is a "drastic remedy that should be utilized with caution and only in extreme cases." *United States v. Walters*, 910 F.3d 11, 26 (2d Cir. 2018).

### B. CEA and Swaps

Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act in the wake of the 2008 financial crisis. Pub. L. No. 111-203, 124 Stat. 1376. The Dodd-Frank Act amended the CEA to regulate "the previously unregulated derivative swaps market." *SIFMA v. CTFTC*, 67 F. Supp. 3d 373, 384 (D.D.C. 2014). That included new prohibitions against fraud and manipulation in connection with swaps. 7 U.S.C. § 9(1).

As part of the Dodd-Frank reforms, Congress provided a broad definition of "swap"—comprising five qualifying categories of instruments, 7 U.S.C. § 1a47(a)(1)(i)-(v)—including agreements and contracts related to "any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence. 7 U.S.C. § 1a47(a)(1)(ii).

## IV. Counts One Through Three Adequately Allege Misconduct in Connection with a Swap

Van Dyke's central argument is that he did not trade "swaps" because event contracts can be a "swap" only if the underlying event is "inherently economic." (Mot. 8-9). That argument fails because it is not what the statute says. To be a "swap," Congress required only that an event be

"associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii). Van Dyke labors to narrow Congress's definition by resorting to the statute's neighboring provisions, a selective history of its enactment, and a novel gloss on its purpose; but these arguments cannot smuggle Van Dyke's "inherently economic" standard into a statute that does not contain one. Van Dyke then pairs his interpretative error with a procedural one: given that the question of whether an event is "associated with a potential financial, economic, or commercial consequence" is fact-bound, Van Dyke's denials of the Indictment's allegations mean that trial, not dismissal, is the appropriate remedy.

### A. The Text of the CEA Reaches the Swaps Alleged in the Indictment

The event contracts alleged in the Indictment are "swaps" because they are contracts whose payment depends on the occurrence of events—U.S. military action against Venezuela and Maduro's removal from power—that are "associated with a potential financial, economic, or commercial consequence." The military operation to capture Maduro certainly had the potential to have, and has had, far reaching economic consequences.

Start where every case must start: the text. *Lackey v. Stinnie*, 604 U.S. 192, 199 (2025). The CEA counts allege Van Dyke committed misconduct in connection with, and affecting the price of, a "commodity" or "swap." 7 U.S.C. §§ 6c(a)(3)-(4), 9(1). Congress "defined 'swap' broadly," *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025), to include any "agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). As the Third Circuit held, "event contracts fit comfortably" within that statutory definition. *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026); *see also id.* at 233 (Roth, J., dissenting) (same). Indeed, while some courts have held that the CEA does not

preempt state gaming laws, as Van Dyke emphasizes, most conclude or assume that prediction market event contracts themselves are "swaps." *See, e.g.*, *United States v. Minnesota*, No. 26 Civ. 2661 (KMM/DTS), 2026 WL 2150211, at *13 (D. Minn. July 27, 2026) ("several courts that have considered the meaning of the statutory definition of swap have found that event contracts involving the outcomes of sporting events fall within the definition's scope"); *KalshiEX LLC v. Johnson*, No. 26 Civ. 1715 (PHX/MTL), 2026 WL 1223373, at *5 (D. Ariz. May 5, 2026) ("event contracts traded on DCMs are swaps within the meaning of 7 U.S.C. § 1a(47)(A)"); *Kalshiex LLC v. Orgel*, No. 3:26 Civ. 34, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026) (same).

There is no requirement that the swaps be "inherently economic," as Van Dyke claims. In defining "swaps," Congress chose "associated with"—not "caused by" or "inherent in." "Associated" means "connected," *Associated*, Oxford American Dictionary and Thesaurus (2d ed. 2009), a materially looser link than the "close" connection Van Dyke derives from an unrelated adjectival meaning of the same root word. And "potential" modifies "consequence": a potential consequence, by definition, "exist[s] in possibility" and may or may not come to pass. *Potential*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). Congress "could have imposed a more stringent requirement" but "chose to use 'potential,' which is broad." *Orgel*, 2026 WL 474869, at *8. The statute's text makes clear that an event need not be economic in nature to be associated with a potential economic effect; it need only be connected to the possibility of one. Rather than giving effect "to every clause and word of [the] statute," *Duncan v. Walker*, 533 U.S. 167, 174 (2001), Van Dyke's gloss would strike "potential" from the statute altogether, since an event that is "inherently economic" produces a certain, not merely potential, consequence.

The structure of the CEA also confirms that event contracts involving military intervention, like the ones Van Dyke traded, are "swaps." Dodd-Frank added what has come to be called the "Special Rule" to the CEA, codified at 7 U.S.C. § 7a-2(c)(5)(C), which permits, but does not

require, the CFTC to bar an event contract or swap from listing on a designated contract market if it determines the contract is "contrary to the public interest," *id.* § 7a-2(c)(5)(C)(ii). That authority presupposes such a contract is a "swap" since the CFTC has no listing power over instruments outside its jurisdiction. And Congress told the CFTC precisely which event contracts to scrutinize under that authority: contracts involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity." *Id.* § 7a-2(c)(5)(C)(i). That list is Congress identifying, by name, a set of event contracts it understood to fall within the "swap" definition and worth the CFTC's added scrutiny.

Van Dyke's reading of the CEA cannot be squared with the Special Rule. On his account, war-related event contracts can never be "swaps" because war is not "inherently economic." But then the Special Rule's reference to "war" would give the CFTC a category to review and nothing to put in it. A statute should not be read to turn an entire clause of its own text into a dead letter, and "the canon against surplusage applies with special force" when a proposed construction "renders an entire subparagraph meaningless." *Pulsifer v. United States*, 601 U.S. 124, 143 (2024) (cleaned up). Congress did not write a category of swaps into the statute for the CFTC to police and then write those same contracts out of the definition of "swap."

Van Dyke's additional interpretative arguments fare no better, contradicting the plain text of the statute. He argues that *noscitur a sociis* and *ejusdem generis* require a "narrow reading" of subpart (ii) of the statutory definition of "swap" to match the references found in subparts (i), (iii), and (v) to rates, currencies, and indices. (Mot. 9-10). But reliance on those canons "to limit the reach of subparagraph (ii) risks making that provision do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish," a reading that "would, in fact, create surplusage." *Minnesota*, 2026 WL 2150211, at *13. Van Dyke's "narrow reading" is also impossible to square with the types of swaps enumerated in subsection (iii). Weather and emissions swaps are expressly

defined as "swaps" under the CEA, *see* 7 U.S.C. § 1a(47)(A)(iii), even though neither is "inherently" economic. If Van Dyke's canon-driven reading were correct, decades of settled CFTC practice regulating weather, catastrophe, emissions, and longevity swaps would be *ultra vires*. Moreover, notwithstanding his claims to the contrary, "redundancies are common in statutory drafting" and reflect "a congressional effort to be doubly sure." *Barton v. Barr*, 590 U.S. 222, 239 (2020). That's the case here. Congress wrote six overlapping definitions of "swap," including catchalls covering contracts "commonly known" as swaps and "any combination or permutation of" the other five, 7 U.S.C. § 1a(47)(A)(iv), (vi), precisely because it intended the term to be defined broadly beyond rates, currencies, and indices.

Van Dyke ultimately urges the Court to reject a natural reading of the text because, he says, such a reading makes "swap" limitless. (Mot. 14-15). He argues that if any event "associated with a potential" economic consequence qualifies, then almost nothing is excluded because nearly any event could produce some hypothetical ripple effect. That academic objection has little relevance to this prosecution: whatever the statute's outer boundary, Van Dyke's contracts are nowhere near it. Van Dyke's contracts concern serious military activity "associated with" a "potential" financial, economic, or commercial consequence. Van Dyke's hypotheticals are cases for another day.

Van Dyke's fact-dependent claim that these event contracts lack sufficient economic substance cannot be adjudicated on a motion to dismiss. *See Dawkins*, 999 F.3d at 780 ("[T]hat is something [courts] do after trial."). But were this fact to be contested at trial, the Government would offer evidence concerning both the economic reasons investors would buy event contracts tied to U.S. intervention in Venezuela and the economic effects of that intervention. Investors exposed to assets that would suffer if the United States intervened—such as Venezuelan sovereign debt, obligations tied to Venezuela's state-owned oil company, or businesses reliant on steady Venezuelan oil production—might buy "yes" on the event contracts Van Dyke purchased in order

to hedge against losses if intervention occurred, while investors whose portfolios depended on intervention happening—because regime change could boost Venezuelan output, lower long-term oil prices, or improve credit prospects—might buy "no" on those same contracts to protect against the risk that regime change never happened. In both cases, the prediction market event contracts functions as a hedge keyed to the potential economic consequences the market has long recognized follow from dramatic changes in Venezuela's political and security landscape.

The effects of the U.S. intervention confirm the point: markets immediately reacted to the operation in light of Venezuela's vast oil reserves; the trading price of Venezuela-issued sovereign bonds increased by 35%; the trading price of bonds issued by Venezuela's state-run oil company increased by 43%; oil prices rose as analysts weighed the possibility of production disruptions against the prospect of increased output; and the intervention sparked major investment commitments, drove Venezuelan oil exports to their highest level in more than seven years, and yielded over $13 billion in U.S. receipts from Venezuelan oil sales within months. *See* Marianna Parraga and Mircely Guanipa, Reuters, *Venezuela's oil exports jump to highest since 2018, with more sales to US, India*, May 1, 2026, https://www.reuters.com/business/energy/venezuelas-oil-exports-jump-highest-since-2018-with-more-sales-us-india-2026-05-01/ (last visited Aug. 11, 2026); Spencer Kimball, CNBC, *Trump says U.S. has sold more than $13 billion of Venezuela oil since Maduro's capture*, July 28, 2026, https://www.cnbc.com/2026/07/27/trump-says-us-has-sold-more-than-13-billion-of-venezuela-oil-.html (last visited Aug. 11, 2026).

### B. Van Dyke's Policy and Legislative History Arguments Do Not Overcome the Statutory Text

Van Dyke's extratextual arguments for why "swaps" must be "inherently economic," and why these event contracts are not "swaps," are also unpersuasive.

*First*, Van Dyke argues that these contracts involve "probability discovery," not "price discovery," and that only the latter qualifies as a "swap." (Mot. 11-12). His premise is that swaps must track an external variable—an interest rate, an exchange rate, a temperature—whose independent movement the market continuously prices. A prediction market, he says, tracks nothing; it simply resolves to "yes" or "no" on a single future event, so its price is just the crowd's guess at the odds, or a "probability." This distinction is a fiction. A price is a probability estimate the moment a payoff turns on an uncertain future event, and that is true of every instrument Van Dyke would concede is a swap. A weather swap's price is the market's estimate of the odds that rainfall crosses a threshold; an option's price is the market's estimate of the odds the underlying moves past the strike. There is no daylight between "the market's assessment of how likely rain is" and "the market's assessment of how likely Maduro's removal is"—both are prices set by people with money on the line, estimating the odds of a future contingency. "Probability discovery" is not a different activity from price discovery; it is the same activity, relabeled to reach a different result.

*Second*, Van Dyke claims that these contracts are "gambling," not "hedging" and that the distinction has legal significance. (Mot. 12-15). His theory is that a true swap offsets a pre-existing risk—an airline hedging jet-fuel costs, an exporter hedging currency exposure—but Van Dyke, by contrast, had no exposure to whether Maduro was captured. Because nothing in his portfolio was offset, he says nothing was hedged, and an instrument used only to bet supposedly falls outside a statute aimed at risk management.

Van Dyke's premise fails thrice over. For one thing, common sense counsels that Congress did not create a regulatory regime that varied trader by trader. For another, no statute, rule, or common law holding make a trader's subjective intent the *sine qua non* of a swap, and, indeed, the CEA treats "hedg[ing] or mitigate[ing] commercial risk" as a separate, downstream classification

used for the end-user clearing exception, 7 U.S.C. § 2(h)(7), rather than as a gate to swap status. Further still, the courts have recognized that "speculator[s]" play a "crucial role in an effective and orderly futures market" because a hedger's "ability to engage in hedging depends on the availability of investors willing to assume or to share the hedger's risk in the hope of making a profit." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 390 (1982). Van Dyke's own authorities confirm this. *Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236 (1905), cited for the proposition that a hedge differs from speculation, actually recognized speculation as "perfectly consistent with a serious business purpose," and thus an essential component of an orderly futures trading system. *Id.* at 249.

*Third*, Van Dyke argues that Congress never meant "swap" to cover trades on geopolitical events because Dodd-Frank was purportedly focused on opaque financial derivatives that contributed to the 2008 financial crisis, not event contracts tied to invasions or political actions. (Mot. 15-18). Van Dyke, however, offers little legislative history to show that Congress meant something narrower than what it said.[2] Nor is it significant that Congress did not fixate on prediction markets in extending antifraud authority to swaps. Statutes routinely reach beyond the "principal evil" that motivated them, because "it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998).

Bereft of helpful legislative history, Van Dyke instead quotes 7 U.S.C. § 5(a) as a sign that Dodd-Frank sought to reach only instruments that "provid[e] a means for managing and assuming

[2] In fact, a group of former members of Congress, some of whom authored Dodd-Frank, have stated that Dodd-Frank was intended to capture event contracts traded on contract markets, including event contracts related to gambling and sports betting. *See* Brief of Amici Curiae of Seven Former Members of Congress in Support of Plaintiff-Appellee, *KalshiEx v. Flaherty et al.*, 2025 WL 2306500, at *26.

price risks, discovering prices, or disseminating pricing information[.]" (Mot. at 11). But Congress wrote that language—a Congressional "finding," not a jurisdictional provision—a decade earlier, in the Commodity Futures Modernization Act of 2000, or CFMA, when it dismantled gatekeeping tests for futures contracts that Van Dyke now wants this Court to resurrect for swaps. It does not help him.

Before the CFMA, the CEA required the CFTC to find that a proposed futures contract satisfied "an economic-purpose test whereby an exchange [was required to] demonstrate that its proposed contracts [would] be used for base-pricing and hedging, not just for speculation." *Jordon v. New York Mercantile Exch.*, 571 F. Supp. 1530, 1555 (S.D.N.Y. 1983) (citing 7 U.S.C. § 7(g)). The CFMA abolished those requirements outright. Pub. L. No. 106-554, 114 Stat 2763 (2000). When Congress added swaps and event contracts to the CEA in 2010, it did not revive the old economic-purpose requirement. Instead, it conferred authority over swaps to the CFTC, defined "swap" broadly, and created the Special Rule—discretionary, case-by-case authority to bar particular swaps, including war and gaming contracts, when they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C). A statute that eliminated categorical *ex ante* gatekeeping in 2000, and that in 2010 built only a narrow safety valve rather than restoring it, cannot fairly be read to impose that gatekeeping test now.

The twelve unenacted bills Van Dyke cites offer no interpretative value whatever. (Mot. 18-19). Unpassed legislation is, of course, not law and "postenactment legislative history … tells us nothing about what Congress meant" at the time a statute was drafted. *Massachusetts v. E.P.A.*, 549 U.S. 497, 530 (2007). And, in any event, most of these bills presuppose that event contracts are swaps. For example, the first bill Van Dyke cites, the Prediction Market RISK Act, H.R. 8148, 119th Cong. (2026), states that its purpose is to "reaffirm the [CFTC's] authority to enforce prohibited activity on prediction markets." Likewise, the second proposal, the BETS OFF Act, S.

4115, 119th Cong. (2026), prohibits certain event contracts, including event contracts concerning the outcome of war, which assumes they are swaps to begin with. Most of the other proposals relate to specific prohibitions on government officials and insiders.

*Fourth*, Van Dyke's argues that all true swaps share a common "structural feature" that event contracts do not possess. (Mot. 19-21). He insists a swap's payout must track an "objective, non-discretionary mechanism"—an index, a market price, official data—and that Polymarket's reliance on "a consensus of credible reporting" disqualifies these contracts. (Mot. 19-20). Nothing in the text imposes that requirement, and the argument is contradicted by how conventional swaps actually resolve. Credit default swaps, among the most heavily regulated instruments in the derivatives universe, are settled by exactly this kind of collective, interested-party vote: the Credit Derivatives Determinations Committee decides whether a "credit event" has occurred. *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 913 (D.N.M. 2023). If interested-party resolution disqualified an instrument from swap status, the CDS market would fail its own test. Van Dyke's facts undercut him further: Polymarket resolved through its Optimistic Oracle mechanism, which lets any party dispute a proposed resolution by posting a bond, subject to adjudication—a built-in check against manipulation, and a more rigorous process than a great many instruments no one doubts are swaps. Ambiguity at the margins of a fact-based resolution standard is a feature of nearly every contract that turns on real-world facts rather than a ticker price. Congress did not condition "swap" status on eliminating it.

*Fifth*, the sports betting decisions Van Dyke musters do not save his motion. (Mot. 14). To be sure, courts have not been uniform in resolving suits between prediction markets and state gaming authorities, but whatever divergence exists does nothing to advance Van Dyke's position. *Hendrick*, *North American Derivatives Exchange, Inc. v. Nevada*, *Robinhood Derivatives, LLC v. Dreitzer*, *Schuler*, and *QCX* each rest on, among other things, the premise that

a sports game is the "event," while which team wins is merely its "outcome," so that subpart (ii)'s reference to "occurrence, nonoccurrence, or … extent of the occurrence" speaks only to whether the game happened, not how it turned out. *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1033 (D. Nev. 2025). That distinction does not survive its own dictionary. "Event" is standardly defined to include "the outcome, issue, or result of anything," which is why one naturally calls a team's championship win, or a president's election, an "event" even though each is also an outcome. *Johnson*, 2026 WL 1223373, at *4. But even taking those decisions on their own terms, they resolve only whether the outcome of an already-scheduled game is a distinct "event"—a line-drawing problem not presented here. Van Dyke's contracts do not ask who won an already-scheduled game. They ask whether U.S. forces would enter Venezuela, whether Maduro would be removed from power, and whether the President would invoke war powers—whether an event will occur at all, which is the paradigm case subpart (ii) was written to cover under even the narrowest construction any court has adopted.

*Finally*, lenity is no refuge. (Mot. 21). It requires a "grievous ambiguity"—not a close call, not a policy disagreement, but genuine equipoise after exhausting text, structure, history, and purpose. *United States v. DiCristina*, 726 F.3d 92, 97 (2d Cir. 2013); *Chapman v. United States*, 500 U.S. 453, 463 (1991). This case does not require the Court to find the outer edge of "swap," because under the plain text, the Special Rule's own internal logic, and the weight of decided authority, these contracts fall comfortably inside it—and, at minimum, the Indictment's allegation that they do is enough to proceed to trial.

### C. The CEA's Application Here Does Not Offend Due Process

Van Dyke's vagueness claim (Mot. 22-27) fails at the threshold because the statute gives clear notice as applied to his conduct. His argument is simply a repackaged version of his statutory-construction theory: that because some courts disagree about sports-wagering products

the statute is vague everywhere. But breadth is not vagueness, and disagreement at the margins does not disable enforcement at the core. *See United States v. Williams*, 553 U.S. 285, 306-07 (2008). Nor does the existence of interpretive litigation, "[j]udicial disagreements," or "close cases" establish vagueness. *United States v. Shvartsman*, 722 F. Supp. 3d 276, 301 (S.D.N.Y. 2024); *see also Phillips*, 155 F.4th at 132 ("due process is not violated simply because the issue is a matter of first impression" (citations and quotation marks omitted)). If it did, no statute that ever generated disagreement among district courts could be enforced criminally while that disagreement persisted—a rule with no basis in the case law and no logical stopping point. Every court in the supposed "split" he cites agrees that a contract is a swap when its price is "associated with" a "potential financial, economic, or commercial consequence." As described above, the contracts Van Dyke purchased easily meet that standard. No court has ever suggested that a contract tied to whether the United States would capture the leader of a county sitting on one of the world's largest oil reserves falls outside it. Vagueness cannot be conjured from difficult hypotheticals when the application at hand is straightforward.

Nor does Van Dyke's reliance on subpart (iv)'s "commonly known to the trade" language help him. (Mot. 24-25). The Indictment rests on subpart (ii)—an event contract "associated with a potential financial, economic, or commercial consequence"—not on whether prediction-market contracts have separately become "commonly known to the trade" as swaps. A defendant cannot manufacture a constitutional problem by attacking a provision the government does not need to convict and has not invoked. In any event, the CFTC recognized event contracts as subject to the CEA for years before Van Dyke ever opened a Polymarket account. *See In re Blockratize, Inc. d/b/a "Polymarket.com"*, CFTC Dkt. No. 22-09 (Jan. 3, 2022); *Concept Release on the Appropriate Regulatory Treatment of Event Contracts*, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008). And because event contracts have existed in regulated form for decades, Van Dyke is not

attacking any statutory uncertainty at all—only the particular platform he chose or the specific subject matter of his trades, neither of which provides a basis for a void-for-vagueness challenge.

Van Dyke's citations to agency statements fare no better. (Mot. 25-26). That the CFTC and SEC solicited public comment on drawing a cleaner jurisdictional line between swaps and security-based swaps does not imply that the statutory core is vague. *See* https://www.federalregister.gov/documents/2026/06/24/2026-12743/joint-request-for-comment-on-further-definition-of-swap-and-security-based-swap-and-on-alternative (last accessed August 12, 2026). Regulators routinely seek comment to refine boundaries at the margins of settled authority; doing so is not an admission that the authority itself is uncertain. Nothing in those requests suggests that event contracts of the kind Van Dyke traded sat outside the CEA's reach in December 2025.

Van Dyke's "arbitrary enforcement" argument collapses for similar reasons. He claims that prosecuting him "while leaving the vast majority of similar conduct untouched" itself violates due process. (Mot. 26). But the void-for-vagueness doctrine polices statutes that give law enforcement no standards to apply, not prosecutorial decisions made under a statute that does supply standards. *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972), addressed an ordinance with no ascertainable standard at all; it did not hold that any statute under which one defendant is charged before others is therefore unconstitutional. And the CEA's scienter requirement makes his claim even weaker: willfulness cabins discretion by requiring the Government to prove he knew his conduct was wrongful. Because that is a necessary element "in an insider trading prosecution … the Government does not have virtually unlimited or unfettered discretion to penalize insider trading." *Shvartsman*, 722 F. Supp. 3d at 301 (internal quotation marks and citation omitted). Indeed, *Morales* itself distinguished ordinances lacking any scienter requirement from statutes,

like those at issue here, that "regulate[] business behavior and contain[] a scienter requirement." *City of Chicago v. Morales*, 527 U.S. 41, 55 (1999).[3]

All of this underscores why his vagueness challenge is not only wrong but premature. The Indictment alleges that Van Dyke acted willfully, and that allegation, if proven, forecloses his claim. A vagueness challenge turns on whether the statute, "standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016). That inquiry is fact-bound, and courts in this District "await conclusion of the trial" before resolving it. *United States v. Milani*, 739 F. Supp. 216, 218 (S.D.N.Y. 1990); *see also United States v. Phillips*, 690 F. Supp. 3d 268, 292 (S.D.N.Y. 2023) (denying a challenges to the CEA and wire fraud statutes under both the vagueness and novel construction doctrines as premature). Where the Government must prove willfulness, courts have repeatedly held that "a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982); *see also United States v. Little*, 2017 WL 1743837, at *7 (S.D.N.Y. May 3, 2017) (the "scienter requirement undercuts any due process void for vagueness challenge"); *Shvartsman*, 722 F. Supp. 3d at 301 (same). A defendant who must be proved to have known what he was doing cannot simultaneously claim he had no notice of what he was doing. That remains the case here, and the motion should therefore be denied.[4]

---

[3] Van Dyke also suggests that this prosecution was brought in response to public complaints, and claims this "evidences" arbitrary enforcement. (Mot. 27). Needless to say, that is categorically false. This prosecution was brought because, following an investigation, evidence demonstrated that Van Dyke used nonpublic, classified government information to turn a personal profit, and a grand jury returned an Indictment.

[4] Van Dyke also argues that subpart (iv)'s definition of "swap" to include instruments "commonly

**V. Section 6(c)(1) and Rule 180.1 Are Not Unconstitutional**

Van Dyke argues that because Section 6(c)(1), codified at 7 U.S.C. § 9(1), never uses the phrase "insider trading," and because the CFTC's adopting release for Rule 180.1 says only that the agency "modeled" the rule on SEC Rule 10b-5 rather than writing its own freestanding definition of fraud, any court that reads Section 6(c)(1) to reach insider trading has stopped interpreting a statute and started writing one. (Mot. 26-29). That argument does not survive its own premise. Congress did not hand courts a blank page and ask them to fill it in. It transplanted, word for word, language with an eighty-year pedigree—and the settled meaning of that language came with it, whether or not the transplanted text happens to say "insider trading" out loud.

Congress prohibited "any manipulative or deceptive device or contrivance" in violation of CFTC rules. 7 U.S.C. § 9(1). That is "an exact transplant from section 10(b)-5 of the Securities Exchange Act." *United States v. Clark*, 2025 WL 801358, at *3 (5th Cir. Mar. 13, 2025); *see also CFTC v. Gorman*, 587 F. Supp. 3d 24, 40 (S.D.N.Y. 2022) (Section 6(c)(1) and Rule 180.1 are "carbon copies" of Section 10(b) and Rule 10b-5). "When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). By 2008, that soil already contained a settled understanding: trading on material nonpublic information in breach of a duty of trust and confidence "involves feigning fidelity to the source of information" and is therefore a "deceptive device" within the meaning of the borrowed language. *United States v. O'Hagan*, 521 U.S. 642, 655 (1997). Congress is "presumed to be aware of" that judicial interpretation and to adopt it when it re-enacts the same language elsewhere. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 64 (2d Cir. 2020)

---

known to the trade as a swap," 7 U.S.C. § 1a(47)(A)(iv), cannot be applied here without violating the Ex Post Facto Clause, because the category of "commonly known" instruments can expand over time and might be judged only after the fact. (Mot. 31-32). The Court need not reach that argument, because the Government's theory does not depend on subpart (iv).

(quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)). That's the case with the CEA: in using the language of Section 10(b) and Rule 10b-5, Congress intended to import the settled meaning of the terms in those laws and prohibit insider trading. *See Clark*, 2025 WL 801358, at *3 (the "operative language in 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 is an exact transplant from section 10(b)-5" and "[w]hen a statutory term is obviously transplanted … it brings the old soil with it," which is the language prohibits insider trading); *CFTC v. Oystacher*, 203 F. Supp. 3d 934, 949-50 (N.D. Ill. 2016) (Rule 180.1 is "nearly identical" to Section 10(b) and Rule 10b-5, and "case law interpreting Section 10(b) and Rule 10b-5 remains instructive" because "neither the operative language, nor its context, gives any clear indication to contravene" the presumption that Congress adopts the settled meaning of borrowed terms). That is not a judicial rewrite of the statute; it is the straightforward application of the words Congress enacted, informed by the settled meaning Congress deliberately imported.

The legislative history removes any doubt about what Congress meant when it adopted Section 6(c)(1). In introducing the amendment that became Section 6(c)(1), Senator Cantwell explained that the legislation "tracks the Securities [Exchange] Act" because "case law is clear that when the Congress uses language identical to that used in another statute, Congress intended for the courts and the Commission to interpret the new authority in a similar manner, and Congress has made sure that its intention is clear." 156 Cong. Rec. S3333-01, S3348; *see also CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1009 n.3 (N.D. Ill. 2015) (citing the statement of Senator Cantwell). The CFTC echoed that understanding when it promulgated Rule 180.1, stating that it intended "to model" the rule on Rule 10b-5 and would be "guided, but not controlled," by the substantial body of judicial precedent applying the identical language. *Prohibition on the Employment, or Attempted Employment, of Manipulative and Deceptive Devices and Prohibition on Price Manipulation*, 76 Fed. Reg. 41,398, 41,399 & n.11 (CFTC July 14, 2011). Congress thus

did not ask courts to invent a new fraud concept; it deliberately copied language with an eighty-year judicial pedigree and incorporated the meaning that language already carried.

Congress also knew precisely what problem it was enacting Section 6(c)(1) to address. In testimony preceding Dodd-Frank, CFTC Chairman Gary Gensler explained that the then-existing CEA would not have reached even the most archetypal insider-trading scheme—trading commodity futures using stolen, nonpublic government information, as depicted in *Trading Places*—and urged Congress to enact what became the "Eddie Murphy Rule." *Hearing to Review Implementation of Changes to the CEA Contained in the 2008 Farm Bill*, No. 111-42 (Mar. 3, 2010). Congress responded by adding the insider-trading and misappropriation provisions at issue here as part of the same 2010 legislation that adopted Section 6(c)(1). Pub. L. No. 111-203, § 746, 124 Stat. 1376, 1740 (2010). And Congress left no ambiguity about the consequences: the CEA expressly provides that such violations may carry criminal penalties. 7 U.S.C. § 13a(5). Van Dyke's conduct is not some novel extension of statutory text; it is the very scenario Congress identified, debated, and forbade—using nonpublic government information for personal gain in a commodities market. And in the fifteen years since Congress enacted Section 6(c) and Rule 180.1, the CFTC has repeatedly enforced those anti-fraud provisions in commodity insider-trading cases, confirming that market participants had ample notice of the statute's reach.[5] Those civil matters underscore that this is settled terrain, not an unforeseen expansion.

[5] *See, e.g.*, *In re Motazedi*, CFTC No. 16-02, at 3-4, 2015 WL 7880066 (Dec. 2, 2015); *In re Ruggles*, CFTC No. 16-34, 2016 WL 5682206 (Sept. 29, 2016); *In re Classic Energy LLC*, CFTC No. 19-50, 2019 WL 4915492 (Sept. 30, 2019); *In re Schultz*, CFTC No. 20-76, 2020 WL 5876731 (Sept. 30, 2020); *In re Webb*, CFTC No. 21-09, 2021 WL 2534960 (June 14, 2021); *In re Tippett*, CFTC No. 23-03, 2022 WL 17090923 (Nov. 16, 2022); *In re Freepoint Commodities LLC*, CFTC No. 24-02, 2023 WL 8785812 (Dec. 14, 2023); *In re Trafigura Trading*, CFTC No. 24-08, 2024 WL 3225331 (June 17, 2024).

Van Dyke's remaining arguments do not change that conclusion. The fact that neither Section 10(b) nor Rule 10b-5 expressly uses the phrase "insider trading" has never prevented courts from applying their fraud prohibitions to insider-trading schemes. *See, e.g.*, *Salman v. United States*, 580 U.S. 39, 51 (2016). Nor is Rule 180.1 defective because the CFTC "modeled" it on Rule 10b-5 rather than drafting a new taxonomy of fraud. (Mot. 27-28). Congress directed the agency to implement a broad catch-all precisely because fraud evolves faster than any legislature can codify. Looking to the body of law that has already given identical language settled meaning is not evasion, it is fidelity to the text Congress copied. Van Dyke's theory would forbid courts from giving Congress's chosen language the settled meaning it carried when Congress adopted it—an approach that would destabilize not only this prosecution, but decades of securities-fraud jurisprudence built on the same interpretive foundation.

Van Dyke's reliance on *Loper Bright* misunderstands both what that decision held and what the government asks this Court to do. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), abolished *Chevron* deference; it did not abolish an agency's interpretation as a source of persuasive authority. *Id.* at 386 ("interpretations of those responsible for implementing particular statutes … constitute a body of experience and informed judgment to which courts … may properly resort for guidance"). Indeed, "an agency's interpretation of a statute," while not binding, "may be especially informative to the extent it rests on factual premises within the agency's expertise." *Id.* at 402. Consistent with that framework, the CFTC has long explained that it modeled Rule 180.1 on Rule 10b-5 and that Rule 180.1 was intended to reach insider trading, and it has not deviated from that explanation for more than a decade. That sustained, expert reasoning warrants respect under *Loper Bright* even if it does not control the Court's analysis. But the Court need not resolve any deference question at all, because the government's reading does not depend on it. The result here follows from the text of Section 6(c)(1) and the judicial gloss it imported the moment

Congress borrowed Section 10(b)'s language. Whatever persuasive weight Rule 180.1's adopting release carries, this Court would reach the identical conclusion without it.

## VI. The Indictment Properly Alleges Wire Fraud

The defendant next argues that the wire-fraud charge should be dismissed because, he claims, information about classified plans for a military and law-enforcement operation to capture a foreign head of state is not "property" of the United States. This argument, too, should be rejected.[6] For nearly half a century, the Second Circuit has held that confidential operational information used in law-enforcement activities is a protected property interest of the United States. *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979). The decision on which the defendant relies—*Blaszczak*—reaffirmed that holding and drew a clear distinction between regulatory information and operational information that resolves this case. Regulatory information about Medicare reimbursement rates is not "property," the Second Circuit explained, because the agency announces it publicly in due course and premature disclosure costs it nothing operationally. *United States v. Blaszczak*, 56 F.4th 230, 244 (2d Cir. 2022). But information whose theft "would interfere with those operations, by allowing the targets of investigations to, for example, better conceal their criminal conduct, hide their contraband, or flee from arrest, as well as by imperiling the well-being of the undercover agents and confidential informants used in those operations," that information has "inherent value," and it is protected. *Id.* That is this case. If the DEA files identifying informants in *Girard* have inherent operational value because their disclosure permits a target to flee and puts agents at risk, then the operational plan for a military mission to capture a foreign

[6] As described above, on December 8, 2025, the defendant signed a Western Hemisphere Operations NDA under the penalty of perjury. Among other acknowledgments, in signing that NDA, the defendant agreed that "all classified or sensitive information acquired by [him] in connection with [his] assignment, employment or association with USASOC operations within the Western Hemisphere remains the property of the Government of the United States of America." (Ind. ¶ 4.)

head of state has inherent operational value for precisely the same reasons, multiplied. The target flees; the mission fails; the service members executing it are endangered. The defendant, while leaning heavily on *Blaszczak*, fails to acknowledge, let alone engage with, the Second Circuit precedent that controls the outcome here.

For those reasons and others, the defendant's arguments fail. First, the Indictment tracks the statute and alleges the elements, which is all Rule 7 requires; the defendant's real complaint is with the evidence, and evidence is for trial. Second, the confidential military operational information is property under *Girard*, *Blaszczak*, and a line of decisions from several circuits holding that classified, military, and law-enforcement information is government property. Third, and independently, the money the defendant took from his Polymarket counterparties is "money or property"; the wire fraud statute has never required that the party deceived be the party whose money is obtained. Finally, the defendant's arguments for dismissal based on the pleading of specific intent and the rule of lenity are meritless. The motion should be denied.

**A. The Wire Fraud Count, as Pleaded, is Legally Sufficient**

The Indictment's wire-fraud charge easily satisfies the minimal requirements necessary to survive a motion to dismiss. An indictment is sufficient if it "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998). It suffices that the indictment "track[s] the language of the statute charged" and "state[s] the time and place (in approximate terms) of the alleged crime." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992).

The Indictment does all of that and more. The statutory allegation in Count Four, along with the Indictment's speaking allegations, identify the scheme, the confidential information, the defendant's duty of nondisclosure, the "property," the wires, and the defendant's intent. The

defendant's answer is that this allegation is a "rote recitation." (Mot. 35). But tracking the statute is not a defect in an indictment; it is the standard the Indictment is measured against.

Van Dyke's motion asks the Court to make a factual determination not appropriate at the motion-to-dismiss stage. His argument relies on speculative assertions about facts, based on improper inferences from the Indictment and incorrect conclusions about the nature of the charge, to claim that facts do not amount to "property." The defendant, for instance, makes a variety of unfounded assertions about the confidential information at issue, claiming, at different points, the military information "had no commercial value in the government's hands," (Mot. 44), which is an assertion that appears nowhere in the Indictment. "At the indictment stage, [courts] do not evaluate the adequacy of the facts to satisfy the elements of the charged offense." *Wedd*, 993 F.3d at 121. "That is something" for "after trial." *Id.* The Second Circuit has reversed dismissals precisely where a district court "drew inferences as to the proof that would be introduced by the government at trial." *Alfonso*, 143 F.3d at 777. And the Indictment "cannot fairly be said" to be "a full proffer of the evidence" the Government will present; no rule requires the grand jury to "reveal its complete case" in advance. *United States v. Sampson*, 898 F.3d 270, 280-82 (2d Cir. 2018).

Whether particular information constitutes property is a mixed question of law and fact, *see, e.g., United States v. Chastain*, 145 F.4th 282, 298 (2d Cir. 2025)—the paradigm of a question "well suited for jury determination." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015). The Court may resolve the pure legal question the defendant presses: whether confidential military operational information can be property. As shown below, it can. Beyond that, the motion asks for a verdict, not a ruling.

### B. Confidential Military and Law Enforcement Operational Information is Property

In addition to improperly seeking what amounts to summary judgment, Van Dyke's motion fails to acknowledge binding Circuit precedent establishing that confidential military and law-enforcement operational information is "property."

The wire-fraud statute requires the government to show that a fraudulent scheme was designed to obtain "money or property." *Kelly v. United States*, 140 S. Ct. 1565, 1573 (2020) (citing *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). Such property interests include, for the government, its interest in protecting the confidentiality of military and law-enforcement information. The Second Circuit said so in *Girard*, 601 F.2d 69 (2d Cir. 1979), holding that the government has a property interest in the confidentiality of its own operational records, and it said so again in *Blaszczak*, 56 F.4th 230 (2d Cir. 2022), which reaffirmed *Girard*'s core holding. Every other circuit to consider the question—reviewing everything from classified defense records and reconnaissance manuals to grand jury minutes and FBI investigative files—has agreed.

Start with *Girard*, which is binding here. A former DEA agent and his confederate sold information extracted from DEA files—the identities of confidential informants and the status of ongoing investigations—to a drug trafficker. 601 F.2d at 70. The defendants argued that the federal larceny statute "covers only tangible property or documents and therefore is not violated by the sale of information." *Id.* The Second Circuit rejected that argument and held "that the Government has a property interest in certain of its private records which it may protect by statute as a thing of value." *Id.* at 71. *Girard* also explains what makes information of this kind valuable, and the answer has nothing to do with commercial value, as the defendant contends. The Second Circuit affirmed the reasoning of the district court, which it adopted in full. *Id.* at 70 ("We agree with the District Judge's decision and can do little more than harrow the ground he has already plowed.").

That opinion described the DEA information in terms that could have been written for this Indictment: the information "had a value only so long as it remained in the Government's exclusive possession"—"incalculable value . . . gained by the expenditure of countless man hours and other resources, capable of saving lives or, if misappropriated, severely jeopardizing them." *United States v. Lambert*, 446 F. Supp. 890, 895 (D. Conn. 1978). It was property because its value existed only in secrecy, and disclosure would destroy that worth and create real operational risk.

*Blaszczak* did not simply leave *Girard* untouched, it affirmed *Girard*'s reasoning, and that reasoning provides the governing principle that decides this case. The *Blaszczak* majority addressed *Girard* directly, explaining that its decision was fully consistent with that precedent. 56 F.4th at 244. It then articulated the governing principle for confidential government information: DEA informant records, it said, have "inherent value" because their "theft would interfere with . . . operations . . . by allowing the targets of investigations to, for example, better conceal their criminal conduct, hide their contraband, or flee from arrest, as well as by imperiling the well-being of the undercover agents . . . in those operations." *Id.* And the court drew a categorical line: such inherently valuable operational information "is [not] comparable to the regulatory information at issue" in *Blaszczak*. *Id.* By contrast, CMS reimbursement information was not property because, even if prematurely disclosed, it "remain[ed] within the exclusive control of CMS." *Id.* That continuing control meant CMS could still adopt, abandon, delay, or accelerate its planned regulation. *Id.* In short, the disclosure of regulatory information "has no direct impact on the government's fisc" and costs CMS nothing it could not recover because CMS was going to publish the information anyway and retained every option it had before.

The information at issue here aligns with the operational information in *Girard*, not the regulatory data in *Blaszczak*. If information about a classified operational plan to capture Maduro reaches traders on a public prediction market, the government's exclusive control is gone for good;

it cannot be restored by waiting, republishing, or changing course. If a capture operation is prematurely disclosed, the target can flee, fortify, or set an ambush, and the military cannot simply carry out the plan as CMS could with its regulation. Nor can it revise or discard the plan at low cost: CMS could change a rate and move forward, but the military must build the operation anew, and opportunities to capture a head of state do not recur on demand. And there is no announcement to postpone or accelerate, because this information was never destined for publication—it is classified precisely to protect national security and future operations, and disclosure defeats the plan outright. CMS's information survived being leaked or misappropriated; classified information about a military operation cannot withstand disclosure in any form. The Indictment makes that clear, in language that tracks *Blaszczak*: it is kept confidential "to protect national security interests and future operations." Ind. ¶ 6.

Other courts have applied these principles in cases involving information of the same kind Van Dyke misappropriated. In *United States v. Morison*, a naval intelligence analyst was convicted of stealing classified satellite photographs of a Soviet aircraft carrier under construction and intelligence reports on an explosion at a Soviet naval base, and selling both to a foreign defense publication. 604 F. Supp. 655, 658 (D. Md. 1985). The district court held that § 641 applies to the theft of classified national-security information because the statute reaches "'intangibles' such as information," and because classification itself reflects the government's protected interest in secrecy. *Id*. at 664.[7] The Fourth Circuit affirmed, describing the stolen satellite photographs and intelligence reports as "specific, identifiable tangible property" taken "illegally and by

[7] Section 641 and § 1343 employ different terms—"thing of value" and "property," respectively—but courts treat the two as substantially coextensive in this context, and *Blaszczak* itself analyzed both statutes together, holding that the CMS information was neither "property" under § 1343 nor a "thing of value" under § 641 for the identical reasons. 56 F.4th at 243.

stealth," and rejected any suggestion that the government's property turned on whether the defendant was commercially exploiting the information. *United States v. Morison*, 844 F.2d 1057, 1077 (4th Cir. 1988). The Fourth Circuit said the same in *United States v. Fowler*, 932 F.2d 306 (4th Cir. 1991), where the defendant passed classified Department of Defense planning, budgeting, and procurement documents to a private defense contractor. Sustaining convictions under § 641 and § 1341, the court rejected the argument—repeated by Van Dyke—that information cannot be "property," citing *Carpenter v. United States*, 484 U.S. 19 (1987). 932 F.2d at 310.

Similarly, law-enforcement and investigative information has repeatedly been deemed property. The Sixth Circuit sustained a conviction for the sale of carbon-copy grand jury transcripts to the targets of the investigation they described, holding that the defendant was "undoubtedly guilty of selling something that the United States rightfully desired to keep in its exclusive possession, a 'thing of value.'" *United States v. Jeter*, 775 F.2d 670, 682 (6th Cir. 1985). The Ninth Circuit approved an instruction that grand jury transcripts "are the property of the United States and remain its property alone unless and until the release of said information is ordered by a court order." *United States v. Friedman*, 445 F.2d 1076, 1087 (9th Cir. 1971). The Third Circuit sustained convictions for the theft of FBI investigative files that conspirators copied and sold to the subject of the investigation, rejecting the defendant's argument that he was not properly convicted under § 641 because "the government was not deprived of the use of the information." *United States v. DiGilio*, 538 F.2d 972, 978 (3d Cir. 1976). And in this District, courts have repeatedly held that the government's confidential information about military operations, classified materials, or ongoing investigations is its property. *See, e.g.*, *United States v. Rodrigues*, No. 22-CR-00391 (PMH), 2024 WL 113744, at *4 (S.D.N.Y. Jan. 10, 2024) (NLRB records were "inherently valuable," as in *Girard*, and therefore distinguishable from the "regulatory information" at issue in *Blaszczak*); *United States v. Schulte*, 436 F. Supp. 3d 747, 754 (S.D.N.Y.

2020) (sustaining the conviction of a CIA employee who stole information and transmitted it to WikiLeaks); *United States v. Jones*, 677 F. Supp. 238, 240 (S.D.N.Y. 1988) ("Under Second Circuit precedent, it is clear that information about an ongoing criminal investigation, despite its intangible nature, is a thing of value under Section 641.").

The defendant's reliance on *Cleveland*, *Kelly*, *Blaszczak*, and *Chastain* does not alter the analysis. (Mot. at 36-44). *Cleveland*, *Kelly*, and *Blaszczak* addressed whether the government had a *regulatory* or *commercial* interest in the information or authority at issue. *Cleveland* held that a licensing regime is an exercise of sovereign power, not a proprietary interest; *Kelly* held that the allocation of bridge lanes is regulatory and that incidental costs to government employees cannot be transmuted into "property" for wire-fraud purposes; and *Blaszczak* held that CMS's predecisional regulatory information was not property because premature disclosure cost the agency nothing, affected no operations, and left CMS with every option it had before. None involved law-enforcement or military operational information, and none purported to displace the longstanding rule in *Girard* and other precedents that when the government seeks to keep confidential the operational information necessary to conduct law-enforcement or military missions, it acts in its capacity as property holder.[8] And *Chastain*—a private-sector insider-information case—considered whether confidential information about a business decision

[8] For the same reason, the defendant's repeated references to the Government's brief on remand in *Blaszczak* fall flat. As the defendant notes, the Government stated in that brief that confidential government information "typically must have economic value in the hands of the relevant government entity to constitute 'property' for purposes of 18 U.S.C. §[] 1343." Brief on Remand for the United States of America at 7, *United States v. Blaszczak*, No. 18-2811 (2d Cir. April 2, 2021) (ECF No. 453). But the Government's concession about what is "typically" required in cases involving confidential government information was specifically in reference to the regulatory information at issue in *Blaszczak*. *See id.* at 8 (confessing error with respect to "the confidential information at issue in this case"). As the Second Circuit subsequently explained, the "regulatory information at issue" in *Blaszczak* was not "comparable" to "inherently valuable law enforcement information." 56 F.4th at 244.

was "commercially valuable" and therefore property; it did not address, and does not constrain, the rule that operational military and law-enforcement information is property because its value depends entirely on secrecy and operational integrity, and not the possibility of commercially exploiting it.

The defendant's position, carried to its end, would produce a result no court has ever endorsed and Congress could not have intended. On his view, classified military and law-enforcement information would be categorically incapable of qualifying as "property" for fraud purposes. The consequences would be perverse: a defendant who steals classified operational plans and hoards them, or hands them out for free, would be a felon under § 641 and the Espionage Act, yet a defendant who does something far more dangerous—monetizing the theft by trading on the government's secrets for profit on a public platform—would escape wire-fraud liability altogether. Nothing in *Cleveland*, *Kelly*, or *Blaszczak* suggests that Congress designed the statutes to operate in that fashion, or that it intended to limit the government's property rights only to information it can sell. And adopting the defendant's rule would unsettle *Girard* and call into question the decisions that reaffirm it. The Court should decline to adopt a rule that produces that anomaly.

### C. The Money Van Dyke Obtained From Counterparties is "Money" or "Property"

The Indictment also alleges that the defendant schemed to obtain "money or property" in another way. Van Dyke surreptitiously misappropriated classified military information in breach of an express duty of confidentiality and used that stolen information to secure an illicit informational advantage; he then exploited that advantage to induce his Polymarket counterparties—unaware they were trading against classified operational plans—to take the losing side of wagers he already knew he would win. In so doing, he obtained their "money or property."

That is precisely the type of scheme to defraud that *O'Hagan* and *Carpenter* describe. Misappropriating confidential information in breach of a duty of trust and deploying it in trading is a scheme to defraud. As the Supreme Court explained in *Carpenter*, the defendant engaged in "a scheme to defraud . . . within the meaning of the mail and wire fraud statutes" by taking his employer's confidential business information. 484 U.S. at 25; *see also United States v. O'Hagan*, 521 U.S. 642, 652-54 (1997) (explaining that a "fiduciary who pretends loyalty to the principal while secretly converting the principal's information for personal gain … defrauds the principal" of "the exclusive use of that information"). To be sure, in *Carpenter* the Government's theory was solely that the misappropriated information was the "property" that was the object of the scheme. *Id.* But nothing in *Carpenter* limits such a fraudulent scheme to instances in which the information itself is the obtained property. Rather, *Carpenter* and *O'Hagan* establish that the misappropriation of confidential information for personal financial benefit is a scheme to defraud, provided that the object of the scheme counts as "money or property." Here, Van Dyke did exactly what those cases condemn. He surreptitiously misappropriated classified operational information from the military, depriving the government of its exclusive control over that information; he then exploited that stolen informational edge to secure guaranteed profit from Polymarket counterparties he wagered against. By doing so, he obtained their money by means of deception. And because the Indictment expressly alleges that Van Dyke used misappropriated information to "obtain money" from trading counterparties (Indictment ¶ 24), that allegation satisfies the "money or property" requirement entirely apart from the property analysis governing the classified information itself.

The defendant may argue that the party deceived must be the same party whose money he obtained. The Second Circuit has squarely rejected any "convergence" requirement. In *United States v. Greenberg*, 835 F.3d 295, 306-07 (2d Cir. 2016), the court held that nothing in the text of § 1343 "suggests that the scheme to defraud must involve the deception of the same person or

entity whose money or property is the object of the scheme," and that "wire fraud does not require convergence between the parties intended to be deceived and those whose property is sought in a fraudulent scheme." District courts in this Circuit have applied *Greenberg* repeatedly. *See United States v. Weigand*, 482 F. Supp. 3d 224, 237 (S.D.N.Y. 2020); *United States v. Martinez*, No. 22 Cr. 251 (LJL), 2023 WL 2118081, at 3 (S.D.N.Y. Feb. 17, 2023); *Azima v. Dechert LLP*, No. 22 Civ. 8728 (PGG) (JW), 2024 WL 4665106, at 28-29 (S.D.N.Y. Sept. 26, 2024).[9] So have the other circuits, essentially uniformly. *See United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998); *United States v. Porat*, 76 F.4th 213, 222-23 (3d Cir. 2023); *United States v. McMillan*, 600 F.3d 434, 449-50 (5th Cir. 2010); *United States v. Seidling*, 737 F.3d 1155, 1160-61 (7th Cir. 2013); *United States v. Blumeyer*, 114 F.3d 758, 767-68 (8th Cir. 1997); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995). The pattern in those cases is the pattern here: deceive one party—often a regulator, employer, or gatekeeper—and use that deception to obtain money from another.

*Kelly* does not disturb those precedents. There, the Supreme Court held only that property must be "an object of the fraud" rather than "an incidental byproduct." 590 U.S. at 402. It said nothing about whose property must be obtained. The Second Circuit has read *Kelly* to ask whether "the loss of property . . . was at the heart of [the defendant's] scheme," *United States v. Gatto*, 986 F.3d 104, 116 (2d Cir. 2021), which is precisely the case here, where Van Dyke engaged in misappropriation for the single purpose of obtaining money through trading. And the fact that the "money or property" was obtained from a party other than the defrauded victim does not make

[9] The defendant my point to dictum in *United States v. Evans*, 844 F.2d 36, 39 (2d Cir. 1988), suggesting that a fraud's misrepresentations must run to the party deceived of money, *Evans* predates *Greenberg* by nearly three decades, was dictum even on its own facts, and cannot be reconciled with the unbroken line of post-*Evans* convergence cases cited above.

property "incidental" or the wire fraud statute boundless. That the money must be obtained "by means of" the fraudulent conduct, *see Loughrin v. United States*, 573 U.S. 351, 362-63 (2014), requires that the obtaining of money naturally flow from the fraud—as it does here, where the misappropriation directly enabled the defendant's trading on nonpublic information—and not be separated from the scheme by an attenuating, independent transaction, *see United States v. Berroa*, 856 F.3d 141, 156-57 (1st Cir. 2017). Van Dyke's scheme presents no such gap: the obtaining money was not incidental or an attenuated action; it was the point. *See United States v. Ramsey*, 2021 WL 4244284, at *7 (E.D. Pa. Sept. 17, 2021) (object of scheme was "both property in the form of the proprietary information and money in the form of profits from sales that would not have taken place but for" the misappropriation). In short, he "had money in mind." *Kousisis v. United States*, 605 U.S. 114, 133 (2025).

Nor are *Cleveland* or *Blaszczak* inconsistent. Both addressed a different question, whether an intangible interest held by the government—state licenses in *Cleveland* and CMS's regulatory information in *Blaszczak*—can itself be "property," and said nothing about whether a defendant who steals confidential information and immediately converts it into trading profit at another party's expense has obtained "money or property" from that party.[10]

[10] The wire-fraud counts in *Blaszczak* alleged that the defendants "schemed to defraud CMS of confidential information" and did not otherwise allege that the object of the scheme was to obtain any other form of money or property, so the question of whether trading profits can be the money or property obtained via misappropriation was not presented in that case. *United States v. Blaszczak*, Superseding Indictment, 17 Cr. 357, Dkt. 137, ¶¶ 86, 92, 98 (Mar. 5, 2018). The same can be said about the government's brief in *Blaszczak*, which neither addressed whether confidential military information was the government's property, nor considered whether the property element is satisfied where money is obtained from a counterparty to a trade.

**D. The Indictment Adequately Pleads Specific Intent**

The defendant next argues that the Indictment fails to plead specific intent. (Mot. at 44). He is wrong in several respects. First, because the Indictment "track[s] the language of the statute charged," *Stavroulakis*, 952 F.2d at 693, including by alleging that the defendant "knowingly . . . devised" and "intend[ed] to devise a scheme and artifice to defraud" to obtain money and property, and therefore it sufficiently alleges that the defendant had specific intent to defraud. Second, the defendant misstates the law as to what is required to be proven for specific intent, relying on "intent to harm" language in *United States v. Parce*, 789 F.3d 83, 121 (2d Cir. 2015), that has since been abrogated by *Kousisis*, which held that a defendant need not "seek[] to leave the victim economically worse off." 605 U.S. at 124. Third, to the extent the defendant's argument is simply a quarrel with the use of the phrase "material nonpublic information" instead of "confidential information" or "property" in the to wit clause, *Carpenter*, *O'Hagan*, and a legion of other cases prove the phrases are used interchangeably. And in any event, the fact that the defendant knows enough to nitpick the language of the to wit clause proves he has sufficient notice of the charges against him to satisfy the requirement of Rule 7.

**E. The Rule of Lenity and Due Process Do Not Require Dismissal**

Finally, the rule of lenity does not support Van Dyke's construction of "property" to exclude the information at issue in this case, despite his protestations to the contrary. *See* Mot. at 45-46. The rule of lenity is tool of last resort, "reserved for cases where, after seizing everything from which aid can be derived, the Court is left with an ambiguous statute." *DiPierre v. United States*, 564 U.S. 70, 88 (2011). It is not a general thumb on the scale in favor of defendants, and the "mere possibility of articulating a narrower construction . . . does not by itself make the rule of lenity applicable." *Smith v. United States*, 508 U.S. 233, 239 (1993). Here, there is no "grievous ambiguity" that warrants applying the rule. *Maracich v. Spears*, 570 U.S. 48, 76 (2013). Rather, it

appears the defendant missed the binding precedent that establishes the information at issue is property, or for some unknown reason chose to ignore it. For the reasons discussed above, the conditions favoring application of the rule of lenity simply do not exist here.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny Van Dyke's motion in its entirety.

Dated: New York, New York
August 19, 2026

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney

By: /s/
Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, New York 10278
Telephone: (212) 637-1247 / 6612 / 2314

**CERTIFICATION**

The undersigned hereby certifies that the Memorandum of Law in Opposition to Defendant Gannon Van Dyke's motion to dismiss the indictment complies with the Court's July 31, 2026, Order authorizing oversized briefs. The word count is 14,376 words.

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney

By: ________________________________
Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, New York 10278
Telephone: (212) 637-1247 / 6612 / 2314