# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>GANNON KEN VAN DYKE,<br>Defendant. | No. 1:26-cr-156 (MMG) |

**BRIEF OF *AMICUS CURIAE***
**U.S. COMMODITY FUTURES TRADING COMMISSION**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS (COUNTS ONE–THREE)**

## TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE AND INTRODUCTION ........ 1

BACKGROUND ........ 2

ARGUMENT ........ 6

I. The event contracts that Van Dyke traded are swaps ........ 6

A. The CEA's "swap" definition encompasses Van Dyke's event contracts ........ 6

B. Van Dyke's legislative purpose arguments fail ........ 11

C. The settlement criteria and mechanics of the at-issue event contracts are consistent with undisputedly CEA-jurisdictional derivatives ........ 15

II. Van Dyke had fair notice that his conduct was illegal ........ 17

A. Van Dyke had fair notice that geopolitical event contracts are swaps ........ 17

B. Van Dyke had fair notice that 7 U.S.C. § 9(1) and Rule 180.1 prohibit insider trading on swaps ........ 19

CONCLUSION ........ 21

<u>Cases</u>

*Alabama Power Co. v. Costle*,
636 F.2d 323 (D.C. Cir. 1979)....7

*Barbosa da Cunha v. Freden*,
175 F.4th 61 (2d Cir. 2026)....12

*Bostock v. Clayton Cnty.*,
590 U.S. 644 (2020)....12

*Bufkin v. Collins*,
604 U.S. 369 (2025)....9

*CFTC v. EOX Holdings L.L.C.*,
405 F. Supp. 3d 697 (S.D. Tex. 2019)....20

*CFTC v. Spagnuolo*,
No. 1:26-cv-4419 (S.D.N.Y.)....5

*CFTC v. Van Dyke*,
No. 1:26-cv-3369 (S.D.N.Y.)....1, 5, 19

*In re Blockratize, Inc. d/b/a Polymarket.com*,
CFTC Dkt No. 22-09 (Jan. 3, 2022)....18

*In re Classic Energy*, CFTC No. 19-50,
2019 WL 4915492 (Sept. 30, 2019)....20

*In re Commodity Exchange, Inc.*,
213 F. Supp. 3d 631 (S.D.N.Y. 2016)....16

*In re Credit Default Swaps Auctions Litig.*,
710 F. Supp. 3d 895 (D.N.M. 2023)....17

*In re Freepoint Commodities LLC*,
CFTC No. 24-02 (Dec. 14, 2023)....20, 21

*In re Motazidi*, CFTC No. 16-02,
2015 WL 7880066 (Dec. 2, 2015)....20

*In re Ruggles*,
CFTC No. 16-34 (Sept. 29, 2016)....20

*In re Schultz*, CFTC No. 20-76,
2020 WL 5876731 (Sept. 30, 2020) ....................20

KalshiEX LLC v. Flaherty,
172 F.4th 220 (3d Cir. 2026) ....................10, 11

*KalshiEX LLC v. Orgel*,
2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ....................7

*KalshiEX v. Schuler*,
2026 WL 657004 (S.D. Ohio Mar. 9, 2026) ....................8

*KalshiEX LLC v. Williams*,
2026 WL 1961872 (S.D.N.Y. July 7, 2026) ....................1

*Leist v. Simplot*,
638 F.3d 283 (2d Cir. 1980) ....................13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ....................10

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006) ....................19, 20

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
456 U.S. 353 (1982) ....................2, 13

*Milner v. Department of Navy*,
562 U.S. 562 (2011) ....................12

*Prime Int'l Trading, Ltd. v. BP P.L.C.*,
937 F.3d 94 (2d Cir. 2019) ....................16

*Smith v. City of Jackson*,
544 U.S. 228 (2005) ....................19

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
531 U.S. 159 (2001) ....................14

*Taggart v. Lorenzen*,
587 U.S. 554 (2019) ....................21

*United States v. Bulloch*,
2024 WL 4654134 (E.D.N.Y. Nov. 1, 2024),
aff'd 165 F.4th 646 (2d Cir. 2026) ....................13

*United States v. Clark*,
2025 WL 801358 (5th Cir. Mar. 13, 2025) ....................21

*United States v. Coonan*,
143 F.4th 119 (2d Cir. 2025) ....................12

*United States v. Lanier*,
520 U.S. 259 (1997) ....................21

*United States v. Minnesota*, __ F. Supp. 3d __,
2026 WL 2150211 (D. Minn. July 27, 2026) ....................7, 8, 9

*United States v. O'Hagan*,
521 U.S. 642 (1997) ....................19

*United States v. New York*,
No. 26-cv-3404 (S.D.N.Y.)....................1

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) ....................3, 6

*United States v. Reed*,
2022 WL 597180 (S.D.N.Y. Feb. 28, 2022) ....................6, 17, 18

*United States v. Wilkinson*,
986 F.3d 740 (7th Cir. 2021) ....................10

<u>Statutes</u>

7 U.S.C. §§ 1–26....................1

7 U.S.C. § 1a(9) ....................10

7 U.S.C. § 1a(19) ....................10

7 U.S.C. § 1a(47)(A)(ii)....................6, 7, 8

7 U.S.C. § 1a(47)(A)(iii)(XVII), (XXI)....................8

7 U.S.C. § 1a(47)(A)(iv) ....................8, 9, 10, 12

7 U.S.C. § 1a(51)(A)....................11

7 U.S.C. § 1a(51)(B)(i) ....................11

7 U.S.C. § 2(a)(1)(A) ....................3

7 U.S.C. § 2(e) ....................4, 11

7 U.S.C. § 5(a) ....................14

7 U.S.C. § 7 ....................4

7 U.S.C. § 7a-2(c)(5)(C) ....................4

7 U.S.C. § 7a-2(c)(5)(C)(i) ....................8, 9, 10, 12, 18

7 U.S.C. § 9(1) ....................19, 20, 21

15 U.S.C. § 8321(b) ....................9, 12

15 U.S.C. §§ 8302(d)(1) ....................9, 12

31 U.S.C. § 5362(1)(E) ....................11

Regulations

17 C.F.R. § 40.2 ....................4

17 C.F.R. § 180.1 ....................19, 20, 21

Concept Release on the Appropriate Regulatory Treatment of Event Contracts,
73 Fed. Reg. 25,669 (request for comments May 7, 2008) ....................3, 4, 8, 9, 12, 14, 18

Data Reporting Requirements for Certain Event Contracts,
91 Fed. Reg. 40,102 (proposed July 1, 2026) ....................5

Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,
77 Fed. Reg. 48,208 (Aug. 13, 2012) ....................10

Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance,
91 Fed. Reg. 37,873 (request for comment June 24, 2026) ....................5

Prediction Markets; Public Interest Determinations,
91 Fed. Reg. 35,806 (proposed June 12, 2026) ....................5

Legislative Materials

156 Cong. Rec. S3348 (daily ed. May 6, 2010) ....................20

S. Res. 708, 119th Congress (2026)....................14, 15

Other Authorities

Alejandro Peña Esclusa, *Venezuela's uneven transition from Maduro*, GIS Reports (Aug. 5, 2026)....................7, 8

Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/....................14

*Cantor Commences Institutional Block Trading in Prediction Markets*, BusinessWire (Aug. 19, 2026), https://www.businesswire.com/news/home/20260819078964/en/Cantor-Commences-Institutional-Block-Trading-in-Prediction-Markets....................13

Catherina Gioino, *This NYC bar just covered everyone's tabs because the Knicks won, and used Kalshi to hedge their bets*, Fortune (June 3, 2026), https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/ ....................14

Marc Jones, *Venezuela's bonds soar after US capture of President Maduro*, Reuters (Jan. 5, 2026)....................7

Vivian Sequera, *et al.*, *Chevron agrees to asset swap in Venezuela to focus on heavy oil projects*, Reuters (Apr. 13, 2026)....................7

CFTC, Contracts & Products, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm ....................3

CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-26.....4

CFTC, Release Number 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026), https://www.cftc.gov/PressRoom/PressReleases/9274-26....................5

CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf....................4

CFTC, *Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions* (July 31, 2026) ....................5

CFTC, *Order Prohibiting the Listing or Trading of Political Event Contracts* (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf ....................18

*CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey*, (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26................................5

## INTEREST OF *AMICUS CURIAE* AND INTRODUCTION

The Commodity Futures Trading Commission (the "CFTC" or "Commission") is the federal agency charged with administering and enforcing the Commodity Exchange Act ("CEA" or "Act"), 7 U.S.C. §§ 1–26. The CEA and the CFTC's rules provide the regulatory framework for the trading of commodity derivatives, including "swaps," in the United States.

This case is about a type of swap called an "event contract." While the Commission has regulated event contracts for decades, those contracts have expanded significantly in recent years. The Commission welcomes financial innovation and increased market participation, yet acknowledges that these contracts can be manipulated or abused by individuals who possess inside information about the underlying event. The Commission's Division of Enforcement has accordingly devoted significant resources to protecting the integrity of event-contract markets. This case is the first federal prosecution for the insider trading of event contracts and therefore will be a significant bellwether not only for the Commission's pending civil enforcement action against Van Dyke,[1] but also for future prosecutions and enforcement actions arising from event contracts.

Defendant Gannon Ken Van Dyke moves to dismiss the CEA charges against him on the ground that event contracts are not "swaps" subject to the CEA.[2] That contention is wrong: Congress's definition of "swap" easily encompasses Van Dyke's event contracts, and that result is

---

[1] *Commodity Futures Trading Commission v. Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.).

[2] There is ongoing litigation around the country about the scope of the Commission's jurisdiction with respect to event contracts. In this District, Judge Torres assumed without deciding that event contracts are swaps but held that the CEA does not preempt New York gambling law. *KalshiEX LLC v. Williams*, 2026 WL 1961872, at *5–9 (S.D.N.Y. July 7, 2026). Meanwhile, the United States and the Commission have moved to preliminarily enjoin New York from enforcing its gambling law as to transactions on CFTC-registered exchanges, which is pending before Judge Schofield. *United States v. New York*, No. 26-cv-3404 (S.D.N.Y.). The issue is percolating in other courts, as well.

amply reinforced by the CEA's broader context. Van Dyke's distortion of the CEA's text, if accepted, would undermine the Commission's jurisdiction over a huge range of event contracts whose notional volume totals into the tens of billions of dollars. And if the Commission lacks regulatory and enforcement oversight in this space, *no federal regulator* has oversight—a gaping hole in a national market that, as this case exemplifies, can be manipulated to create national-security risks.

Van Dyke also maintains that the CEA's anti-fraud provision cannot constitutionally apply to his conduct. Again, that is not so: Van Dyke had clear notice that event contracts relating to geopolitical occurrences are "swaps" based on the CEA's text, the Commission's regulatory actions, and the trading of analogous event contracts on CFTC-registered exchanges. He also had notice that the CEA's anti-fraud provision applies to his conduct, as it mirrors identical language in the Securities Exchange Act that the Supreme Court has construed for decades to prohibit insider trading.

## BACKGROUND

**1.** Congress enacted the CEA almost 100 years ago to provide "a comprehensive regulatory structure to oversee" commodity derivatives markets. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). A derivative is a financial instrument, the value of which depends on (*i.e.*, is derived from) the value of some underlying asset, index, or other measure (*i.e.*, the underlier). In general, market participants use derivatives to hedge risks or speculate on commodity price movements, the result of which is a process of information aggregation and price discovery that further aids the financial, economic, or commercial planning of market participants. The most common derivatives are "futures," "options," and "swaps."

The concept of a "derivative" has never been static. While futures exchanges were first created to foster hedging and speculation on agricultural products, futures markets quickly evolved to encompass other types of underliers, such as physical commodities like metals, oil, and gas, and later, cash-settled futures linked to less tangible measures like interest rates and stock-market indices. Derivatives have also evolved in structure over time. Swaps were introduced to allow counterparties to exchange cash flows based on the value of an underlying commodity, like an interest rate, exchange rate, or even the weather. In the 2010 Dodd-Frank Act, Congress extended the Commission's "exclusive jurisdiction" to encompass "transactions involving swaps," 7 U.S.C. § 2(a)(1)(A), and it "defined 'swap' broadly," *United States v. Phillips*, 155 F.4th 102, 113 (2d Cir. 2025). "The Act also amended the CEA to prohibit not only price manipulation, but also fraudulent behavior related to commodity derivatives and the underlying commodities more broadly." *Id.*

**2.** Event contracts are part of this tradition of innovation. An "event contract" is a CFTC-regulated "derivative contract whose payoff is based on a specified event, occurrence, or value."[3] Typically, they are based on yes-no scenarios and provide for a fixed payout (usually $0 or $1) at the expiration of an event. Here, for example, Van Dyke paid a volume-weighted average price of $0.09 to purchase "YES" shares on President Maduro being out of power by January 31, 2026. Indictment ¶ 11(b). When the contract resolved in his favor, he received a dollar per share, *id.* ¶ 15; had it not resolved in his favor, he would have received nothing.

While event contracts have become increasingly popular with the American public, these contracts are not recent innovations. "Since 1992, Commission-regulated exchanges have listed for trading a variety of commodity futures and options contracts with payout terms based on"

[3] CFTC, *Contracts & Products*, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm.

events "as diverse as regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events." 73 Fed. Reg. 25,669, 25,671 (request for comments May 7, 2008). In 1993, the Commission issued a no-action letter to Iowa Electronic Markets, allowing the facility to list event contracts tied to U.S. and Canadian elections.[4] And by 2005, event contracts encompassed "the accomplishment of certain scientific advances, world population levels, the adoption of particular pieces of legislation, the outcome of corporate product sales, the declaration of war and the length of celebrity marriages." 73 Fed. Reg. at 25,670. Dodd-Frank confirmed the Commission's jurisdiction over event contracts, as it created a "Special Rule" acknowledging that "[e]vent contracts" are "swaps" and granting the Commission authority to prohibit a subset of those event contracts that are contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C).

The Commission exercises its exclusive jurisdiction over event contracts in myriad ways. Event contracts offered to the general public must be traded on a CFTC-registered exchange called a Designated Contract Market ("DCM"). 7 U.S.C. § 2(e). The Commission requires DCMs to complete a registration process with the Commission before listing products for trading, and it monitors their activity to ensure that they comply with the CEA's core principles. *See id.* § 7. It reviews self-certifications that DCMs file before listing a contract for trading. 17 C.F.R. § 40.2. It has signed Memoranda of Understanding with professional sports leagues to promote market integrity in sports-related event contracts.[5] And the Commission has pursued legal actions against

[4] CFTC Staff Letter No. 93-66 (June 18, 1993), https://www.cftc.gov/sites/default//files/idc/groups/public/@lrlettergeneral/documents/letter/93-66.pdf.

[5] CFTC, Release Number 9199-26, *CFTC and MLB Sign Groundbreaking MOU* (Mar. 19, 2026), https://www.cftc.gov/PressRoom/PressReleases/9199-26; CFTC, Release Number 9235-

Van Dyke and others for insider trading and manipulative conduct on prediction markets. *See Van Dyke*, No. 1:26-cv-3369 (S.D.N.Y.); *CFTC v. Spagnuolo*, No. 1:26-cv-4419 (S.D.N.Y.) (Google employee who used material nonpublic information to trade event contracts related to Google's Year in Search list); CFTC, *Order Instituting Proceedings Pursuant to Section 6(c) and (d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions* (July 31, 2026) (imposing penalties on former Congressman George Santos for manipulative activity around State of the Union event contracts).

The Commission is also engaged in significant rulemaking concerning event contracts. On June 12, 2026, it released a proposed rule that would deem certain event contracts presumptively against the public interest—such as contracts that pose national-security risks. *See* 91 Fed. Reg. 35,806 35,834–37 (proposed June 12, 2026). The CFTC and the SEC have issued a joint request for comment on definitional and regulatory clarity with respect to swaps. Joint Request for Comment on Further Definition of "Swap" and "Security-Based Swap" and on Alternative Compliance, 91 Fed. Reg. 37,873 (request for comments June 24, 2026). The CFTC also issued a Notice of Proposed Rulemaking concerning data-reporting requirements for certain event contracts, *see* 91 Fed. Reg. 40,102 (proposed July 1, 2026), and most recently, it announced proposed rulemaking concerning affiliations between CFTC-regulated entities that would address issues concerning perceived and potential conflicts of interest.[6] Van Dyke's baseless argument that

---

26, *CFTC and National Hockey League Sign MOU Related to Integrity in Professional Hockey*, (May 21, 2026), https://www.cftc.gov/PressRoom/PressReleases/9235-26.

[6] CFTC, Release Number 9274-26, *CFTC Seeks Public Comment on Notice of Proposed Rulemaking Concerning Affiliations Among Certain CFTC-Regulated Entities* (July 30, 2026), https://www.cftc.gov/PressRoom/PressReleases/9274-26.

event contracts are not swaps threatens to pull the rug out from under all these regulatory and enforcement efforts.

## ARGUMENT

### I. The event contracts that Van Dyke traded are swaps

Van Dyke moves to dismiss Counts One, Two, and Three on the ground that the geopolitical event contracts he traded are not "swaps" under the CEA. Not so: the plain text of the "swap" definition straightforwardly encompasses event contracts based on geopolitical events, and other pieces of context in the CEA amply reinforce that conclusion. *See United States v. Reed*, 2022 WL 597180, at *3 (S.D.N.Y. Feb. 28, 2022) (denying motion to dismiss where the alleged CEA regulatory classification "literally fell within the statutory definition").

#### A. The CEA's "swap" definition encompasses Van Dyke's event contracts

**1.** Congress "defined 'swap' broadly." *Phillips*, 155 F.4th at 113. Among other things, the term includes "[1] any agreement, contract, or transaction" that "[2] provides for any purchase, sale, payment, or delivery … [3] that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [4] associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Van Dyke does not dispute that his event contracts satisfy the first three elements: they are [1] "contract[s]," [2] that provided for "payment" [3] which was "dependent on the occurrence … of an event or contingency"—namely, the removal of Nicolás Maduro from power, the arrival of U.S. forces in Venezuela, or President Trump's invocation of war powers against Venezuela.[7]

[7] Van Dyke disputes that the settlement mechanism for event contracts is not based on "the real-world event itself," Mot. 19–21, but he does not dispute that Maduro's ouster or the arrival of U.S. forces in Venezuela are events.

Van Dyke only disputes element [4]: whether the underlying events are "associated with potential financial, economic, or commercial consequences." 7 U.S.C. § 1a(47)(A)(ii). That language is unmistakably sweeping. For one, Congress opted to "use[] the term *potential* financial, economic, or commercial consequence," which means that even if the "financial consequences" of an event are not felt "right away"—indeed, even if those consequences *never actually occur*—a contract based on that event can still be a "swap." *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *8 (M.D. Tenn. Feb. 19, 2026); *see Alabama Power Co. v. Costle*, 636 F.2d 323, 353 (D.C. Cir. 1979) (recognizing that "potential … will always and inherently exceed actual"). And "there [] can be no doubt that an array of transactions are 'associated with' [potential] financial consequences." *United States v. Minnesota*, __ F. Supp. 3d __, 2026 WL 2150211, at *12 (D. Minn. July 27, 2026).

Here, the commercial consequences associated with Maduro's removal from power and U.S. forces arriving in Venezuela are not merely "potential"—they are empirically verifiable. The Monday morning after the raid, Venezuela's government-issued bonds jumped nearly thirty percent.[8] Thereafter, the United States "launched a $100 billion reconstruction plan for Venezuela's energy sector after capturing President Nicolas Maduro." Vivian Sequera, *et al.*, *Chevron agrees to asset swap in Venezuela to focus on heavy oil projects*, Reuters (Apr. 13, 2026). Chevron accordingly has increased its stake in a Venezuelan joint venture and plans to increase Venezuelan oil production by 50% in the next two years. *Id.* And "[m]acroeconomic indicators have improved on the back of rising oil production" for the Venezuelan people. Alejandro Peña Esclusa,

[8] Marc Jones, *Venezuela's bonds soar after US capture of President Maduro*, Reuters (Jan. 5, 2026).

*Venezuela's uneven transition from Maduro*, GIS Reports (Aug. 5, 2026). The list could go on and on. *See generally Investors Evaluate Developments in Venezuela*, Morgan Stanley (Jan. 6, 2026).

**2.** Van Dyke wisely does not dispute that economic consequences resulted from U.S. forces' capture of Maduro. Instead, he claims that those are not the *type* of economic consequences that Congress had in mind. In his view, the underlying event must be "inherently economic" or "traditionally and directly affect commodity prices," as the other "swap" definitions target. Mot. 8 (quoting *KalshiEX v. Schuler*, 2026 WL 657004, at *5 (S.D. Ohio Mar. 9, 2026)). Otherwise, he claims, the "swap" definition in subparagraph (ii) would render the other "swap" definitions "superfluous" and would cover "any event that may have some remote, tangential economic consequence, however small." Mot. 9–10.

This reasoning goes wrong in several respects. *First*, the statutory text refutes the notion that swaps must be tethered to events that are, in Van Dyke's words, "inherently economic." That "effort to limit the scope of the CFTC's jurisdiction to trades that focus on traditional commodities futures" simply "ignores the plain language of the statutory definition of swap, which has no such limiting language." *Minnesota*, 2026 WL 2150211, at *13. And the CEA's broader context *undermines* Van Dyke's made-up gloss. The other "swap" definitions encompass, for example, "weather swap[s]" and "emissions swap[s]." 7 U.S.C. § 1a(47)(A)(iii)(XVII), (XXI). Neither the weather nor emissions are "inherently economic," so it cannot be the "swap" definition is so limited. *Id.* § 1a(47)(A)(ii). Congress also defined as "swaps" contracts that "in the future become[] commonly known to the trade as a swap," and nothing about that language requires the contract to be based on an "inherently economic" measure. *Id.* § 1a(47)(iv). In addition, the CEA's "Special Rule" makes clear that "swaps" can "involve" events related to "terrorism," "assassination," "war," and "gaming," none of which is inherently financial. 7 U.S.C. § 7a-

2(c)(5)(C)(i). Indeed, the Special Rule *expressly contemplates* CEA coverage of Van Dyke's event contracts, which arguably "involve[d]" "war." *Id.*; *see also* 73 Fed. Reg. at 25,670 (acknowledging Commission's exercise of jurisdiction over event contracts about "the declaration of war").

*Second*, while Van Dyke argues that an overbroad subparagraph (ii) would make other subparagraphs surplusage, his artificial narrowing would make subparagraph (ii) superfluous, since subparagraphs (i) and (iii) already cover the waterfront of finance-related contingencies. *See Minnesota*, 2026 WL 2150211, at *12–13 (rejecting argument to "limit the reach of subparagraph (ii)" to transactions like those in subparagraphs (i) and (iii) based on the "associated-words canon," because such an approach "risks making [subparagraph (ii)] do nothing more than reiterate what subparagraphs (i) and (iii) already accomplish: that reading would, in fact, create surplusage"). Although a fair interpretation of subparagraph (ii) creates some redundancy, that is inevitable. *Bufkin v. Collins*, 604 U.S. 369, 387 (2025) ("[W]hen both interpretations involve the same redundancy, the canon against surplusage simply does not apply."). Subparagraph (iv), for instance, defines "swap" to include a contract that "is, or in the future becomes, commonly known to the trade as a swap," which necessarily encompasses all the other swap definitions. 7 U.S.C. § 1a(47)(A)(iv). And Congress *still* worried its "swap" definition was not expansive enough, as it instructed the Commission to "adopt a rule to further define the term[] 'swap'" in order to "include transactions and entities that have been structured to evade this subtitle." 15 U.S.C. § 8321(b); *see also id.* § 8302(d)(1) (CFTC and SEC have authority to "further define the term[] 'swap'"). Given that context, subparagraph (ii) is best read to capture something that other subparagraphs already cover, rather than capture nothing that is not already covered. *Bufkin*, 604 U.S. at 387 ("In any event, '[s]ometimes the better overall reading of the statute contains some redundancy.'").

*Third*, even accepting Van Dyke's own "swap" definition—a transaction that "traditionally and directly affect[s] commodity prices," Mot. 8—geopolitical events *are commodities* under the CEA. The definition of commodity is exceptionally broad, encompassing virtually "all [] goods and articles" and "all services, rights, and interests … in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(9). And, as relevant here, the term "commodity" also includes "an occurrence, extent of an occurrence, or contingency … that is—(I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence."[9] *Id.* § 1a(19)(iv). Van Dyke's event contracts fit the bill: the underlying events are "beyond the control of the parties" who trade the contracts and, as noted above, carry "financial, commercial, or economic consequence[s]." *Id.* So even if Van Dyke's re-invention of the "swap" definition were valid, it would not change the outcome.

*Finally*, a faithful interpretation of the "swap" definition does not require that it reach "*any* event or scenario [with] the potential to remotely affect some aspect of economic activity." Mot. 10. Like any causation requirement, the "swap" definition's "associated with" language presumptively incorporates proximate-cause principles, so potential economic consequences that are "too remote" from the underlying event don't count. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 133 (2014). Moreover, in "far-fetched scenarios, Congress's express delegation to the CTFC and the Securities and Exchange Commission to 'further define'

[9] The CEA classifies this as an "excluded commodity" which, despite the name is a commodity. *See United States v. Wilkinson*, 986 F.3d 740, 745 (7th Cir. 2021) ("excluded commodities" "remain 'commodities' under the Act as a whole"); *see* 7 U.S.C. § 7a-2(c)(5)(C)(i) (granting Commission jurisdiction over event contracts "in excluded commodities"). Although the at-issue contracts are swaps under 7 U.S.C. § 1a(47)(A)(ii), they also necessarily satisfy the definition of "swap" in Section 1a(47)(A)(i), since they are binary "options" under Section 1a(36) on "commodities." *See CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 36 (D.D.C. 2015).

swaps would prove useful." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026); 77 Fed. Reg. 48,208, 48,246 (Aug. 13, 2012) (excluding insurance and consumer transaction from the "swap" definition). While there may be edge cases about which events have potential economic consequences, this case is nowhere near the line—an American military intervention and a foreign leader's removal from power have direct economic impacts that cannot plausibly be described as "remote." *Supra* Section I(A)(1).

Nor does the Government's interpretation of the "swap" definition "sweep every tableside bet … into federal regulatory jurisdiction." Mot. 15. A so-called "tableside bet" is a bilateral transaction priced by two parties, rather than by the market. Such bets are therefore not readily susceptible to the CEA's exchange-trading requirement for swaps offered to retail participants. *See* 7 U.S.C. § 2(e).[10] Van Dyke's event contracts, by contrast, traded on a neutral exchange that matched counterparties and collected transaction fees, like other futures and swaps exchanges.[11] That the latter are within the Commission's jurisdiction does not demand the same of the former. *See* 31 U.S.C. § 5362(1)(E) (distinguishing CEA-regulated products from gambling).

In short, Van Dyke's event contracts straightforwardly qualify as swaps under the CEA, because the underlying events were associated with potential financial, economic, or economic consequences. Dismissal of Counts One, Two, and Three should therefore be denied.

---

[10] An exchange is a "trading facility," and Congress excluded from the definition of "trading facility" a platform that allows "participants to negotiate the terms of and enter into bilateral transactions as a result of communications exchanged by the parties and not from interaction of multiple bids and multiple offers within a predetermined, nondiscretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(B)(i). Bets fit this exclusion.

[11] Trading facilities "accept[] bids or offers made by other participants that are open to multiple participants in the facility or system" or "through the interaction of multiple bids or multiple offers within a system with a pre-determined nondiscretionary automated trade matching and execution algorithm." 7 U.S.C. § 1a(51)(A). Exchanges like Polymarket fit this mold.

**B. Van Dyke's legislative purpose arguments fail**

**1.** With no foothold in the text, Van Dyke pivots to Dodd-Frank's legislative history and purported purposes. "As a threshold matter," however, Van Dyke's "argument about the legislative history is irrelevant because the plain statutory text controls." *Barbosa da Cunha v. Freden*, 175 F.4th 61, 88 (2d Cir. 2026). "[A]mbiguous legislative history" cannot "muddy clear statutory language." *United States v. Coonan*, 143 F.4th 119, 127 (2d Cir. 2025) (quoting *Milner v. Department of Navy*, 562 U.S. 562, 572 (2011)).

In any event, Van Dyke identifies *no* legislative history that support his position; he simply observes the absence of legislative history to support the Government's position. Mot. 16 ("None of the legislative history focused on market risk caused by unregulated geopolitical events betting."). But Dodd-Frank's *text* addresses contracts based on "geopolitical events." As noted above, the Special Rule acknowledged that "[e]vent contracts" that "involve" "war" (however defined) are covered by the CEA. 7 U.S.C. § 7a-2(c)(5)(C)(i). And Congress was on notice about the existence of event contracts on "the declaration of war." 73 Fed. Reg. at 25,670.

More fundamentally, Van Dyke's premise—that the "swap" definition is limited to the types of contracts Congress had in mind when it enacted Dodd-Frank—is demonstrably false. "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 674 (2020) (citation modified). That is especially true here: Congress defined "swap" to include contracts that "in the future" become known as a swap, 7 U.S.C. § 1a(47)(A)(iv), and it gave the Commission authority to further define the term, 15 U.S.C. §§ 8302(d)(1), 8321(b). CEA coverage of novel transactions is therefore a feature, not a bug, of Congress's design.

**2.** Van Dyke also claims that the "swap" definition must be cabined by the CEA's purported purpose of regulating "derivatives that facilitate hedging and price discovery." Mot. 11. The "swap" definition, however, contains no such requirement, and "a court may not elevate general statements of purpose over clear statutory text." *United States v. Bulloch*, 2024 WL 4654134, at *6 (E.D.N.Y. Nov. 1, 2024), *aff'd*, 165 F.4th 676 (2d Cir. 2026). And Van Dyke's characterization of the CEA's purpose only covers half the equation, because "[t]he system would not function … if only hedgers sold and purchased commodity futures contracts." *Leist v. Simplot*, 638 F.3d 283, 288 (2d Cir. 1980). There must also be "speculators" who have "no underlying interest in the cash market … to take on the risks which the hedgers want to shift." *Id.* So it has never been true that a derivative must be backed by a hedging purpose. *See Curran*, 456 U.S. at 389 ("The characterization of persons who invest in futures contracts as 'speculators' does not exclude them from the class of persons protected by the CEA.").

Regardless, event contracts can be used both to hedge and speculate. An oil trader, for instance, could buy "yes" or "no" shares on Maduro's capture as a means of shielding his existing portfolio's exposure to Venezuelan events (hedge). Or, a trader could have purchased those shares to gain exposure to Venezuelan events (speculation). Indeed, the trading firm Susquehanna Group recently said that prediction markets will support "large institutional risk transfer," to "hedge both general market and bespoke industry risk currently unserved by traditional insurance markets."[12] Indeed, there is already evidence of retail and institutional market participants using sports-related

[12] *Cantor Commences Institutional Block Trading in Prediction Markets*, BusinessWire (Aug. 19, 2026), https://www.businesswire.com/news/home/20260819078964/en/Cantor-Commences-Institutional-Block-Trading-in-Prediction-Markets.

event contracts to hedge risk.[13] It takes little imagination to understand that market participants would do the same with geopolitical event contracts.

And insofar as Congress's purposes are relevant, the CEA also identifies a "national public interest" in "discovering prices, or disseminating pricing information." 7 U.S.C. § 5(a). It has long been understood that event contracts serve this interest by acting as an "information aggregation vehicle" for financial, economic, and/or commercial planning. 73 Fed. Reg. at 25,670 . For instance, the volume-weighted average price that Van Dyke paid on December 30, 2025 for a YES share on Maduro's capture by January 31, 2026—$0.09—reflected the market's calculation that the likelihood of Maduro's capture was 9%. The trading of that contract reflects market sentiments about the overall likelihood of the underlying event. And while Van Dyke suggests that event contracts only foster "*probability* discovery," Mot. 11, that is a distinction without difference. After all, the price of a weather swap does not reflect anything inherent about "prices"; it reflects the probability of certain weather outcomes—but that still has valuable information-aggregation utility that is a hallmark of derivatives markets. 73 Fed. Reg. at 25,671.

**3.** Finally, Van Dyke points to various proposals in Congress with respect to event contracts. But "[f]ailed legislative proposals are a particularly dangerous ground on which to rest an interpretation of a prior statute." *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 169–70 (2001). And to the extent such measures are relevant, the United States Senate recently changed its rules to bar members from participating in "prediction

[13] Catherina Gioino, *This NYC bar just covered everyone's tabs because the Knicks won, and used Kalshi to hedge their bets*, Fortune (June 3, 2026), https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/; Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

market[s]" and described those transactions as "swap[s] … as defined in section 1a of the Commodity Exchange Act … that [are] dependent on the occurrence, nonoccurrence, or the extent of the occurrence of a specific event or contingency." S. Res. 708, 119th Cong. (2026).

### C. The settlement criteria and mechanics of the at-issue event contracts are consistent with undisputedly CEA-jurisdictional derivatives

Van Dyke also asserts the novel theory that, to be a "swap," the contractual right to "payment must track the real-world event itself, ascertained through an objective, non-discretionary mechanism like an underlying index, a specific price that is ascertainable by all on a marketplace, or some type of official data." Mot. 20. But he claims that Polymarket "uses subjective and deliberative judgment by interested market participants as the operative mechanism by which contracts are settled—as opposed to objective ascertainment of fact or reference index." *Id.*

Van Dyke provides no real support for either argument, because there is none. There are products, long understood to be within the CFTC's jurisdiction, (1) that have settlement criteria that are formally distinct from their purported underliers; and (2) with settlement mechanisms dependent on the judgment of third parties, some of whom may be interested.

***Settlement Criteria.*** According to Van Dyke, event contracts make payment "contingent not on the underlying event the contract references—as it would be with a 'swap' properly regulated under the CEA—but on whatever terms the contracts provide," which, in the case of Van Dyke's trading, "turned on 'a consensus of credible reporting' regarding the scenarios posited by the contract." *Id.* But that dynamic is not uncommon. Many derivatives, including traditional commodity futures, must adopt approximating settlement criteria or underlier benchmarks—subject to uncertainty and third-party inputs—to be exchange-tradeable.

Take Van Dyke's example of the Latin American Dated Brent strip. Mot. 13. Any derivative based on the Latin America Dated Brent—whether a basic futures contract, an event contract, or a non-event-contract swap—will settle based on the future benchmark value for Latin America Dated Brent. But that benchmark is not self-actualizing; it is calculated based on a third party's collection and analysis of market survey data, which in turn has to be further analyzed in subsequent calculations to create a final benchmark.[14] An event contract based on Latin American Dated Brent—which Van Dyke acknowledges as a swap—would not cease to be a swap simply because it settles based on a third-party data collector's survey and analysis. Likewise, "[b]ecause there is no single forum for trading gold and gold-related investments," market participants in the London Bullion Market have traditionally held an "auction" via "private teleconference" in which the participants "combine [market] orders with orders from their own proprietary trading desks" to establish "an objective price point" for "derivatives trad[ing]." *In re Commodity Exch., Inc.*, 213 F. Supp. 3d 631, 642–43 (S.D.N.Y. 2016). In short, derivatives commonly use closely tethered proxies to "fix" an underlying commodity's price. Event contracts do not fall outside CEA jurisdiction simply because they too rely on such proxies.

***Settlement Mechanism.*** Van Dyke similarly suggests that Polymarket's settlement mechanism—"rel[ying] on the collective judgment of interested parties as the operative trigger of

[14] Latin American Dated Brent gives "buyers and sellers a market-based reference price for [] regional oil," which itself is derived from "the average value of Dated Brent … over the month a Latin American cargo is set to load, captured at the US market close." Mot. 13 n.5. Dated Brent, in turn, is a value based on "a prominent London-based price-reporting agency['s] collect[ion of] information from market participants regarding their physical Brent crude transactions," which is then "analyze[d] … to compute benchmark prices." *Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 99 (2d Cir. 2019).

payment"—means that the contracts cannot be swaps. Mot. 20. But swaps can depend on third-party inputs, including those from interested parties, to trigger and resolve settlement.

For example, credit-default swaps between institutional participants can be "settled directly between the counterparties to the contract, that is, on a 'bilateral basis.'" *In re Credit Default Swaps Auctions Litig.*, 710 F. Supp. 3d 895, 911 (D.N.M. 2023). Such "bilateral" mechanisms necessarily entail interested-party settlement, as settlement of a credit default swap requires a "payment to the buyer if a 'credit event' occurs" (*i.e.*, one counterparty pays the other if settlement is judged to have been triggered). *Id.* at 909. Alternatively, a third-party organization, the International Swaps and Derivative Association Determinations Committee, can settle a credit-default swap by "decid[ing] that an adverse credit event triggered a given reference entity's [credit default swap] contracts," and it can then schedule an "auction" in which market participants—who are not necessarily disinterested—set a final price. *Id.* at 913 (citations omitted). So the alleged use of "the collective judgment of interested parties" to settle event contracts does not distinguish those contracts from other swaps.

## II. Van Dyke had fair notice that his conduct was illegal

Next, Van Dyke argues that the CEA's anti-fraud provision and the CFTC's implementing rule cannot constitutionally apply to his conduct because the "swap" definition and the insider-trading prohibition fail to provide fair notice. Mot. 21–31. The Court should reject both arguments.

### A. Van Dyke had fair notice that geopolitical event contracts are swaps

For the reasons discussed in Section I, geopolitical event contracts are squarely encompassed within the "swap" definition in § 1a(47)(A)(ii). *See also Reed*, 2022 WL 597180, at *3-4 (denying motion to dismiss, among other reasons, because "defendant had ample notice from the broad definition of commodities under the CEA that cryptocurrencies were within the

definition”). Van Dyke’s argument to the contrary is predicated on his argument that the Government’s interpretation “is so open-ended that virtually any wager on any event could be recharacterized as a regulated derivative.” Mot. 24. That is not true: while Congress undoubtedly wrote a broad definition of “swap,” the underlying event must be proximately linked to the potential economic consequences to constitute a swap. Van Dyke’s geopolitical event contracts easily satisfy that criterion. *Supra* Section I(A)(1).

Van Dyke also ignores that the Special Rule squarely contemplates CEA coverage over “[e]vent contracts” involving “war.” 7 U.S.C. § 7a-2(c)(5)(C)(i). Indeed, the Commission has regulated event contracts since at least 1992, including event contracts related to “the declaration of war” and other geopolitical events such as “the results of presidential elections” and “world population levels.” 73 Fed. Reg. at 25,670. And since Dodd-Frank was enacted, the Commission has publicly rejected a DCM’s request to list election-based event contracts—a clear indication that such contracts were CEA-jurisdictional products.[15] Indeed, the Commission issued an order in 2022 settling claims against Polymarket—the platform on which Van Dyke traded—and explained that “event contracts, each of which is composed of a pair of binary options, constitute swaps under the CFTC’s jurisdiction, and therefore can only be offered on a registered exchange in accordance with the Act and Regulations.” *In re Blockratize, Inc. d/b/a Polymarket.com*, CFTC Dkt. No. 22-09, at 2 (Jan. 3, 2022). That order went on to highlight the variety of swaps available on Polymarket, including those related to geopolitical events such as “current events,” Covid case numbers, and the 2020 presidential election. *See id.* at 3.

[15] *See Order Prohibiting the Listing or Trading of Political Event Contracts* (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf (in accordance with the Special Rule, DCMs “shall not list for trading any contract based upon an excluded commodity” in certain categories that violate the public interest).

Finally, it bears emphasis that geopolitical event contracts are traded on *CFTC-registered Designated Contract Markets*, including Polymarket's U.S. affiliate. Indeed, "a CFTC-licensed and regulated designated contract market … [contemporaneously] offered event contracts related to Venezuela, including event contracts related to the removal of Maduro." *Van Dyke*, No. 1:26-cv-03369, Dkt. No. 1 (S.D.N.Y. Apr. 23, 2026). That, if nothing else, should have been a tipoff to Van Dyke that his trades implicated the CEA.

**B. Van Dyke had fair notice that 7 U.S.C. § 9(1) and Rule 180.1 prohibit insider trading on swaps**

Van Dyke next argues that the CEA's anti-fraud provision and the CFTC's implementing rules are void for vagueness because neither "expressly prohibit insider trading, much less mention trading on the basis of confidential information." Mot. 27. But as Van Dyke acknowledges, 7 U.S.C. § 9(1) "simply mirrors the exact language of Section 10(b) of the Securities Exchange Act." *Id.* And when Congress enacted Section 9(1) in the Dodd-Frank Act, it had long been established that a person criminally violates the anti-fraud provisions of Securities Exchange Act Section 10(b) and SEC Rule 10b-5 by misappropriating material nonpublic information for securities trading in breach of a duty of trust and confidence. *See United States v. O'Hagan*, 521 U.S. 642, 652 (1997). Again, Van Dyke agrees: "there is substantial common law outlining the contours of criminal insider trading under Section 10(b) and Rule 10b-5." Mot. 29.

That background provides clear notice that the insider-trading prohibition in the securities context is equally applicable in the commodity-derivatives context. Courts presume that "when Congress uses the same language in two statutes having similar purposes," it "intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). "And when 'judicial interpretations have settled the meaning of an existing statutory provision, repetition

of the same language in a new statute indicates, as a general matter, the intent to incorporate its ... judicial interpretations as well.'" *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85–86 (2006). That logic applies with full force to Section 9(1). Indeed, the Senate sponsor of Section 9(1), Senator Cantwell, stated that the provision borrows the words "any manipulative or deceptive device or contrivance" from Section 10(b) so that "courts and the Commission [] interpret the new authority in a similar manner" by reference to "the 75 years" of "case law [that] has developed around th[ose] words." 156 Cong. Rec. S3348 (daily ed. May 6, 2010).

This should come as no surprise to Van Dyke. The CFTC has brought numerous 7 U.S.C. § 9(1) and Rule 180.1 enforcement actions over the past decade. *See, e.g.*, *In re Motazedi*, CFTC No. 16-02, 2015 WL 7880066 *1 (Dec. 2, 2015) (trader violated Section 9(1) and CFTC Rule 180.1(a) by frontrunning employer's trades using misappropriated material nonpublic information in breach of a duty to his employer); *In re Ruggles*, CFTC No. 16-34 (Sept. 29, 2016) (violation of Section 9(1) and Rule 180.1 to trade against employer using misappropriated material nonpublic information in breach of duty); *In re Classic Energy*, CFTC No. 19-50, 2019 WL 4915492 (Sept. 30, 2019) (similar); *CFTC v. EOX Holdings L.L.C.*, 405 F. Supp. 3d 697, 708-16 (S.D. Tex. 2019) (denying motion to dismiss "insider trading" charges because the "allegations fall squarely within the parameters of established law governing misappropriation of material, nonpublic information" from the securities context); *In re Schultz*, CFTC No. 20-76, 2020 WL 5876731 (Sept. 30, 2020) (insider trading tipper liability for disclosing material nonpublic information to other market participants in breach of duty); *In re Freepoint Commodities LLC*, CFTC No. 24-02 (Dec. 14, 2023) ("fraudulent scheme to misappropriate material non-public information" for trading purposes violated Section 9(1) and CFTC Rule 180.1).

In fact, Van Dyke's *exact* argument—that CEA insider trading, as distinct from securities insider trading, presents fair-notice defects—was squarely raised and roundly rejected in a case that Van Dyke himself cites, *United States v. Clark*, 2025 WL 801358, at *3 (5th Cir. Mar. 13, 2025). *See* Mot. 28. There, the defendant sought "to overturn his 'insider trading' convictions, arguing that the phrase 'manipulative or deceptive device or contrivance' in 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1 is unconstitutionally vague." *Clark*, 2025 WL 801358, at *3. The Fifth Circuit rejected that argument because "the Supreme Court has previously given an authoritative construction to similar language in the context of the Securities Exchange Act of 1934. And '[w]hen a statutory term is obviously transplanted from another legal source, it brings the old soil with it.'" *Id.* (quoting *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019)).

As the Supreme Court has elsewhere observed, the fair notice "touchstone" is "whether the statute, either standing alone or as construed [with any judicial gloss], made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997). For roughly three decades, Section 10(b) of the Securities Exchange Act has been construed to impose criminal liability for insider trading, and Congress inserted "an exact transplant" of that language into the CEA. *Clark*, 2025 WL 801358, at *3. There is no credible argument that Section 9(1) and Rule 180.1 are unconstitutionally vague as to Van Dyke's conduct.

## CONCLUSION

For these reasons, the Court should deny Defendant's motion to dismiss Counts One through Three and hold that the event contracts at issue are "swaps" under the CEA.

Dated: August 21, 2026

Respectfully submitted,

*<u>/s/ Cameron J. Sinsheimer</u>*
Tyler S. Badgley, General Counsel
M. Jordan Minot, Deputy General Counsel
Cameron J. Sinsheimer, Counselor
Henry J. Dickman, Sr. Assistant General Counsel

U.S. Commodity Futures Trading Commission
Three Lafayette Centre
1155 21st Street, NW
Washington, D.C. 20581
csinsheimer@cftc.gov
(646) 746-3928

## CERTIFICATION

The undersigned hereby certifies that the amicus brief contains 6,457 words, exclusive of the caption, tables, signature block, and certification, according to the word-processing system used to prepare the document. This is less than one-half the maximum length for a party's principal brief as authorized by the Court's July 31, 2026, Order. *Cf.* Fed. R. App. P. 31(a)(5) ("Except by the court's permission, an amicus brief may be no more than one-half the maximum length authorized by these rules for a party's principal brief.").

Dated: August 21, 2026

Respectfully submitted,

*/s/ Cameron J. Sinsheimer*