UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

GANNON KEN VAN DYKE,

Defendant.

26 Cr. 156 (MMG)

**REPLY MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE INDICTMENT**

## TABLE OF CONTENTS


**I. Preliminary Statement** ........ 1

**II. The CEA Counts Must Be Dismissed** ........ 2

A. The At-Issue Trades Are Not Swaps ........ 2

B. The CEA's Legislative History Counsels Dismissal ........ 6

C. Subpart (ii) of the "Swap" Definition is Unconstitutionally Vague ........ 9

D. Insider Trading is Not Encompassed in Section 6(c)(1) ........ 11

**III. Count Four Must Be Dismissed** ........ 11

A. The Government's 18 U.S.C. §641 Arguments Miss the Mark ........ 12

B. The Alleged Military Plans Are Not "Property" ........ 16

C. The Government's New, Uncharged Theory Cannot Save Count Four ........ 18

D. The Indictment Fails to Plead Specific Intent ........ 22

**IV. Count Five Must Be Dismissed** ........ 23

**V. Conclusion** ........ 23

## I. **Preliminary Statement**

The Government's interpretation of the CEA counts rests on an interpretation of "swap" vast enough to treat virtually any contract with a contingency as a regulated financial instrument. But this reading deprives defendants of fair notice and subjects them to arbitrary enforcement.

The law has always drawn a meaningful distinction between gambling and genuine financial instruments. A financial instrument does economic work—hedging real exposure, allocating capital, and transferring price risk. Labeling a wager a "swap" generates economic function no more than calling a bookie a "broker" imparts investment expertise.

This question is the subject of litigation only because *Murphy v. NCAA*, 584 U.S. 453 (2018), allowed states to legalize sports betting. A lucrative market sprang up. Prediction markets sought to profit by repackaging sports wagers as "event contracts." Why? To shade their product under the statutory umbrella of "swap" and trade fifty state regulatory regimes for the CFTC's single light touch. Without congressional authorization, the CFTC has seized the opportunity to expand its jurisdiction. The government must now reconcile the CFTC's current position with existing law and prior agency rules. But the CEA's text and history constrain the scope of the statute and fair notice principles prohibit the government from expanding its reach on an ad hoc basis.

As to Count Four, this case reflects a misguided effort to stretch federal fraud beyond its limits. The prosecution theory conflicts with the many Supreme Court and Second Circuit decisions interpreting "property" narrowly. Lacking any rejoinder, the government resorts to an overbroad interpretation by relying exclusively on irrelevant interpretations of a different statute with meaningfully different text. In so doing, it mischaracterizes the issues and misreads the very cases it cites—which only further support Van Dyke's arguments. Its position is so weak it pivots

to a new prosecution theory entirely—that the scheme at issue was to obtain "money" as opposed to "property"—but that theory is invalid and was not charged here.

The Court should accordingly dismiss the Indictment.

## II. The CEA Counts Must Be Dismissed

### A. The At-Issue Trades Are Not Swaps

The government's position comes down to this: Every conceivable contract with a contingency can be a swap if the CFTC says so. It advances five arguments in support.

*First*, the government argues Subpart (ii)'s statutory language does not require that swaps be "inherently economic." Dkt.25 at 11. But "the Court must give independent meaning to the phrase 'associated with' by identifying a meaningful boundary on what it requires." *Coinbase Financial Markets, Inc. v. Tong*, 2026 WL 2294602, at *13 (D. Conn. Aug. 10, 2026). An "inherently joined or connected with" requirement is supported by the statute's neighboring provisions, which exclusively describe instruments tied to measurable economic variables. Including the term "potential" does not counsel a broader interpretation. Subpart (ii) relates to an uncertain future event or contingency, whose occurrence is only a possibility when a contract is executed. The specified event or contingency may never occur, so of course its consequences are only "potential."

*Second*, the government argues that Van Dyke's reading would render Subpart (ii) surplusage. But the contingent payout structure distinguishes the event contracts in Subpart (ii) from the instruments in other definitions, even when they reference the same variables. Indeed, subpart (ii) may include certain prediction markets. For instance, Polymarket offers binary "Yes" or "No" bets to the question, "Fed rate hike in 2026?" Another market asks, "What will Silver (XAGUSD) hit in August 2026?," offering multiple prices to bet on. That there is some overlap

in the various subparts is of no moment. As the Supreme Court acknowledged, "the canon against surplusage is not an absolute rule." *Marx v. General Revenue Corp.*, 568 U.S. 371, 385 (2013). Indeed, some "[r]edundancies across statutes are not unusual events in drafting." C*onnecticut Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992). The problem arises when "an interpretation would render superfluous another part of the same statutory scheme," *id.* at 386, which would be the result of the government's overbroad reading. *See Fischer v. United States*, 603 U.S. 480, 489 (2024) (if a broader clause covered "all forms of…conduct" elsewhere listed, "there would have been scant reason for Congress to provide any specific examples at all").

The government's claim that Van Dyke's interpretation would render "decades of settled CFTC practice regulating weather, catastrophe, emissions, and longevity swaps...*ultra vires*" is similarly unavailing. Dkt.25 at 13. Congress specifically enumerated weather and emissions swaps in Subpart (iii), granting the CFTC express regulatory authority. 7 U.S.C. §1a(47)(iii)(XVII), (XXI). Both facilitate price discovery: Weather swaps are correlated with agricultural commodities performance, while emissions swaps are correlated with the prices of emissions allowances traded pursuant to regulatory permits. Catastrophe swaps, traded only over-the-counter by eligible contract participants,[1] identify contingencies, such as hurricane categories or losses tied to wildfires, that trigger insurance coverage. Longevity swaps tie payment terms to an indexed measurement—mortality—that allows commercial actors (e.g., pension funds, annuity providers, and the like) to hedge economic risk directly tied to longevity. In each instance, these instruments support Congress's goal of providing market stability. Not so for the bets at issue here.

Regardless, courts have not determined that all instruments the CFTC regulates as swaps are indeed swaps within the meaning of the CEA. That they may share certain common features

[1] *See* 7 U.S.C. §1a(18).

with enumerated swaps does not necessarily mean they fit the legal definition. Perhaps they fall within Subpart (iv) as instruments that have become "commonly known to the trade as swaps." 7 U.S.C. §1a(47)(iv). This may be sufficient for regulatory purposes, but not for criminal prosecution.

*__Third__*, the government contends Dodd-Frank's Special Rule presupposes that event contracts are swaps. Dkt.25 at 11-12. Again, not so. In the Special Rule, "events contracts" capture "agreements, contracts, transactions, *or swaps* in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency." 7 U.S.C. §7a-2(c)(5)(C)(i) (emphasis added). Swaps may be classified as a type of event contract, but event contracts are not necessarily swaps. Just as the Special Rule's reference to death-related contracts does not establish that life insurance contracts are swaps, the inclusion of war-related contracts does not establish that war-related prediction markets are swaps. The Special Rule only grants the CFTC authority to promulgate rules *prohibiting* event contracts against the public interest—like those regarding terrorism, assassination, war, and gaming—from being listed on DCMs. 7 U.S.C. §7a-2(c)(5)(C)(i); 17 C.F.R. 40.11(a).

*__Fourth__*, the government claims a sufficient economic nexus between the at-issue trades and their consequences is an issue of fact that should be "determined after trial." Dkt.25 at 13. It urges the Court not to engage in the "academic" exercise of determining the statute's "outer boundary." *Id*. The government would prefer to decide what conduct it deems criminal under Subpart (ii), require defendants to face trial, and leave it to juries to determine, on a case-by-case basis, whether an event contract is "associated with a potential financial, economic, or commercial consequence" without clarifying the definition. But the government must charge a valid crime under the terms of the applicable statute. Understandably, the government seeks to avoid the issue, because it

cannot reconcile this prosecution with CFTC rules counseling a narrower reading of "swap." *See infra* Section II.C; 91 Fed. Reg. 35806, 35814 (proposed June 12, 2026)[2] (prediction markets "generally take the form of financial agreements linked to eventualities or measures that neither derive from, nor correlate with, market prices or broad economic or commercial measures").

Moreover, the government's fact-based arguments about the downstream economic effects of Operation Absolute Resolve on oil markets do little to resolve the issue because a law enforcement operation is not inherently economic. The government points to low oil prices that occurred after regime change in Venezuela to demonstrate economic nexus, but this reflects a hindsight bias. The results of U.S. invasion were unknowable at the time of the trades and could have instead included prolonged conflict, producing an opposite downstream effect on oil markets. The subsequent market effects cannot establish that the trades were "affected with a national public interest" by facilitating price discovery. 7 U.S.C. §5(a).

*Fifth*, the government sweeps aside the numerous decisions holding that sports bets are not swaps. Dkt.25 at 18-19. It concedes "courts have not been uniform in resolving suits between prediction markets and state gaming authorities." *Id.* at 18. The government steps gingerly, as it must, because these cases don't merely distinguish "events" from "occurrences" as it contends. Instead, they limit Subpart (ii) to transactions inherently joined with a potential economic consequence. *See, e.g.*, *KalshiEX, LLC v. Hendrick*, 817 F.Supp.3d 1014, 1027 (D. Nev. 2025) ("the phrase 'associated with a potential financial, economic, or commercial consequence' means that the event or contingency is itself inherently joined or connected"); *Robinhood Derivatives, LLC v. Dreitzer*, 2025 WL 3283308 (D. Nev. Nov. 25, 2025) (same); *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *5 (S.D. Ohio Mar. 9, 2026) (same); *QCX LLC v. Nessel*, 2026 WL 1166362

[2] 91 Fed. Reg. 35806,35,814 (proposed June 12, 2026).

(W.D. Mich. Mar. 10, 2026) (similar). This includes three cases that were decided since Van Dyke filed his Motion. *KalshiEX, LLC v. Cafferelli*, 2026 WL 2294589, at *9 (D. Conn. Aug. 7, 2026) ("'[A]ssociated with a potential financial, economic, or commercial consequences'…mean[s] that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence."); *Tong*, 2026 WL 2294602, at *13 (same); *Coinbase Financial Markets, Inc. v. Nessel*, No. 25-cv-14092 (E.D. Mich. Aug. 6, 2026) (ECF No. 57), at 26 (similar). And this is *exactly* our point.

**B. The CEA's Legislative History Counsels Dismissal**

The government next contends the CEA's legislative history and text counsel a broad reading of "swap" that encompasses Van Dyke's trades and rejects any difference between probability discovery and price discovery. Dkt.25 at 15. But the government's opposition does not grapple with the central issue we raised in our motion to dismiss, a purely legal issue ripe for decision now: Prices of all traded instruments reflect probabilistic market assessments, but not all traded instruments generate pricing signals correlated with economic measures. "Price discovery" in the CEA relates to the substantive economic function of generating pricing signals for assets. Economic actors use these signals to allocate resources and manage commercial risk. These are transactions that "are affected with a national public interest." 7 U.S.C. §5(a).

Not all speculation leads to price discovery. A weather swap does because it conveys information about the expected cost of weather-related exposure. But "U.S. forces in Venezuela by January 31" is merely a geopolitical forecast. It does not signal to an oil producer what to charge per barrel, nor does it tell a bondholder the value of Venezuelan debt. The at-issue trades were linked to measures "that neither derive[d] from, nor correlate[d] with, market prices or broad economic or commercial measures." 91 Fed. Reg. 35806, 35814 (proposed June 12, 2026).

Anyone can hedge anything if they are creative enough. For instance, one New York City bar promised customers free bar tabs up to $100 if the New York Knicks beat the San Antonio Spurs in Game 1 of the NBA Finals, hedging by betting "yes" on a Kalshi market predicting a Knicks win.[3] But this sort of creative commercial use does not transform gambling into hedging.

The government points to the CFMA's elimination of the economic purpose test as evidence that price determination and hedging are irrelevant. It is true that after CFMA, exchanges do not need to affirmatively prove economic purpose as a prerequisite to listing. But this does nothing to affect Van Dyke's point: Even after the CFMA, Congress left intact the requirement that transactions subject to the CEA be "affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information." 7 U.S.C. §5(a). And in one respect, by limiting the scope of events contracts considered swaps to those "associated with a potential financial, economic, or commercial consequence," Dodd-Frank resurrected the economic purpose test. *See* 7 U.S.C. §1a(47)(ii).

The government attempts to characterize Van Dyke's invocation of the Great Recession and the opaque financial derivatives that contributed as a failed appeal to legislative history. But this history goes to the heart of the statute's purpose—"to promote the financial stability of the United States by improving accountability and transparency in the financial system, to end 'too big to fail,' to protect the American taxpayer by ending bailouts." Pub. L. No. 111-203, 124 Stat. 1376.

The government claims that Congress could well have intended a broader definition of swaps even if Van Dyke is correct about the origin and purpose of the CEA, since "statutory

[3] "This NYC bar just covered everyone's tabs because the Knicks won, and used Kalshi to hedge their bets," (June 3, 2026), https://fortune.com/2026/06/03/nyc-bar-knicks-kalshi-win-prediction-market/.

prohibitions often go beyond the principal evil to cover reasonably comparable evils." Dkt.25 at 16 (quoting *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 79 (1998)). But the Supreme Court has also instructed courts not to assume the government will use criminal statutes "responsibly." *McDonnell v. United States*, 579 U.S. 550, 576 (2016). And the at-issue trades are simply not a "reasonably comparable" evil. Prediction markets played no role in the financial crisis. Reading the swap definition to encompass such contracts would divorce the statute from the problem it was enacted to solve and extend CFTC jurisdiction into a domain Congress never contemplated.

Indeed, the legislative history is clear. Where is the discussion of sports-bet parlays, contingency fee agreements between lawyers and clients, and employment contracts tied to performance metrics? There is none. None of which have ever been considered swaps.

Further, there is no comparison between the at-issue bets and credit default swaps (CDS). CDS are "among the most heavily regulative instruments in the derivatives universe," (Dkt.25 at 18), specifically *because* Dodd-Frank's purpose was to regulate financial instruments that risked causing another financial crisis. Prior to enactment, the Treasury Department singled out CDS in its white paper, finding that the "lax regulatory regime for OTC derivatives—and, in particular, for credit default swaps (CDS)—became disastrously clear" after "many institutions and investors had substantial positions in CDS—particularly CDS that were tied to asset backed securities (ABS)."[4] During the financial crisis, "the sheer volume of [ABS] overwhelmed some firms…and left institutions with losses that they believed they had been protected against," leading to bank closures and bailouts.[5]

[4] *Financial Regulatory Reform: A New Foundation*, Treasury Dep't (2009) at 47, https://www.govinfo.gov/content/pkg/GOVPUB-T-PURL-LPS113933/pdf/GOVPUB-T-PURL-LPS113933.pdf.

[5] *Id.*

Aside from heavy regulation, CDS differ from the at-issue trades in at least two other respects. One, the triggering event in a CDS—a default—is inherently economic, has a standardized legal definition, and is governed by an ISDA. Two, contested events are determined by disinterested third parties. But on Polymarket, disputes are resolved in a decentralized system called Universal Market Access ("UMA"), which is nothing more than traders holding $UMA tokens they can purchase and stake on an outcome. They are utterly anonymous and entirely unregulated. Therefore, every market on Polymarket is vulnerable to manipulation: Whales can anonymously stake $UMA tokens and sway an outcome. This is directly at odds with Dodd-Frank's purpose of "protect[ing] market participants from fraud and abuse." 7 U.S.C. §5(b).

**C. Subpart (ii) of the "Swap" Definition is Unconstitutionally Vague**

The government argues Van Dyke's notice arguments fail because willfulness is an element. This confuses two separate issues: Whether the statute itself is too vague to delineate lawful from unlawful conduct versus whether a defendant knows his actions violate the law. The government's theory would immunize every statute with a willfulness element from a vagueness challenge. This argument finds no support. Further, the vagueness at issue concerns only the statutory language and is a purely legal matter that Courts may determine on a motion to dismiss. *See United States v. Velastegui*, 199 F.3d 590, 593 (2d Cir. 1999) ("[A] motion to dismiss on grounds that a criminal statute provides insufficient notice raises a question of law…."); *Skilling v. United States*, 561 U.S. 358, 408-09 (2010) ("Reading the [honest services fraud] statute to proscribe a wider range of offensive conduct…would raise the due process concerns underlying the vagueness doctrine.").

The government urges the Court to ignore the ambiguity underscored by CFTC rules, weekly-evolving and divergent case law, and disparate enforcement. Line-drawing efforts by

agencies "to refine boundaries at the margins of settled authority," it argues, are "not an admission that the authority itself is uncertain." Dkt.25 at 21. But the notion there is "settled authority" on whether the at-issue contracts "fall[] outside [Subpart (ii)]," Dkt.25 at 20, is absurd. This prosecution is the very first relating to prediction markets, which are themselves novel. Indeed, the plethora of recent litigation between prediction market exchanges and state agencies demonstrates that the issue is far from settled. And contrary to the government's argument that "judicial disagreements" don't evidence vagueness, Dkt.25 at 20, they do. *See Johnson v. United States*, 576 U.S. 591, 597, 601 (2015) ("arbitrary enforcement by judges" and "disagreement" demonstrates vagueness).

In any event, the government misses the point. The CFTC has interpreted the statute to exclude certain events trades that did not contribute to the Great Recession, including "consumer" transactions like those here. *See* 77 Fed. Reg. 48208, 48318 (Aug. 13, 2012) ("The Commissions are stating that certain customary consumer and commercial transactions *that have not previously been considered swaps or security-based swaps do not fall within the statutory definitions of those terms*."). The distinction signals that only instruments traditionally considered swaps qualify.

Courts analyzing whether sports bets constitute swaps further highlight the vagueness issue by acknowledging Subpart (ii)'s boundless language and interpreting the statute narrowly. *Nessel*, No. 25-cv-14092 (ECF No. 57), at 25 ("the words and phrases at issue are highly ambiguous and subject to multiple meanings when read in isolation"); *Cafferelli*, 2026 WL 2294589, at *8 ("associated with a potential financial, economic, or commercial consequence" is an "undefined concept"); *Tong*, 2026 WL 2294602, at *11 (same); *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *4 ("The CEA does not define the words comprising th[e Subpart (ii)] definition."). Narrow interpretation in these civil cases counsels lenity in the criminal context.

**D. Insider Trading is Not Encompassed in Section 6(c)(1)**

Van Dyke does not dispute that Section 6(c)(1) borrows Section 10(b)'s language. He disputes only that a textual transplant can, standing alone, supply an otherwise undefined criminal prohibition. *See Whitman v. United States*, 574 U.S. 1003, 1004-05 (2014) (Scalia, J.) ("Congress cannot, through ambiguity, effectively leave [the legislative] function to the courts."). The government cannot bootstrap a criminal prohibition from parallel, unconstitutional, court-made law.

The government's reliance on the CFTC's fifteen-year enforcement history is telling: Every cited enforcement action is an agency adjudication. *See* Dkt.25 at 25. Indeed, this prosecution is the first under the rule, and no court has ever determined that Section 10(b)'s judge-made contours may be imported to Section 6(c)(1) prosecutions. Civil enforcement offers little more than its power to persuade. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024). Independent interpretation of Section 6(c)(1)'s plain language, which does not reach insider trading, counsels rejection of the Section 10(b) "judicial oak which has grown from little more than a legislative acorn." *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737 (1975).

**III. <u>Count Four Must Be Dismissed</u>**

Van Dyke's opening brief demonstrated that Count Four must be dismissed because it rests on the erroneous theory that the military's purportedly confidential plans constitute "property" under 18 U.S.C. §1343. None of the government's "property" arguments persuade. To the contrary, the arguments concern a different statute entirely (18 U.S.C. §641), are flatly incorrect, and misconstrue the cited cases. The government's new theory—that the charged scheme is a scheme to obtain "money"—should also be rejected as it is invalid and was not even charged.

### A. The Government's 18 U.S.C. §641 Arguments Miss the Mark

The government concedes—as it must—that for the purportedly confidential military information to qualify as the object of the alleged fraud scheme, it must constitute "property" within the meaning of the fraud statute. *See* Dkt.25 at 30. It concedes the statute is given a narrow, common law construction. *Id.* But the government cites no authority construing the statutory term "property" to reach the at-issue military information. Nor does it cite any common law analogue supporting its position. There is none.

Instead, the government pivots. It tries to argue that "confidential military operational information is property under *Girard*, *Blaszczak*, and a line of decisions from several circuits holding that classified, military, and law-enforcement information is government property." Dkt.25 at 28.

But this cannot save the government. Its argument relies on an entirely separate body of precedent construing the phrase "thing of value" in a different statute altogether: 18 U.S.C. §641.[6] The government admits "[s]ection 641 and §1343 employ different terms—'thing of value' and 'property,' respectively." Dkt.25 at 32, n.7. Trying to render §641 relevant here, it states—incorrectly—that "courts treat the two as substantially coextensive in this context." *Id.*

This is just not so. Section 641 precedent has no relevant application here. The phrase "thing of value" is notably broader than "property." It is interpreted differently as the government's own cases explicitly state. *United States v. Jeter* states plainly that "thing of value" is "more expansive" than "property." 775 F.2d 670, 680 (6th Cir. 1985). *United States v. Morison* observed that §641 was "written in broad terms with the clear intent to sweep broadly." 844 F.2d 1057, 1076

---

[6] That statute punishes "[w]hoever embezzles, steals, purloins, or knowingly converts to his use…any record, voucher, money, or thing of value of the United States…, or any property made or being made under contract for the United States." 18 U.S.C. §641.

(4th Cir. 1988). And *United States v. Hung* noted that "[b]y appending 'thing of value' onto the list of 'any record, voucher, (or) money,' Congress certainly did not evince an intent to restrict the reach of [section] 641." 629 F.2d 908, 924 (4th Cir. 1980). By contrast, the term "property" in the fraud statute is not a "catchall." *Kousisis v. United States*, 605 U.S. 114, 132 (2025). All this makes sense because §641 is a theft statute, not a fraud statute.

The government relies heavily on *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979), but that was also a §641 case—not a fraud case. And *Girard* also observed that the statutory text "thing of value" is broader than "property." Indeed, the Second Circuit "adopted in full" the district court's reasoning on that score. Dkt.25 at 30. The district court explicitly contrasted "record…or thing of value" with "property," which it deemed narrower. It did so by outlining the history of §641, which was "a condensation of at least four sections in the 1940 Code, 18 U.S.C. ss 82, 87, 100, 101." *United States v. Lambert*, 446 F.Supp. 890, 892 (D. Conn. 1978). While "[s]ection 82 referred to the larceny of 'any property' of the government," and while "[s]ection 87 referred to the theft of 'any ordinance, arms, ammunition, clothing, subsistence, stores, money, or other property of the United States"—which were "[c]learly" references to "tangible goods"—the addition of "'record…or thing of value' in s 641…contrast[ed] sharply with the more concrete references of ss 82 and 87." *Lambert*, 446 F.Supp. at 892-93. *Girard* thus saw "no reason to restrict the meaning of s 641 to its common-law origins." *Lambert*, 446 F.Supp. at 893.

The Supreme Court requires courts to construe the text of the fraud statute differently. "[P]roperty" must be interpreted consistent with its "well-settled meaning at common law," *Neder v. United States*, 527 U.S. 1, 22 (1999), and "reaches only traditional property interests" "that had 'long been recognized as property' when the…statute was enacted," *Ciminelli v. United States*, 598 U.S. 306, 316, 314 (2023) (quoting *Carpenter v. United States*, 484 U.S. 19, 26 (1987)). No

precedent deems purportedly confidential military plans "property," and such plans cannot qualify as "property." *See* Dkt.23 at 32-44. Again, the government does not dispute this. Instead, its entire argument is to point to a red herring—§641 and *Girard*—and falsely suggest the broader phrase "thing of value" is interpreted "substantially coextensive[ly]." Dkt.25 at 32, n.7. It is not.

This alone disproves the government's contention that "[f]or nearly half a century, the Second Circuit has held that confidential operational information used in law-enforcement activities is a protected property interest of the United States." Dkt.25 at 27. *Girard* concerned a different statute with broader text and did not hold the at-issue information was "property." And neither has any court since. Thus, to the extent *Girard* established a "longstanding rule," Dkt.25 at 34, regarding "thing of value," it is not a rule that has any application here. Nor is *Girard* "binding here." *Id.* at 30.

Other cases beyond *Girard* confirm "thing of value" is not "coextensive" with "property." Indeed, the Second Circuit has described "thing of value" as "words of art" covering a broad scope. *United States v. Calk*, 87 F.4th 164, 182 (2d Cir. 2023) (citing *Girard*, 601 F.2d at 71). It has interpreted the phrase to include "amusement," "[s]exual intercourse, or the promise of sexual intercourse," a "promise to reinstate an employee," "an agreement not to run in a primary election," and the "testimony of a witness." *Id.* These are obviously not "property" or anything akin to "traditional property interests." *Kousisis*, 605 U.S. at 122. "Thing of value" is also broader because the Circuit held it "refer[s] to 'a subjective, rather than objective, concept." *United States v. Raniere*, 55 F.4th 354, 361-62 (2d Cir. 2022). But when it comes to "property," subjective value does not suffice, because "commercial value" is objective. *United States v. Chastain*, 145 F.4th 282, 295 (2d Cir. 2025); *Carpenter*, 484 U.S. at 26 (information was WSJ's "stock in trade…to be distributed and sold to those who would pay money for it").

The government also mischaracterizes *United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), and its discussion of *Girard*. *Blaszczak* did not adopt *Girard*'s holding as a viable construction of the term "property" in the fraud statute. To the contrary, *Blaszczak* clearly and correctly characterized *Girard* as interpreting "thing of value" "within the meaning of §641." *Id.* at 244. It discussed *Girard* because the *Blaszczak* defendants were charged with violations of §641 as well as wire fraud and the court ordered dismissal of the §641 counts. Indeed, the Acting Solicitor General noted in *Blaszczak* that "[s]ection 641 applies…to conversion of 'a thing of value,' rather than 'property.'" U.S. Supp. Letter Brief at 8, *United States v. Blaszczak*, No. 18-2811 (2d Cir. June 4, 2021) (ECF No. 497). The government makes much of *Blaszczak*'s reference to "inherent value" when discussing *Girard*, but while inherent value might suffice to satisfy §641's "thing of value" language, the government itself admitted in *Blaszczak* that to constitute "property," information must have "inherent *market* value" to its "owners," as Van Dyke argues here. *Id.* at 7 (emphasis added).

Moreover, even if *Blaszczak*'s discussion of *Girard* was meant to construe "property" in the fraud statute—it plainly was not for the reasons discussed—*Blaszczak*'s discussion of *Girard* was clearly dicta and the government "cannot transmute dictum into decision by waving a wand and uttering the word 'hold.'" *United States v. Rubin*, 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, J., concurring).

Although the government's §641 arguments are irrelevant for the reasons outlined, the government overstates its cited "line of decisions," Dkt.25 at 28, for additional reasons. Most of the cases clarify the at-issue "thing" the defendant converted was in fact *tangible* property, not information in a purely *intangible* form—as alleged here. *See Morison*, 844 F.2d at 1077 ("Whether pure 'information' constitutes property…is not…involved here. We are dealing with

specific, identifiable tangible property."); *United States v. DiGilio*, 538 F.2d 972, 978 (3d Cir. 1976) ("[S]ince there was an asportation of records…we need not…decide whether appropriation of information alone falls within §641."); *United States v. Fowler*, 932 F.2d 306, 309-10 (4th Cir. 1991) (case concerned "tangible property"); *United States v. Rodrigues*, 2024 WL 113744, at *4 (S.D.N.Y. Jan. 10, 2024) (defendant "sold NLRB records to an outside consultant," which constituted a "record of the United States"); *United States v. Schulte*, 436 F.Supp.3d 747, 749 (S.D.N.Y. 2020) (defendant copied "CIA cyber tools and source code, which he later transmitted to Wikileaks"). And in *United States v. Friedman*, the defendant did not even "argue that, as a matter of law, the information contained in the transcripts was not government property." 445 F.2d 1076, 1087 (9th Cir. 1971). The government also hides that the Ninth Circuit has squarely held against it, concluding classified information is not a "thing of value" because the statute "should not be read to apply to…intangible goods—like classified information." *United States v. Tobias*, 836 F.2d 449, 451 (9th Cir. 1988). The government is thus wrong again when arguing "[e]very other circuit to consider th[is] question…has agreed" with it. Dkt.25 at 30.

In sum, the Court should reject the government's argument that Van Dyke's motion "ignores decades of contrary precedent." Dkt.25 at 8. Section 641 is not the wire fraud statute, and the government's cases only confirm Van Dyke's position.

**B. The Alleged Military Plans Are Not "Property"**

The government is right about one thing: "Second Circuit precedent…controls the outcome here," Dkt.25 at 28—but it controls *in Van Dyke's favor*. "[C]onfidential information does not qualify" as property "unless it has commercial value to the [entity] that holds it." *Chastain*, 145 F.4th at 294-95; *Blaszczak*, 56 F.4th at 243-44 ("confidential information" not

"property" because agency "is not a commercial entity" and "does not sell, or offer for sale, a service or a product").

The government has already admitted this in many prior prosecutions. *See* Dkt.23 Point V(A)(3)). The government attempts to diminish its previous representations by stating they were "in reference to the regulatory information at issue" in *Blaszczak*. Dkt.25 at 34, n.8. But that ignores Van Dyke's discussion of the government's additional representations in other appeals, including *Chastain*, where the government reiterated that "[i]n a case involving government information, a court can helpfully look at whether the value of information to the government is primarily regulatory or economic." U.S. Brief at 21, n.4, No. 23-7038 (ECF No. 38). The government has clearly admitted, in a case not involving regulatory information whatsoever, that when "[g]overnments, unlike private businesses…, [] act through their 'sovereign power[s]…,' rather than in their capacity as market participants," schemes implicating those powers do not constitute fraud. *Id.* at 20 (quoting *Kelly v. United States*, 590 U.S. 391, 401 (2020)). The government's opposition does not resolve these inconsistencies.

Military plans clearly invoke the government's sovereign powers, not any commercial government interest, and such plans are not primarily economic. *See* Dkt.23 Point V(B). The government has no response. Instead, it confirms Van Dyke's position by admitting that "an exercise of sovereign power" is "not a proprietary interest." Dkt.25 at 34 (citing *Cleveland*); *see also Kelly*, 590 U.S. at 401 (the information cannot merely be created in government's role as a "sovereign wielding traditional police powers"). The government also fails to rebut Van Dyke's arguments that the military "is not a commercial entity," *Blaszczak*, 56 F.4th at 244, and that the information shares no other features of a "traditional property interest." Dkt.25 at 42-43.

Ignoring the bulk of Van Dyke's arguments, the government appeals to policy, stating Van Dyke's position "would produce a result no court has ever endorsed and Congress could not have intended." Dkt.25 at 35. It incorrectly claims no precedent "intended to limit the government's property rights" in fraud cases. *Id.* But courts have already dismissed the government's concerns. *McNally v. United States* discussed this issue head on, contrasting statutes "aimed at protecting the Federal Government alone"—such as 18 U.S.C. §641—with the fraud statute, which "had its origin in the desire to protect individual property rights" only. 483 U.S. 350, 359 n.8 (1987). Drawing that distinction, the Court made clear "any benefit which the Government derives from the [fraud] statute must be limited to the Government's interests as property holder." *Id.*

In other words, the question is not whether the government should or could protect the at-issue information through *some statute* or regulation. Because the prosecution elected to use the fraud statute, the only relevant question is whether the information constitutes "property"—it plainly doesn't.[7]

**C. The Government's New, Uncharged Theory Cannot Save Count Four**

It may be telling that the government's opposition turns to a new theory altogether that we suspect was not charged to the grand jury. The government now alleges, in its opposition, that Van Dyke's scheme targeted "money" in the form of "trading profits" from his Polymarket counterparties. Dkt.25 at 4. Even if the grand jurors heard evidence supporting this theory, it fails on a number of levels. Van Dyke received money from Polymarket, and no one alleges Polymarket was lied to. Next, money obtained from third parties cannot serve as the "money or property"

---

[7] The government's only argument against the rule of lenity is that "binding precedent…establishes the information at issue is property." Dkt.25 at 40. Again, the government's "precedent" is not binding here and is no reason to reject lenity, which clearly governs. That the government cannot cite a single case construing §1343 to support its position further underscores why due process and lenity considerations favor dismissal.

required. To the contrary, in a misappropriation case such as this one it is the fraudulent embezzlement of the alleged victim's money or property—here the United States Military's property—that must serve as the object of the scheme.

In misappropriation cases, the "victim" of the fraud is the entity or source whose confidential information the defendant misappropriates, not the defendant's trading counterparty. It is therefore the source's "money or property" that must be the object of the scheme. The Supreme Court explained in *United States v. O'Hagan* that in a misappropriation case a "fiduciary who pretends loyalty to the principal while secretly converting the principal's information for personal gain…defrauds the *principal*." 521 U.S. 642, 652 (1997) (emphasis added). "[T]he person or entity defrauded *is not* the other party to the trade." *Id.* at 656 (emphasis added). The Second Circuit stated the same in *United States v. Chestman*, explaining that in misappropriation cases "the predicate act of fraud [is] perpetrated on *the source* of the nonpublic information," not "the buyer or seller" who is the trading counterparty. 947 F.2d 551, 566 (2d Cir. 1991) (en banc) (emphasis added). *Carpenter* and *O'Hagan* further held that misappropriation "constitutes fraud" because it is "akin to embezzlement"—a form of theft through which the defendant steals money or property from *his principal*. *O'Hagan*, 521 U.S. at 654 (citing *Carpenter*, 484 U.S. at 27). As alleged in the indictment, and consistent with misappropriation case law, the purported victim here is the U.S. Military—Van Dyke's employer—not Polymarket counterparties.

That is dispositive, because fraud cases further hold the scheme's object must be "money or property" of the fraud *victim*, not money or property from whomever might be willing to exchange it. For example, *Cleveland* squarely held "the object of the fraud [must] be [money or property] in the victim's hands." 531 U.S. at 26; *United States v. Sekhar*, 570 U.S. 729, 737 (2013). And *Kelly* observed "[t]he victim's loss must be an objective of the [deceitful] scheme rather than

a byproduct of it." 590 U.S. at 402 n.2; *see also United States v. Miller*, 997 F.2d 1010, 1019 (2d Cir. 1993) (rejecting "constructive trust" theory of fraud). For these reasons, *Carpenter* does "limit[] [a misappropriation] scheme to instances in which the information itself is the obtained property," Dkt.25 at 36, because the information is the only thing the defendant "obtain[s]" from the victim in such a scheme, 18 U.S.C. §1343. Therefore, the government's new theory—that Van Dyke committed a fraud against trading counterparties to obtain their money—doesn't work.

The government tries to characterize its allegations as "precisely the type of scheme to defraud that *O'Hagan* and *Carpenter* describe," but it comes up short. Dkt.25 at 36. *Carpenter* explicitly recognized the defendants there engaged in "an ongoing scheme to share profits from trading," but it nowhere indicated the conviction could separately be sustained on the theory the defendants schemed to obtain their trading counterparties' "money." 484 U.S. at 27; *O'Hagan*, 521 U.S. at 654 (describing *Carpenter* as "a scheme to obtain trading profits" but nowhere indicating that alone sufficed). Instead, *Carpenter* analyzed whether the victim—the WSJ—was deprived of property in the form of confidential information. Again, that is because in a misappropriation case, it is the "money or property" of the *victim*—the source of the information—that matters. If every misappropriation case could be independently sustained as a "money" fraud merely by citing the defendant's trading profits as the government argues, the "property" analyses in *Carpenter*, *Blaszczak*, *Chastain*, and all related "insider trading" cases since *Carpenter* was decided in 1987 would have been entirely unnecessary. In each of these cases the defendant sought profits from the alleged scheme—but in none of these cases did the court observe the defendant fraudulently obtained "money."

The government's discussion of whether "convergence" is required does not govern here. Its precedent, *United States v. Greenberg*, 835 F.3d 295 (2d Cir. 2016), did not involve a

misappropriation scheme. And it is doubtful that *Greenberg* is even good law still given the multiple intervening Supreme Court precedents narrowing the scope of the fraud statute. For example, *Greenberg* stated that "[n]othing in [the statute] suggests that the scheme to defraud must involve the deception of the same person or entity whose money or property is the object of the scheme," 835 F.3d at 306, but the case did not consider how "property fraud [w]as defined at common law…as Congress would have understood it," *Ciminelli*, 598 U.S. at 315.

The common law makes clear that convergence *is* a requirement of fraud. The Restatement instructs "[o]ne who fraudulently makes a misrepresentation of fact…for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability *to the other in deceit*." Restatement (Second) of Torts §525 (1977). It further explains one's liability is limited to "the persons or class of persons whom he intends or has reason to expect to act or to refrain from action *in reliance* upon the misrepresentation." *Id.* §531.[8] And although *Neder* stated "justifiable reliance" is not an element of criminal fraud, it did so only because the statute "prohibit[s] [a] 'scheme to defraud'" in its inchoate form, "rather than the *completed* fraud." 527 U.S. at 24-25 (emphasis added). But the Supreme Court has never suggested the object of the fraud in a misappropriation case can be the money or property of a party who is not the actual victim of the fraudulent misappropriation.

The Court should reject the government's new theory for a separate reason altogether. If the government truly intends to proceed on its new theory, it has failed to allege enough information to "serve[] the Fifth Amendment protection against prosecution for crimes based on evidence not presented to the grand jury." *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999).

---

[8] The Ninth Circuit thus holds "the intent must be to obtain money or property from the one who is deceived." *United States v. Ali*, 620 F.3d 1062, 1070 (9th Cir. 2010).

Rather, the Indictment alleges a scheme exactly like the one in *Chastain*, in which information was misappropriated to secure trading profits, but where the Second Circuit still required the government to prove the at-issue information was "property" of the victim.[9] Indeed, the government's brief indicates the scheme's object was "material nonpublic information"—not "money." Dkt.25 at 39.

If the Court permits the government to proceed on the theory that the object of the alleged fraud was Van Dyke's trading counterparties' money, Van Dyke moves for disclosure of the grand jury minutes pursuant to Federal Rule of Criminal Procedure 6(e)(3)(E)(ii). Van Dyke has a constitutional right to a grand jury indictment, *see* U.S. Const. amend. V., and the Indictment indicates the government's last minute alternative theory was not presented to the grand jury.

Should the Court not order full disclosure, the Court should at least independently assure itself that the government's new theory was presented to the grand jury by inspecting the minutes.

**D. The Indictment Fails to Plead Specific Intent**

The Indictment fails to plead specific intent because it does not adequately plead that "[o]btaining the victim's money or property" was "the 'aim'…of the defendant's fraud." *Kousisis*, 605 U.S. at 122. The government argues incorrectly that "material nonpublic information" is "used interchangeably" with "property." Dkt.25 at 39. But information can obviously be MNPI without constituting "property," because information can affect public markets without having

[9] *Compare* Indictment ¶24, *with United States v. Chastain*, 1:22-cr-00305-JMF-1, Dkt.1 at 6-7 ("CHASTAIN misappropriated OpenSea's confidential business information by purchasing NFTs that he knew were going to be featured on OpenSea's homepage, and then profited by reselling the NFTs after they had been featured and appreciated in value.").

"commercial value to the [entity] that holds it." *Chastain*, 145 F.4th at 294-95 (a case in point); *Blaszczak*, 56 F.4th 230 (same).[10]

## IV. Count Five Must Be Dismissed

Because Count Four fails, no "specified unlawful activity" has been alleged and Count Five must be dismissed.

## V. Conclusion

For the foregoing reasons, the Court should dismiss the indictment with prejudice.

Dated: August 26, 2026
New York, NY

Respectfully submitted,

Zach Intrater
Teny R. Geragos
Jason A. Driscoll
Daniela Manzi
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4530
New York, NY 10005

Mark J. Geragos
Tina Glandian
GERAGOS & GERAGOS, APC
256 Fifth Ave., 6th Fl.
New York, NY 10017

cc: All counsel (by ECF)

[10] The government's confusion on this score is further evidence the grand jury was not properly charged here.

**CERTIFICATION**

The undersigned hereby certifies that the Reply Memorandum of Law in Support of Gannon Ken Van Dyke's motion to dismiss the indictment complies with this Court's July 31, 2026, Order authorizing counsel to file an oversized brief in this matter. The word count, exclusive of the caption, tables, and signature block is 6,926 words according to the word-processing system used to prepare the document.

Dated: August 26, 2026
New York, NY

Respectfully,

Zach Intrater
Teny R. Geragos
Jason A. Driscoll
Daniela Manzi
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4530
New York, NY 10005

Mark J. Geragos
Tina Glandian
GERAGOS & GERAGOS, APC
256 Fifth Ave., 6th Fl.
New York, NY 10017