UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

GANNON KEN VAN DYKE,

Defendant.

26 Cr. 156 (MMG)

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO THE U.S. COMMODITY FUTURES TRADING COMMISSION'S BRIEF OF *AMICUS CURIAE***

**TABLE OF CONTENTS**

I. The CFTC's Proposed Statutory Construction Fails ........ 1

II. The CFTC's Legislative Purpose Arguments Fail ........ 6

III. Polymarket Contracts Are Categorically Different Than Traditional "Swaps" ........ 9

IV. Fair Notice ........ 10

The CFTC wants to expand its jurisdiction in the wake of the growing prediction markets industry. That much is clear from its purported "amicus" brief. But the brief does nothing to show that the at-issue event contracts—geopolitical gambling wagers—are "swaps" subject to CFTC jurisdiction. Instead, it shows only that the CFTC's interpretation of "swap" is divorced from the text and legislative purpose, and so broad as to be meaningless. The CFTC wants to regulate a broader swath of conduct, but the law is running away from it: Since Van Dyke filed his reply, the Ninth Circuit rejected similar arguments. *See KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *12 (9th Cir. Aug. 28, 2026). Perhaps this is why the CFTC chose to file its amicus here, instead of litigating the case against Van Dyke that it started, and then desperately sought to stay. This Court should reject the CFTC's arguments and grant Van Dyke's motion to dismiss.

## I. The CFTC's Proposed Statutory Construction Fails

***First***, the CFTC argues the phrase "associated with a potential financial, economic, or commercial consequence" "is unmistakably sweeping." Dkt.28-1, hereinafter "AB," at 7. It claims contracts are "swaps" if the underlying event has even a theoretical financial consequence, even if "not felt right away" and even if "those consequences *never actually occur*." *Id.* The CEA's text does not support this reading.

*KalshiEX, LLC v. Assad* held that "associated with" as used in §1a(47)(A)(ii) "means that the event or contingency must be inherently associated with a potential financial [or economic] consequence, not just that the event or contingency have some potential downstream financial consequence." 2026 WL 2543846, at *12. The court rejected any broader interpretation, which "would render the definition of swap so broad as to be meaningless." *Id.* (citing *United States v. Lopez*, 514 U.S. 549, 565 (1995) (rejecting a "rationale [that] lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial")).

Rather, a narrow reading—Van Dyke's interpretation—is "supported by the plain meaning

of 'associate.'" *Id.* at *12 (citing *Associate*, Webster's New World College Dictionary 86 (4th ed. 2004); *Associate*, Oxford English Dictionary (2025)). This is because such terms "require[] a connection that is not 'tenuous, remote, or peripheral.'" *Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1061 (2026); *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) (courts avoid taking terms like "associate" "to the furthest stretch of its indeterminacy").

*Assad* also held the narrower reading "is supported by the surrounding statutory language," which refers "almost exclusively to financial measures, indices, or instruments," as Van Dyke argued. *Id.* at *12. The text of §1(a)(47)(A) further supports that conclusion, as it uses "associated with" in a limiting fashion elsewhere. Subsection (iii) defines "swap" as any contract that "transfers, as between the parties…the financial risk *associated with* a future change in…value." 7 U.S.C. §1a(47)(A)(iii). This means financial risk directly connected to or inherent in the referenced change in value.[1]

***Second***, the CFTC argues the Special Rule "acknowledg[es] that '[e]vent contracts' are 'swaps,'" AB at 4, 12, but that is also wrong. The Special Rule only applies to "contracts…in excluded commodities," 7 U.S.C. §7a-2(c)(5)(C)(i), as defined in 7 U.S.C. §1a(19). The at-issue contracts do not concern "excluded commodities." The definition of "excluded commodities" includes "an occurrence…beyond the control of the parties…and associated with a financial,

[1] For example, through a "rate floor"—cited in subsection (iii)—parties agree to an interest rate floor, thus transferring the financial risk inherent in falling interest rates onto the counterparty. Rate floor contracts do not seek to transfer any other risks; only those "associated with"—i.e., inherent in—the identified measure (interest rates). The same is true of the other types of contracts in §1a(47)(A)(iii). The CEA similarly uses the phrase "associated with" in a narrowing fashion in 7 U.S.C. §1a(4)(A). That section defines "[t]he term 'associated person of a swap dealer or major swap participant' [as] a person who is *associated with* a swap dealer or major swap participant as a partner, officer, employee, or agent." 7 U.S.C. §1a(4)(A) (emphasis added). "Associated with" in this context refers to specific agents of a swap dealer or participant—not anyone with a foreseeable or tangential association. Just as the phrase "associated with a swap dealer" does not include, for example, a third-party mailman who interacts with a swap dealer, "associated with a potential financial" consequence does not describe things not inherently financial or traditionally associated with financial hedging.

commercial, or economic consequence." 7 U.S.C. §1a(19)(iv). It "sets an even higher standard than the swap definition, which allows for 'potential' consequences." *Assad*, 2026 WL 2543846, at *16. Van Dyke's contracts did not concern "occurrences," and certainly not occurrences "associated with a financial, commercial, or economic consequence." Moreover, the Special Rule's text shows that Congress did not consider all event contracts swaps. The rule explicitly distinguishes between "event contracts" and "swaps contracts," *compare* 7 U.S.C. §7a-2(c)(5)(C)(i), *with* §7a-2(c)(5)(C)(ii), and reiterates that not all "agreements, contracts, [or] transactions" constitute "swaps," 7 U.S.C. §7a-2(C)(i).

In fact, the Special Rule is further evidence Congress did not consider the at-issue contracts to be transactions subject to Dodd-Frank. They do not further a "national public interest" by facilitating price discovery or hedging. 7 U.S.C. §5(a).[2] To the contrary, contracts involving "war" are deemed "contrary to the public interest"—primarily because they do not serve such functions. 7 U.S.C. §7a-2(c)(5)(C)(i); *see Assad*, 2026 WL 2543846, at *10 (sports "event contracts"—referenced in the Special Rule—"do not help institutions or investors hedge against risk"). The CFTC has itself admitted that event contracts like these "cannot reasonably be expected to be used for hedging purposes" and "have no price basing utility."[3] This is due to the "unpredictability of the specific economic consequences" of such events, as Van Dyke argues. *Id.*

***Third***, the CFTC argues the Court should deny the motion to dismiss because Van Dyke's contracts can alternatively be considered "binary 'options' under Section 1a(36) on 'commodities,'" and therefore be swaps under 7 U.S.C. §1a(47)(A)(i). AB at 10, n.9. Not so: Again, the contracts do not concern "commodities" and the government did not pursue an

[2] The CFTC asks the Court to ignore statutory purpose, AB at 13, but courts "interpret the relevant words…with reference to the statutory…purpose." *L.S. v. Webloyalty.com, Inc.*, 954 F.3d 110, 115 (2d Cir. 2020).
[3] *See Order Prohibiting the Listing or Trading of Political Event Contracts* at 3 (Apr. 2, 2012), https://www.cftc.gov/stellent/groups/public/@rulesandproducts/documents/ifdocs/nadexorder040212.pdf.

indictment on that theory. The government instead exclusively alleges the contracts are swaps under 7 U.S.C. §1a(47)(A)(ii). If the CFTC wanted to make such an argument, it could have pursued the case it brought, and then sought to stay, against Van Dyke.

***Fourth***, the CFTC claims the government's interpretation of "swap" would not "sweep every tableside bet…into" its jurisdiction, citing an exclusion from the definition of "trading facility" in 7 U.S.C. §1a(51)(B)(i), AB at 11. This argument is a red herring. The CEA states unambiguously that "[i]t shall be unlawful for any person…to enter into a swap unless the swap is entered into on…a board of trade designated as a contract market." 7 U.S.C. §2. For this reason, the *Assad* court rejected similar arguments and held the CFTC's proposed interpretation "would have to include all bets on 'bingo games' and 'pingpong matches'"—an "overly broad reading." 2026 WL 2543846, at *11. "Congress could not have intended for such a rationality-defying outcome." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 233 (3d Cir. 2026) (Roth, J., dissenting).

Indeed, the CFTC's own attempt to argue its interpretation of "swap" is not overbroad proves the opposite. The CFTC claims it can "further define" "swap" to resolve ambiguity. AB at 10-11. But that is not how criminal prosecutions work—due process and fair notice are *ex ante* requirements, and "[o]nly the people's elected representatives in Congress have the power to write new federal criminal laws." *United States v. Davis*, 588 U.S. 445, 447-48 (2019).

The same problem undermines the CFTC's proposed "proximate cause" test. It claims "potential economic consequences that are 'too remote' from the underlying event don't count." AB at 10, 18. But the phrase "associated with" is not "[l]ike any causation requirement," as the CFTC suggests. AB at 10. It is statutory text prescribing a specific requirement before the referenced "event or contingency" can qualify as a "swap." Moreover, "proximate cause" is an issue of fact, and makes no sense as the limiting principle for criminal CEA enforcement. The

definition of "swap" must be clear as a matter of law, especially if it dictates conditions for "managing and assuming price risks," 7 U.S.C. §5(a), or "jurisdiction over" a potential billion-dollar industry, AB at 2. The CFTC also overlooks that ambiguity cannot be resolved merely "by a trial jury…on a case-specific basis" through factfinding. *United States v. Barrett*, 937 F.3d 126, 128 (2d Cir. 2019). Due process and vagueness concerns foreclose that possibility.

The CFTC claims Van Dyke's interpretation of the statute would "undermine" its supposed enforcement power, AB at 2, but its argument ignores a more important consideration—that its interpretation of the statute would "vastly expand[] federal jurisdiction without statutory authorization." *Ciminelli v. United States*, 598 U.S. 306, 315-16 (2023). In the absence of a "clear statement by Congress," courts reject such interpretations. *Id.*; *Snyder v. United States*, 603 U.S. 1, 15-16 (2024) (requiring "clear lines"). Indeed, accepting the CFTC's arguments "would create a major-questions problem." *Assad*, 2026 WL 2543846, at *14. The CFTC's position would alter the federal-state balance in activities normally regulated by state police power, such as gambling, "an area…long…regulated by the States and Tribes." *Id.*[4] The CFTC suggests Van Dyke's interpretation would leave "a gaping hole in the national market," because "*no federal regulator* [would have] oversight," AB at 2—but that is also wrong. We don't argue event contracts genuinely "associated with" financial consequences should be exempt from CEA regulations—just that wagers *not* so associated are *not* so regulated.

***Fifth***, reaching far outside its area of expertise, the CFTC presumes to tell this Court there are no constitutional due process or lenity concerns in this case. Critically, the CFTC's brief underscores the very concerns it tries to wave away. It concedes "there is ongoing litigation around

[4] For this reason, "Forty-four States have" already entered the debate. Pet. For Writ of Certiorari at 24, *Flaherty v. KalshiEX, LLC*, No. 26-299, https://www.supremecourt.gov/DocketPDF/26/26-299/422751/20260902102245623_26-_PetitionForWritOfCertiorari.pdf.

the country about the scope of the Commission's jurisdiction," with judges, States, regulators, and billion-dollar-industry players disagreeing left and right. AB at 1 n.2. There is a circuit split regarding the meaning of "swap" and a petition for writ of certiorari has already been filed on these very issues. Moreover, the CFTC had taken "no steps to advise the public that it believed the [conduct] was questionable" until after it occurred. *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996). The first time the CFTC publicly declared its policy on insider trading on prediction markets was on February 25, 2026, when it issued an enforcement advisory. And the CFTC cites no enforcement actions involving event contracts brought prior to this one. *See* AB at 4-5.

Due process and lenity considerations apply with greater force in cases where, as here, the government seeks to extend the law into novel territory. *See United States v. Cohen*, 260 F.3d 68, 76 (2d Cir. 2001). These "prevent courts from 'applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope.'" *Id.* (quoting *United States v. Lanier*, 520 U.S. 259, 266-67 (1997)). Diverging interpretations of "swap" are a hallmark of statutory ambiguity warranting dismissal.

## II. <u>The CFTC's Legislative Purpose Arguments Fail</u>

Dodd-Frank's history makes clear Congress did not intend to transform the CFTC into "a national gambling regulator" and "[n]o one suggested it was [one] until over a decade after the law passed." *Assad*, 2026 WL 2543846, at *14. The CFTC claims the CEA is not limited to the types of contracts Congress had in mind when it enacted Dodd-Frank. AB at 12. But tellingly, the CFTC has, since Dodd-Frank's passage, relied on CEA § 3 as a guidepost to limit its own jurisdiction, citing the same language it now asks the Court to disregard.

In 2012, when the CFTC proposed rulemaking to further define "swap," it concluded that "nothing" in Dodd-Frank's legislative history "suggest[s] that Congress intended such agreements, contracts, or transactions" that "previously have not been considered swaps" to now "be regulated

as swaps" under Dodd-Frank. 77 Fed. Reg. 48208, 48211 (Aug. 13, 2012). In 2024, the CFTC stated the "public interest" is served when America's derivatives markets "provide a means for managing and assuming price risks and providing for price discovery." 89 Fed. Reg. 48,968, 48993 (June 10, 2024).

The CFTC has never regulated event contracts in the manner it now claims. It points to a 1993 no-action letter to Iowa Electronic Markets ("IEM") that "allow[ed] the facility to list event contracts tied to U.S. and Canadian elections." AB at 4. But IEM was "limited solely to academic research and experimental purposes," "operated strictly on a nonprofit basis," and disclosed it was "not regulated by, nor are its operators registered with, the [CFTC] or any other regulatory authority." CFTC Staff Letter No. 93-66 (June 18, 1993) at 1-2. On those conditions, the CFTC agreed not to take action against IEM "without asserting jurisdiction or describing [its] regulatory purview over the market." 73 Fed. Reg. 25669, 25670 (May 7, 2008).

The CFTC similarly points to a 2008 CFTC notice about the regulatory treatment of events contracts as evidence of its jurisdiction over contracts related to "the declaration of war and the length of celebrity marriages." AB at 4. But that notice distinguished such "general events"—which serve as "information aggregation vehicles"—from other instruments, such as "regional insured property losses, the count of bankruptcies, temperature volatilities, corporate mergers, and corporate credit events" that, though "not strictly price-based," have "generally-accepted and predictable financial, commercial or economic consequences." 73 Fed. Reg. at 25671. "[U]nlike the interests that event contracts cover," the CFTC stated, CFTC-regulated instruments "have been viewed as measures and occurrences that reasonably could be expected to correlate to market prices or other broad-based commercial or economic measures or activities." *Id.*

Subpart (ii), similarly, covers only events "associated with a potential financial, economic,

or commercial consequence." 7 U.S.C. §1a(47)(ii). Congress cabined this language after the CFTC had solicited public comment about its authority to regulate non-economic events just two years prior. This is further evidence Congress did not intend to reach "political" events trades such as those the CFTC identified. *See* 73 Fed. Reg. at 25670-71 (referencing "declaration of war" and "whether a Constitutional amendment will be adopted"). Congress further preserved findings that transactions subject to CEA regulation are "affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information," without including the broader "information aggregation" language the CFTC employed in its 2008 notice. 7 U.S.C. §5(a).

The CFTC claims Van Dyke's alleged wagers were not gambling because they facilitated hedging and price discovery. AB at 13. But how? Unlike swaps, the at-issue wagers "d[id] not help institutions or investors hedge against risk; they *create[d]* risk, largely for ordinary consumers, where none previously existed." *Assad*, 2026 WL 2543846, at *10.[5] The alleged trades could pay off in completely unpredictable ways. For example, Maduro would be "out," by the terms of one alleged wager, if he were struck by lightning and killed. But this would not produce "generally-accepted and predictable financial, commercial or economic consequences" that would facilitate hedging. 73 Fed. Reg. at 25671.

Though the CFTC argues recent Congressional proposals have no relevance, the sheer number of bills introduced this year alone shows Congress perceives a regulatory gap in the CEA's existing framework. Here, legislation was proposed *after* widespread reporting on the alleged trades. It is unlike *Solid Waste Agency of N. Cook County v. U.S. Army Corps of Eng'rs*, 531 U.S.

[5] The examples the CFTC cites to demonstrate hedging utility are an online sportsbook using sports bets to offset risk from disproportionate betting and a New York bar hedging its promise to cover customers' drinks if the Knicks won Game 1 of the NBA finals. AB at 14 n.13. Not only are these risks generated from the sports bets themselves, the contracts are "contrary to the public interest." 7 U.S.C. §7a-2(c)(5)(C)(i)(V).

159 (2001), where the court disregarded a single legislative bill pre-dating the case by 24 years. In *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000), for example, the Supreme Court rejected the FDA's then-new assertion it had regulatory authority over tobacco. The Court determined legislative proposals "Congress considered and rejected" after the adverse health consequences of tobacco consumption became well-known demonstrated Congress had "effectively ratified the FDA's [previous] long-held position that it lack[ed] jurisdiction under the FDCA to regulate tobacco products." *Id.* at 144. The CFTC's invocation of an amendment to the Standing Rules of the Senate—passed in one house of the legislature—does not change the calculus. *See* Daily Press Gallery, U.S. Senate (Apr. 30, 2026).[6]

## III. Polymarket Contracts Are Categorically Different Than Traditional "Swaps"

Polymarket resolves contracts unlike any prior market. This cannot be disputed. The CFTC's own two examples prove the point. First, it concedes the Latin America Dated Brent benchmark "is calculated based on a third party's collection and analysis of market survey *data*" that must "be further analyzed in subsequent *calculations*." AB at 16 (emphasis added). The data is measurable and "correlate[s] to market prices or other broad-based commercial or economic measures or activities." 73 Fed. Reg. at 25671. Second, the CFTC cites the London Bullion Market's private auction. Dkt. 28-1 at 16. This example is consistent with historically understood price discovery in pure commodities markets: Traders offer to buy or sell at various prices until demand and supply meet, creating a price signal on which economic actors directly rely.

## IV. Fair Notice

In addition to the due process arguments outlined above, Van Dyke reincorporates the fair notice and vagueness arguments contained in his prior briefing. *See* Dkts.23, 31.

[6] Available at https://www.dailypress.senate.gov/thursday-april-30-2026/.

* * *

For the foregoing reasons, the Court should dismiss the indictment with prejudice.

Dated: September 9, 2026
New York, NY

Respectfully,

Zach Intrater
Teny R. Geragos
Jason A. Driscoll
Daniela Manzi
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4530
New York, NY 10005

Mark J. Geragos
Tina Glandian
GERAGOS & GERAGOS, APC
256 Fifth Ave., 6th Fl.
New York, NY 10017

**CERTIFICATION**

The undersigned hereby certifies that the Memorandum of Law in Opposition to the U.S. Commodity Futures Trading Commission's Brief of *Amicus Curiae* complies with this Court's August 24, 2026, Order authorizing counsel to file a ten-page supplemental brief.

Dated: September 9, 2026
New York, NY

Respectfully,

Zach Intrater
Teny R. Geragos
Jason A. Driscoll
Daniela Manzi
AGNIFILO INTRATER LLP
140 Broadway, Ste. 4530
New York, NY 10005

Mark J. Geragos
Tina Glandian
GERAGOS & GERAGOS, APC
256 Fifth Ave., 6th Fl.
New York, NY 10017