USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 10/26/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

-against-

GANNON KEN VAN DYKE,

Defendant.

26-CR-156 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Defendant Gannon Ken Van Dyke is charged in a five-count indictment (the "Indictment") with unlawful use of confidential government information for personal gain, in violation of 7 U.S.C. §§ 6c(a)(3) and 13(a)(5) (Count One); theft of nonpublic government information, in violation of 7 U.S.C. §§ 6c(a)(4)(C) and 13(a)(5) (Count Two); commodities fraud, in violation of 7 U.S.C. §§ 9(1) and 13(a)(5), and 17 C.F.R. § 180.1 (Count Three); wire fraud, in violation of 18 U.S.C. § 1343 (Count Four); and engaging in a monetary transaction in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957 (Count Five). Dkt. No. 2. Van Dyke has moved to dismiss the Indictment in its entirety. For the reasons set forth below, the motion is DENIED.

## BACKGROUND[1]

### A. Van Dyke and Operation Absolute Resolve

Defendant Gannon Ken Van Dyke has served as an active-duty soldier in the United States Army since approximately 2008 and, since at least 2023, has served as a Master Sergeant

[1] Unless otherwise noted, this Opinion relies only on undisputed facts and the allegations of the Indictment, which are presumed true for purposes of this motion. *United States v. Aleynikov*, 737 F. Supp. 2d 173, 176 (S.D.N.Y. 2010) (quoting *United States v. Velastegui*, 199 F.3d 590, 592 n.2 (2d Cir. 1999)).

with U.S. Army Special Forces. Dkt. No. 2 ¶ 2. At all times relevant to the Indictment, Van Dyke was stationed at Fort Bragg in Fayetteville, North Carolina, which houses, among other units, the U.S. Army Special Operations Command ("USASOC") and Joint Special Operations Command. *Id.*

As part of his military service, Van Dyke had access to sensitive, nonpublic, and classified information. *Id.* ¶¶ 3–5. In September 2018, Van Dyke signed a Sensitive Compartmented Information ("SCI") Nondisclosure Agreement, under which he acknowledged that the United States Government had placed "special confidence and trust" in him and agreed not to divulge information he knew to be SCI. *Id.* ¶ 3. Van Dyke further acknowledged that "all information" to which he obtained access pursuant to that agreement "is now and will remain the property of the United States Government." *Id.* On December 8, 2025, Van Dyke signed another nondisclosure agreement concerning "Western Hemisphere Operations." *Id.* ¶ 4. Under that agreement, Van Dyke agreed not to disclose classified or sensitive information concerning USASOC operations in the Western Hemisphere and acknowledged that such information "remains the property of the Government of the United States of America." *Id.*

From December 8, 2025, through January 5, 2026, Van Dyke was involved in the planning and execution of "Operation Absolute Resolve," the U.S. military operation to apprehend the then-President of Venezuela, Nicolás Maduro, and his wife, Cilia Flores. *Id.* ¶¶ 1, 5. In this role, Van Dyke had access to large amounts of sensitive, nonpublic, and classified information concerning the operation. *Id.* The Indictment further alleges that Van Dyke understood the nonpublic nature of information concerning U.S. special operations, both in general and in connection with this operation in particular. *E.g.*, *id.* ¶ 6.

**B. Polymarket and Van Dyke's Trades**

Polymarket is a prediction marketplace that offers binary event contracts, or "shares," through which users can trade on the outcomes of future events. *Id.* ¶ 7. Each "market" or contract poses a "Yes/No" question and pairs a "YES" share with a "NO" share. *Id.* The markets are created by Polymarket personnel before being made available for trading. *Id.* When a market "resolves," the share corresponding to the correct outcome pays $1.00 and the other pays nothing. *Id.* Before resolution, shares trade between $0.00 and $1.00, with the price reflecting the market's assessment of the probability that the specified event will occur. *Id.* Polymarket operates the markets relevant here using a blockchain and processes trading activity and payments using "USDC.e," a cryptocurrency pegged one-to-one to the U.S. dollar. *Id.* ¶ 8. The relevant markets are published to the blockchain as smart contracts that automatically distribute USDC.e to holders of winning shares upon resolution. *Id.*

During the fall and winter of 2025, Polymarket offered several markets concerning Venezuela and Maduro. *Id.* ¶ 9. These included markets asking whether U.S. forces would enter Venezuela by various dates; whether Maduro would be removed from power by various dates; whether the United States would invade Venezuela by January 31, 2026; and whether President Trump would invoke the War Powers Resolution against Venezuela by a specified date. *Id.*

On December 26, 2025, while involved in the final planning stages and execution of Operation Absolute Resolve, Van Dyke opened a Polymarket account. *Id.* ¶¶ 5, 10. Between December 27, 2025 and January 2, 2026, Van Dyke purchased a total of $33,934 in "YES" shares on Maduro- and Venezuela-related markets. *Id.* ¶¶ 10–11. The Indictment identifies thirteen separate trades made by Van Dyke during that period. On December 27, for example, Van Dyke purchased approximately 634 "YES" shares on the market asking whether U.S. forces would be in Venezuela by January 31, 2026, at an average price of approximately $0.15 per

share. *Id.* ¶ 11(a). On December 30, he purchased approximately 14,619 "YES" shares on the market asking whether Maduro would be out of power by January 31, at average prices of approximately $0.09 and $0.10 per share. *Id.* ¶ 11(b).

Van Dyke substantially increased his Polymarket positions during the two days immediately preceding the military operation to capture Maduro. On January 1, 2026, he purchased approximately 17,858 "YES" shares on whether the United States would invade Venezuela by January 31; approximately 1,752 "YES" shares on whether President Trump would invoke the War Powers Resolution against Venezuela by January 31; and approximately 73,685 "YES" shares on whether Maduro would be out of power by January 31. *Id.* ¶ 11(c). On January 2, Van Dyke made additional purchases on Polymarket totaling more than 350,000 "YES" shares across several Maduro- and Venezuela-related markets, including approximately 348,000 shares concerning whether Maduro would be out of power by January 31. *Id.* ¶ 11(d).

According to the Indictment, Van Dyke "possessed material nonpublic information about [Operation Absolute Resolve] at the time of each and every trade he placed in Maduro- and Venezuela-related markets." *Id.* ¶ 12. That information had been obtained through his employment and was subject to his duties and commitments to maintain the confidentiality of classified information and not use it for personal gain. *Id.*

**C. Maduro's Capture, Van Dyke's Profits, and Subsequent Account Activity**

In the predawn hours of January 3, 2026, U.S. special forces entered Venezuela and apprehended Maduro and his wife at a residence in Caracas. *Id.* ¶ 13. At approximately 4:21 a.m. Eastern Standard Time, President Trump publicly announced the operation on social media. *Id.* Following the announcement, Polymarket resolved several of the contracts on which Van Dyke had purchased "YES" shares at $1.00 per share, including the markets asking whether Maduro would be out of power by January 31 and whether U.S. forces would be in Venezuela by

January 31. *Id.* ¶ 15. Van Dyke also sold his positions in the "Trump invokes War Powers against Venezuela by . . . January 31" market and the "Will the U.S. invade Venezuela by . . . January 31" market for a profit before those markets resolved. *Id.* In total, Van Dyke realized approximately $409,881 in profits from his trades. *Id.*

Following the successful trades, Van Dyke transferred the proceeds through several accounts. *Id.* ¶ 16. On January 3, 2026, Van Dyke transferred approximately 437,859 USDC.e from his Polymarket account to a foreign cryptocurrency "vault." *Id.* Two weeks later, he transferred approximately 444,209 USDC.e from that vault to a cryptocurrency-exchange account, from which he subsequently withdrew approximately $444,209 and deposited the funds into a newly created brokerage account. *Id.* As of April 21, 2026, the brokerage account contained approximately $415,511 traceable to Van Dyke's Polymarket trades. *Id.*

## DISCUSSION[2]

## I. LEGAL STANDARD ON A MOTION TO DISMISS

On a motion to dismiss an indictment pursuant to Federal Rule of Criminal Procedure 12(b), "the Court accepts the allegations in the indictment as true and may not consider the sufficiency of the evidence." *United States v. Block*, No. 16-CR-595 (JPO), 2017 WL 1608905, at *2 (S.D.N.Y. Apr. 28, 2017); *see also United States v. Perez*, 575 F.3d 164, 166 (2d Cir. 2009).[3] However, because "federal crimes are solely creatures of statute," a defendant may move to dismiss any count in an indictment "on the ground that it fails to allege a crime within

[2] The Court refers to the memoranda of law in support of and in opposition to the motion to dismiss as follows: Dkt. No. 23 ("Mot."), Dkt. No. 25 ("Opp."), and Dkt. No. 31 ("Reply").

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes and omissions, and adopt alterations.

the terms of the applicable statute," even if all facts alleged in the indictment are true. *United States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012); *see also* Fed. R. Crim. P. 12(b)(3)(B)(v).

Rule 7(c) requires only that an "indictment . . . be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). "An indictment is sufficient when it charges a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992). Generally, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime." *United States v. Stringer*, 730 F.3d 120, 124 (2d Cir. 2013).

Indictments returned by a grand jury are presumptively valid and sufficient to allow the matter to proceed to trial, *see Kaley v. United States*, 571 U.S. 320, 328 (2014) ("[A]n indictment 'fair upon its face,' and returned by a 'properly constituted grand jury,'. . . conclusively determines the existence of probable cause to believe the defendant perpetrated the offense alleged."); *Costello v. United States*, 350 U.S. 359, 409 (1956) ("An indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits."), and accordingly a defendant seeking the pre-trial dismissal of charges faces a heavy burden. "[D]ismissal of an indictment is an extraordinary remedy reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001); *see also United States v. Coren*, No. 07-CR-265 (ENV), 2009 WL 2579260, at *1 (E.D.N.Y. Aug. 20, 2009) (defendants seeking to dismiss an indictment carry a "Herculean burden" given the extraordinary nature of the remedy sought).

## II. THE MOTION TO DISMISS COUNTS ONE, TWO, AND THREE IS DENIED

Van Dyke argues that Counts One, Two, and Three of the Indictment must be dismissed because first, the event contracts at issue are not "swaps" within the meaning of the Commodities Exchange Act ("CEA"), *see* Mot. at 6–21, and second, the charges independently fail on constitutional grounds, including under the void-for-vagueness doctrine, *see id.* at 21–31. Neither argument provides a basis for dismissal.

### A. Van Dyke Fails to Establish That the Contracts at Issue Cannot Constitute Swaps as a Matter of Law

Van Dyke contends that the transactions at issue are not swaps because the subjects of the transactions are not "inherently economic" and do not "traditionally and directly affect commodity prices." *Id.* at 8. The Government responds that the event contracts alleged in the Indictment fit comfortably within the statutory definition of a swap because "they are contracts whose payment depends on the occurrence of events—U.S. military action against Venezuela and Maduro's removal from power—that are 'associated with a potential financial, economic, or commercial consequence.'" Opp. at 10 (quoting 7 U.S.C. § 1a(47)(A)(ii)). Both sides devote a considerable portion of their briefs arguing in support of their respective interpretations of subpart (ii), relying on statutory text and structure, legislative history, and policy considerations. *See* Mot. at 7–21; Opp. at 10–19. But the Court need not wade into the thicket of the parties' interpretive dispute at this stage because Van Dyke's motion can succeed only if the event contracts alleged in the Indictment cannot be swaps as a matter of law, and Van Dyke has failed to make that showing.

Whether the contracts at issue are "associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii), turns on the nature of those contracts and their relationship to the underlying events—factual questions that cannot be resolved on a motion

to dismiss. *See United States v. Pirro*, 96 F. Supp. 2d 279, 282–83 (S.D.N.Y. 1999) (on a motion to dismiss, the court must "presume the truth of the allegations in the indictment" and "cannot resolve questions . . . that require trying facts reserved for the jury"). While Van Dyke's briefs attempt to paint the issue as solely one of statutory interpretation, defense counsel's statements at oral argument underscore the fact-dependent nature of these questions. *See, e.g.*, Dkt. No. 45 ("October 7 Tr.") at 12:19–20 (arguing that whether a transaction constitutes a swap turns on "how the consequences flow from the event and whether that can give you the ability to hedge"); *id.* at 14:15–17 (considering whether "there is a direct correlation between the underlier of the swap and the risk you would want to hedge"); *id.* at 19:15–16 (considering whether the underlying event is "too attenuated" from its potential economic consequence). Even on Van Dyke's own account, then, determining whether the contracts fall within subpart (ii) requires assessing the "degree[] of attenuation" between the contracts' underlying events and their potential financial, economic, or commercial consequence. *Id.* at 20:5–6. The same is true regarding whether the transactions could facilitate hedging or price discovery. The Government represents, for example, that investors exposed to, *inter alia*, Venezuelan sovereign debt, obligations tied to Venezuela's state-owned oil company, or businesses dependent on Venezuelan oil production, could use the very contracts Van Dyke purchased to hedge against the economic consequences of U.S. intervention or regime change in Venezuela. *See* Opp. at 13–14; *see also id.* at 14 (arguing that conversely, "investors whose portfolios depended on intervention happening—because regime change could boost Venezuelan output, lower long-term oil prices, or improve credit prospects—might buy 'no' on those same contracts to protect

against the risk that regime change never happened"). Whether the Government can prove those propositions is for trial, and not the proper subject of a motion to dismiss.[4]

That conclusion also accords with decisions in this District declining to determine at the indictment stage whether particular instruments or transactions fall within the definition of a swap. *See, e.g.*, *United States v. Eisenberg*, No. 23-CR-010 (AS), 2023 WL 8720295, at *3 (S.D.N.Y. Dec. 18, 2023) (rejecting defendant's argument that the commodities-related counts must be dismissed because the financial instrument at issue is not "covered by the CEA," on the ground that "the Court cannot resolve the classification of [the underlying instrument] one way or the other at this juncture, given that these calls can't be made without a factual record"); *United States v. Eisenberg*, 784 F. Supp. 3d 579, 603 n.8 (S.D.N.Y. 2025) ("whether an instrument is covered by the CEA" presents a mixed question of law and fact "typically resolved by juries"); *S.E.C. v. Rorech*, 673 F. Supp. 2d 217, 225 (S.D.N.Y. 2009) (whether an instrument is a security-based swap "raises questions of fact"). Resolving the classification of the event contracts Van Dyke allegedly traded on would require the Court to "look[] beyond the face of the indictment and [draw] inferences as to the proof that would be introduced by the Government at trial." *United States v. Alfonso*, 143 F.3d 772, 776–77 (2d Cir. 1998). While Van Dyke remains free to argue at trial, or on a Rule 29 motion if he is convicted, that the Government has failed to

[4] Van Dyke warns that the Government's interpretation would "sweep every tableside bet on who will win an election, when a political leader will die, or even what color tie a candidate might wear during a debate, into federal regulatory jurisdiction." Mot. at 15. So, he urges the Court to construe subpart (ii) to require that the subject of a swap be "inherently economic." *Id.* at 8–10. Even assuming *arguendo* that Van Dyke's proposed limitation exists, he has not established as a matter of *law* that the subject of the contracts alleged in the Indictment are not "inherently economic." The Government contends that "the event contracts in this case . . . are inherently economic," Dkt. No. 40 at 2, and states that it intends to introduce "evidence concerning both the economic reasons investors would buy event contracts tied to U.S. intervention in Venezuela and the economic effects of that intervention," Opp. at 13–14. The Court therefore need not—and does not—determine the precise outer bounds of subpart (ii) to resolve the present motion.

prove that the alleged transactions are swaps within the meaning of subpart (ii), the present inquiry into the sufficiency of the Government's anticipated evidence is "premature" at this stage. *Id.* at 776–77. Because Van Dyke has not established that the transactions alleged in the Indictment cannot, under any circumstances consistent with the Indictment's allegations, constitute swaps as a matter of law, dismissal of Counts One, Two, and Three on this ground is not appropriate.[5]

Nor is dismissal warranted under the rule of lenity, which Van Dyke invokes to argue that "any residual ambiguity" over the statutory definition of a swap "must be resolved in [his] favor." Mot. at 21. The rule of lenity "is not a catch-all maxim that resolves all disputes in the defendant's favor." *United States v. Gonzalez*, 407 F.3d 118, 124 (2d Cir. 2005). It applies only "where there is a grievous ambiguity or uncertainty in the language and structure of a statute." *United States v. Fishman*, 157 F.4th 143, 159 (2d Cir. 2025). "[T]he fact that a statute has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the breadth of a legislative command." *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 644, 674 (2020); *see also Lockhart v. United States*, 577 U.S. 347, 361 (2016)

---

[5] Van Dyke's reliance on out-of-circuit decisions concerning sports event contracts does not help his motion. Mot. at 14; *see also* Reply at 5–6. Those cases addressed a materially different category of underlying events—sporting contests—and arose in the distinct context of whether the CEA preempts state gambling regulations. And to the extent that "whether sports event contracts are swaps" is relevant to this motion, there are a number of courts that have come to the opposite conclusion. *See, e.g.*, *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 228 (3d Cir. 2026) ("Because Kalshi's sports-related event contracts . . . depend on event outcomes associated with economic consequences, they fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction."); *Coinbase Fin. Mkts., Inc. v. Raoul*, No. 25-CV-15406, 2026 WL 2969682, at *16 (N.D. Ill. Oct. 2, 2026) (Kalshi's "core sports-related contracts are swaps"); *United States v. Minnesota*, No. 26-CV-02661 (KMM) (DTS), 2026 WL 2150211, at *14 (D. Minn. July 27, 2026) ("It is not difficult to see how [event] contracts" concerning, *inter alia*, "athletic events and games of skill[,] elections and decisions of government bodies and their agencies[,] legal actions[, and] events in popular culture" "fit the CEA's definition of swaps."). Suffice it to say, the Court has not identified any authority squarely addressing the question raised here: whether the geopolitical event contracts alleged in the Indictment concerning U.S. military action against Venezuela and Maduro's removal from power are swaps under subpart (ii) as a matter of law.

(noting that the rule of lenity does not apply simply because the court can select more than one interpretation from "multiple, divergent principles of statutory construction").

These principles are particularly apt here. Van Dyke emphasizes the novelty of applying subpart (ii) to encompass the event contracts at issue, but novelty of application does not establish ambiguity. Indeed, if a novel "context" and "type of instrument" "were enough for application of the rule of lenity, the enforcement of the . . . commodities laws in an age of rapid development in technology and financial instruments would be impossible." *Eisenberg*, 784 F. Supp. 3d at 610. Because Van Dyke has not identified any ambiguity—let alone, a "grievous" one—in the statute's text or structure, the rule of lenity does not apply.

**B. Van Dyke's Constitutional Arguments Do Not Provide Grounds for Dismissal**

Van Dyke asserts that dismissal of Counts One, Two, and Three is independently warranted on account of the purported "vagueness in 7 U.S.C. § 1a(47)(A)(ii)'s requirement that contracts be 'associated with a potential financial, economic, or commercial consequence.'" Mot. at 24.[6] And specifically as to Count Three, Van Dyke contends that extending insider-trading jurisprudence developed under Section 10(b) and Rule 10b-5 to Section 6(c)(1) and Rule 180.1 would "create a new federal common-law crime in violation of separation-of-powers principles." *Id.* at 28–29. The Court addresses each argument in turn.

**1. Van Dyke's Void-for-Vagueness Challenge Is Premature**

"When the challenge is vagueness as applied [to a defendant's conduct], there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the

[6] Because the Government has disclaimed reliance on subpart (iv) of the swap definition, *see* Opp. at 22 n.4, the Court need not and does not address Van Dyke's void-for-vagueness arguments regarding that subpart, *see* Mot. at 31–32.

law provides explicit standards for those who apply it." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993); *see also Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) ("[A]ll vagueness challenges . . . require us to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement.").[7] Outside the First Amendment context, the Court must assess vagueness "in light of the specific facts of the case at hand." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003). Given the focus on factual analysis, a defendant's as-applied vagueness challenge is often premature at the indictment stage. *See United States v. Phillips*, 690 F. Supp. 3d 268, 292–93 (S.D.N.Y. 2023).

Consistent with *Phillips* and other authorities, the Court declines to resolve Van Dyke's vagueness challenge at this stage of the case. *See, e.g.*, *United States v. Gotti*, No. 02-CR-743 (RCC), 2004 WL 32858, at *6 (S.D.N.Y. Jan. 6, 2004) ("Arguments that a statute is unconstitutionally vague as applied to the facts of the case necessarily must be made after those facts emerge."); *United States v. Bastian*, 112 F. Supp. 2d 378, 380 (S.D.N.Y. 2000); *United States v. Peraire-Bueno*, No. 24-CR-293 (JGLC), 2025 WL 2062021, at *6 (S.D.N.Y. July 23, 2025). On a vagueness challenge, the "touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that *the defendant's conduct* was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997) (emphasis added); *see also United States v. Shvartsman*, 722 F. Supp. 3d 276, 299 (S.D.N.Y. 2024) ("An implicit requirement of the vagueness test is that it must be clear what the defendant did."). Here, the Government and Van Dyke take divergent views on Van Dyke's conduct. Van Dyke argues that all the

[7] When "the interpretation of a statute does not implicate First Amendment rights, it is assessed for vagueness only . . . in light of the specific facts of the case at hand and not with regard to the statute's facial validity." *United States v. Rybicki*, 354 F.3d 124, 129 (2d Cir. 2003); *see also United States v. Whittaker*, 999 F.2d 38, 42 (2d Cir. 1993) ("Other than in the First Amendment context, vagueness challenges . . . must be examined . . . on an as-applied basis."). Accordingly, the Court construes the motion as asserting an as-applied vagueness challenge.

Indictment alleges is that he placed bets concerning U.S. military involvement and leadership change in Venezuela, and that such wagers facilitated, if anything, "personal amusement, not commercial risk management or price discovery." Mot. at 6, 13. The Government, on the other hand, contends that Van Dyke knowingly breached his obligation to safeguard material nonpublic information about a highly sensitive military operation by executing swap transactions for his personal profit. Dkt. No. 2 ¶¶ 1, 10–12. Accordingly, the Court requires "full factual development at trial before it can determine whether the CEA . . . statutes failed to provide" fair warning that Van Dyke's actual conduct was prohibited by law. *Phillips*, 690 F. Supp. 3d at 293; *see also United States v. Milani*, 739 F. Supp. 216, 217 (S.D.N.Y. 1990) ("In the absence of a plenary trial record this Court is unable to rule on whether the statute is impermissibly vague as applied to defendant.").[8]

### 2. Section 6(c)(1) and Rule 180.1 Are Not Unconstitutional

Van Dyke contends that the insider trading alleged in Count Three amounts to an unconstitutional federal common-law crime, specifically because it merely copies, without defining, terms from the securities law and regulations, like "manipulative and deceptive device

[8] Van Dyke's alternative argument that the definition of a swap "lacks limiting language" and therefore invites arbitrary enforcement, Mot. at 24–25, conflates ambiguity with breadth. While the definition of a "swap" in the CEA is undoubtedly "broad," *Phillips*, 690 F. Supp. 3d at 286, it is not "so devoid of objective content that any enforcement decision necessarily devolves upon an [individual's] whim," *Copeland v. Vance*, 893 F.3d 101, 120 (2d Cir. 2018). Indeed, "[a] statute that sweeps broadly . . . is not necessarily unconstitutionally vague." *United States v. Yücel*, 97 F. Supp. 3d 413, 419 (S.D.N.Y. 2015). Nor does disagreement over statutory interpretation create vagueness. *See United States v. Morrison*, 686 F.3d 94, 104 (2d Cir. 2012) ("[I]t is manifest that conflicts between courts over the interpretation of a criminal statute do not in and of themselves render that statute unconstitutionally vague."); *Rybicki*, 354 F.3d at 143 ("divergence in panel or circuit views of a statute, criminal or otherwise, is inherent—and common—in our [judicial] system [and] does not establish vagueness"). Notwithstanding that "the growing complexities of financial transactions have generated numerous issues of statutory interpretation that admit of no clear resolution," *Roth v. Goldman Sachs Grp., Inc.*, 740 F.3d 865, 869 (2d Cir. 2014), "[t]hat alone cannot render shapeless a federal criminal prohibition, for even clear rules produce close cases," *Salman v. United States*, 580 U.S. 39, 51 (2016). The arbitrary-enforcement claim also does not provide a basis to dismiss the Indictment.

or contrivance" and "act, practice, or course of business which operates or would operate as a fraud or deceit upon a person." Mot. at 27–28. That argument does not withstand scrutiny.

"When a statutory term is obviously transplanted from another legal source, it brings the old soil with it." *Taggart v. Lorenzen*, 587 U.S. 554, 560 (2019). Here, that "old soil" is the long line of insider-trading jurisprudence developed under Section 10(b) and Rule 10b-5, which clearly holds that the misappropriation of confidential information for trading purposes in breach of a duty owed to the source of that information "satisfies § 10(b)'s requirement that chargeable conduct involve a deceptive device or contrivance," *United States v. O'Hagan*, 521 U.S. 642, 653 (1997), because such conduct "involves feigning fidelity to the source of information," *id.* at 655. The operative language of Section 6(c)(1) and Rule 180.1 is an "exact transplant from section 10(b)-5" and "has a well-settled interpretation" prohibiting certain forms of insider trading. *United States v. Clark*, No. 24-20271, 2025 WL 801358, at *3 (5th Cir. Mar. 13, 2025); *see U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d 996, 1008–09 (N.D. Ill. 2015) ("neither the operative language [of Section 6(c)(1) or Rule 180.1], nor its context, gives any clear indication to contravene this Court's presumption" that Congress intended to import the settled meaning of the borrowed terms and "thus, case law interpreting Section 10(b) and Rule 10b-5 remains instructive"); *see also Commodity Futures Trading Comm'n v. EOX Holdings L.L.C.*, 405 F. Supp. 3d 697, 709 (S.D. Tex. 2019) (applying in a civil case Section 10(b) and Rule 10b-5 misappropriation theory to alleged insider trading under Section 6(c)(1) and Rule 180.1).

Applying that well-established body of law to materially identical statutory language does not create a federal common-law crime, but rather interprets the scope of a prohibition enacted by Congress using language that already carried a settled legal meaning. *See Merrill*

*Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006) ("[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well."); *see also Kraft Foods*, 153 F. Supp. 3d at 1008–09 ("When Congress borrows specific terms of art or legal phrasing (as it did in drafting Section 6(c)(1)), a presumption may arise that Congress 'knows and adopts the cluster of ideas that were attached to each borrowed word.'" (quoting *Morissette v. United States*, 342 U.S. 246, 263 (1952))). Van Dyke's position to the contrary finds no support in caselaw and would turn the ordinary judicial task of interpreting borrowed statutory language into an exercise of legislative power merely because the incorporated body of law developed through judicial decisions.[9]

Accordingly, the motion to dismiss Counts One, Two, and Three is denied.

## III. THE MOTION TO DISMISS COUNT FOUR IS DENIED

Finally, Van Dyke argues that the wire-fraud charge must be dismissed because the subject information does not constitute "property" within the meaning of Section 1343. Mot. at 32. The Government contends precisely the opposite. Opp. at 27. Because confidential operational information used in law-enforcement and military activities can be a protected property interest, the motion to dismiss Count Four is denied.

### A. *Girard* and *Blaszczak* Foreclose Van Dyke's Argument that the Alleged Confidential Information Cannot Be "Property"

[9] This conclusion does not require or depend on deference to the CFTC's view, because the conclusion that Section 6(c)(1) and Rule 180.1 encompass insider trading follows plainly from the statutory and regulatory text, read against the settled meaning of the language Congress chose to employ.

Van Dyke maintains that the fraud statutes reach only traditional property interests and that this case involves none. *See* Mot. at 33–44. According to Van Dyke, "information about the military's plans to engage in an operation to capture a foreign head of state is simply not 'property,'" because such information lacks commercial value to the Government and instead implicates only the Government's sovereign military function. *Id.* at 41–42. Controlling Second Circuit precedent says otherwise.

In *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979), the Second Circuit affirmed the convictions of a current and former DEA agent who sold confidential information from DEA files concerning whether particular individuals were government informants. Rejecting the defendants' argument that Section 641 reached only tangible property, the Second Circuit held that "the Government has a property interest in certain of its private records which it may protect by statute as a thing of value." *Id.* at 71. *Girard* thus established that confidential government information may, under some circumstances, constitute a governmental property interest even though the information is intangible and the Government does not commercially exploit it.

*United States v. Blaszczak*, 56 F.4th 230 (2d Cir. 2022), did not disturb *Girard*, which remains binding on this Court. The defendants in *Blaszczak* obtained advance information concerning reimbursement rates that the Centers for Medicare and Medicaid Services ("CMS") planned to announce and used that information to trade securities. *Id.* at 233–34. Applying *Kelly v. United States*, 590 U.S. 391 (2020), the Second Circuit held that the CMS information did not constitute "property" or a "thing of value" within the meaning of the fraud and conversion statutes, because CMS' planned regulations and the timing of their announcement were "regulatory in character." *Blaszczak*, 56 F.4th at 244. The defendants had "schemed to obtain and promptly utilize advance information as to how the regulatory power would be

exercised by CMS." *Id.* The Second Circuit reasoned that "merely obtaining advance information as to what the agency's preferred regulation would be, and when it would be announced," did not transform that regulatory information into "the agency's money or property or a thing of value that could be converted." *Id.*

Critically, the Second Circuit expressly distinguished *Girard* rather than limiting or overruling it.[10] The *Blaszczak* court explained that the information in *Girard*—the identities of DEA informants in particular investigations—had "inherent value to the DEA in investigations and preparation for prosecutions," and that theft of that information would interfere with those operations by enabling investigative targets to "better conceal their criminal conduct, hide their contraband, or flee from arrest," and by endangering undercover agents and confidential informants. *Id.* The court therefore rejected any comparison between that "inherently valuable law enforcement information" and CMS' "regulatory information." *Id.*

The confidential information at issue in the Indictment is materially analogous to that in *Girard*, not the regulatory information in *Blaszczak*. Like information identifying informants in law enforcement investigations, advance information concerning a planned military operation derives most of its value to the Government from its confidentiality. *Cf. Blaszczak*, 56 F.4th at 244 (disclosure of confidential information can compromise operations by permitting targets to evade capture, alter their conduct, or otherwise frustrate the Government's plans).[11] Indeed, it is

[10] Indeed, the *Blaszczak* majority expressly rejected the accusation of the dissent that they were effectively overruling *Girard.* 56 F.4th at 244 ("We disagree with the dissent's contention that the present decision conflicts with this Court's precedent in *United States v. Girard*, 601 F.2d 69 (2d Cir. 1979).").

[11] The Government also argues that, unlike the regulatory information at issue in *Blaszczak*, there would be a significant economic cost to altering or cancelling a military operation if information concerning that operation was compromised. *See* Opp. at 32 ("Nor can [the Government] revise or discard the [military operational] plan at low cost: CMS could change a rate and move forward, but the

difficult to imagine a scenario in which confidentiality is more paramount than a covert military incursion into a foreign nation. *See New York Times Co. v. United States*, 403 U.S. 713, 728 (1971) (Stewart, J., concurring) ("[I]t is elementary that the successful conduct of international diplomacy and the maintenance of an effective national defense require both confidentiality and secrecy."). Unlike the information in *Blaszczak*, the confidential information at issue does not merely reveal how the Government intends to exercise its regulatory authority, or reveal it sooner than regulators would prefer; its secrecy is indispensable to its operational value because that value hinges on the Government's ability to maintain exclusive control over it. *See Kousisis v. United States*, 605 U.S. 114, 121–22 (2025) ("[T]he federal fraud statutes reach only 'traditional property interests.' Schemes that target the exercise of the Government's regulatory power, for example, do not count." (quoting *Ciminelli v. United States*, 598 U.S. 306, 316 (2023), and citing *Kelly*, 590 U.S. at 400)).

The interest in maintaining the confidentiality of information can be a cognizable property interest under *Girard*. 601 F.2d at 71–72. In addition to the fact that breach of confidentiality utterly destroys any value of the information at issue (information which is essential to the mission of the agency), the Government's interest in maintaining exclusive control over the information alleged in the Indictment bears another hallmark of traditional property ownership: the right to exclude. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights."); *Cedar Point Nursery v.*

military must build the operation anew, and opportunities to capture a head of state do not recur on demand.").

*Hassid*, 594 U.S. 139, 150 (2021) (describing the "central importance to property ownership of the right to exclude").

Van Dyke tries to distinguish *Girard* on two grounds. He first argues that *Girard* is inapposite because it arose under Section 641 rather than the wire-fraud statute.[12] *See* Reply at 12–13. To be sure, Section 641 refers to a "thing of value," whereas Section 1343 refers to "money or property." But *Blaszczak*, which involved convictions under both statutes, did not analyze the wire-fraud and conversion counts separately. After explaining that "a scheme to alter . . . a regulatory choice is not one to appropriate the government's property," *Blaszczak*, 56 F.4th at 243 (quoting *Kelly*, 590 U.S. at 400), the Second Circuit stated that "[i]n the present case the same is true with respect to the counts charging various defendants with fraud in violation of §§ 1343 and 1348 or with conversion of government property in violation of § 641." *Id.* It then framed the governing inquiry collectively: the defendants "could not properly be convicted of violating §§ 1343, 1348, or 641 unless the objective of their schemes and conduct was money or property of CMS." *Id.* The court ultimately concluded that "merely obtaining advance information as to what the agency's preferred regulation would be, and when it would be announced" could not be considered "money or property or a thing of value." *Id.* at 244.

More importantly, *Blaszczak* expressly considered *Girard* in determining whether the confidential CMS information could support the defendants' convictions under those statutes. The Second Circuit did not distinguish *Girard* because it arose under Section 641. Instead, it distinguished *Girard* because the information there was "inherently valuable law enforcement information," whereas the information in *Blaszczak* concerned the exercise of regulatory

---

[12] Section 641 makes it a crime to "embezzle[], steal[], purloin[], or knowingly convert[] to [the defendant's] use . . . any record, voucher, money, or thing of value of the United States." 18 U.S.C. § 641.

authority. *Id.* That distinction would have been unnecessary if, as Van Dyke contends, *Girard* had "no relevant application," Reply at 12, to the wire-fraud statute's "property" analysis. *See also Blaszczak*, 56 F.4th at 257 n.2 (Sullivan, J., dissenting) ("Our case law defines the phrase 'thing of value' under section 641 by reference to case law interpreting the term 'property'" and *Girard* "defines both 'thing of value' and 'property' to include certain private government records, including the 'confidential' information contained in those records.").

Next, Van Dyke attempts to distinguish *Girard* on the basis that the defendants there "actually disclosed" the confidential information, whereas Van Dyke allegedly retained the confidential information and used it to place trades. *See* October 7 Tr. at 84:9–85:3; *see also id.* at 48:2–20. That factual distinction does not render *Girard* inapposite, or suffice to render the Indictment deficient as a matter of law.[13]

Van Dyke's argument conflates two distinct inquiries: whether the confidential information constitutes government property and the manner in which that information was misused. The unauthorized sale of the confidential information by the defendants in *Girard*

---

[13] Van Dyke's contention that his trades involved no "actual" disclosure provides another example of the fact-specific nature of the parties' dispute, illustrating why dismissal of the Indictment is not appropriate. It is not clear at this stage whether the Government intends to present evidence at trial regarding how insider participation in prediction markets may result in disclosure of sensitive, confidential, or classified information. Indeed, recent reporting notes that most people "vastly underestimate how observable unusual betting activity actually is on Polymarket," and that it "would be naive to think foreign-intelligence agencies aren't monitoring these markets." Frank Landymore, *Insider Trading on Polymarket Is Revealing Military Secrets*, Futurism (Aug. 23, 2026, 7:02 AM), https://futurism.com/future-society/polymarket-revealing-military-secrets; *see also* James LaPorta, *Hegseth Bans DoD Personnel From Using Nonpublic Info to Bet on U.S. Military Operations*, CBS News (Oct. 22, 2026, 3:21 PM), https://www.cbsnews.com/news/hegseth-betting-ban-military-operations/ (in a memorandum to senior Pentagon leadership, Defense Secretary Pete Hegseth warned that "financial transactions on prediction markets could expose sensitive military movements to foreign adversaries and endanger American troops" and that "foreign intelligence services could analyze betting activity to anticipate American military movements, targets and timing of an operation"); Anthony Iavarone, *Prediction Markets Could Be a Valuable OSINT Tool*, U.S. Naval Institute (June 1, 2026), https://www.usni.org/PredictionMarketOSINT (providing hypothetical of intelligence analysts observing a 30% shift in a single day on a prediction market regarding whether country X will attack country Y, which could indicate individuals trading on asymmetric information).

answers the latter question; the fact or manner of disclosure itself was not what gave rise to the Government's property interest. Rather, *Girard* recognized that the Government "has a property interest in certain of its private records," 601 F.2d at 71, and *Blaszczak*, in distinguishing *Girard*, likewise focused on the nature of the information itself—its "inherent value to the DEA in investigations and preparation for prosecutions," 56 F.4th at 244.

The Government's case rests upon the misappropriation theory of insider trading as recognized in *O'Hagan*. *See* Dkt. No. 2 ¶ 12 ("By misappropriating and using [classified] information to execute trades, Van Dyke breached his duty of trust and confidence to the source of the information, and violated specific commitments Van Dyke had made to the United States regarding the use of the information."); *United States. v. O'Hagan*, 521 U.S. 642, 652 (1997) ("Under [the misappropriation] theory, a fiduciary's undisclosed, self-serving use of a principal's information . . . in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information."); *see also* October 7 Tr. at 87:13–18. That Van Dyke allegedly misappropriated the Government's information without direct disclosure to a third party does not alter the nature of the Government's asserted property interest in its exclusive use. Indeed, Van Dyke's alleged scheme depended on the information remaining confidential, because had the operation become public, the informational advantage that allegedly enabled Van Dyke to profit from his trades would have ceased to exist. *See Blaszczak*, 56 F.4th at 254 (Sullivan, J., dissenting) ("[T]he defendants' scheme depended on keeping [the Government's] choices . . . *unaltered*. After all, only if the pre-publication information remained the same could they trade on the inside information for a profit before it became public."). The distinction Van Dyke identifies therefore concerns the *manner* in which the confidential information was

allegedly exploited, not whether the Government possessed a property interest in that information in the first place.[14]

Because Van Dyke has failed to establish that the confidential information alleged in the Indictment cannot, as a matter of law, be the "property" of the Government, the motion to dismiss Count Four is denied.[15]

**CONCLUSION**

For all of the foregoing reasons, the motion to dismiss, Dkt. No. 22, is DENIED.

Dated: October 26, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge

[14] Van Dyke's remaining arguments do not save his motion to dismiss Count Four. First, the Indictment sufficiently alleges specific intent, as the Indictment "need only track the language of the statute." *United States v. Percoco*, No. 16-CR-776 (VEC), 2017 WL 6314146, at *8 (S.D.N.Y. Dec. 11, 2017); *see* Dkt. No. 2 ¶ 24. Second, the rule of lenity does not apply to Count Four either. Van Dyke claims that the application of Section 1343 in this case is novel and unexpected, but "[t]he rule of lenity isn't triggered every time the government advances a novel charging theory." *Eisenberg*, 784 F. Supp. 3d at 610 (citing *United States v. Kinzler*, 55 F.3d 70, 74 (2d Cir. 1995) ("The claimed novelty of this prosecution does not help Lida's cause, for it is immaterial that there is no litigated fact pattern precisely in point.")); *see also United States v. Phillips*, 155 F.4th 102, 132 (2d Cir. 2025) ("due process is not violated simply because the issue is a matter of first impression"). The "essential elements" of the wire fraud statute are straightforward: "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the mails or wires to further the scheme." *United States v. Greenberg*, 835 F.3d 295, 305 (2d Cir. 2016). While Van Dyke characterizes the Government's charging theory as "unprecedented," the wire-fraud statute in the context of the Government's theory is not so grievously ambiguous as to implicate the rule of lenity.

[15] Because the motion to dismiss Count Four is denied, dismissal of Count Five is also not warranted. *See* Mot. at 46.