UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

GANNON KEN VAN DYKE,

*Defendant.*

26 Cr. 156 (MMG)

**THE GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE PORTIONS OF PROPOSED EXPERT TESTIMONY OF AMIN SHAMS AND TERRENCE HENDERSHOTT**

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray

Assistant United States Attorneys

- *Of Counsel*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ....1
LEGAL STANDARD ....1
ARGUMENT ....2
I. The Defendant's Motion To Preclude Professor Shams's Opinion Should Be Denied. ..2
A. Professor Shams is Qualified to Render His Opinion .... 2
B. Professor Shams's Opinion Meets the Rule 702 Requirements .... 6
C. Rule 704 Does Not Bar Professor Shams's Opinion .... 8
D. Rule 403 .... 11
II. The Defendant's Motion to Preclude Professor Hendershott's Testimony Should Be Denied. ....12
A. Background .... 13
1. Professor Hendershott's Educational Background and Experience .... 13
2. Professor Hendershott's Proposed Testimony .... 16
B. Discussion .... 19
1. Professor Hendershott's Testimony Concerning Bond and Stock Prices Is Reliable. .... 19
2. Professor Hendershott's Testimony Concerning the Impact of Announcements of U.S. Military Action Is Well Founded and Supported. .... 28
3. Professor Hendershott's Testimony About Hedging Utility is Admissible. .... 30
CONCLUSION ....32

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
303 F.3d 256 (2d Cir. 2002) ........ 1, 7
*Better Holdco, Inc. v. Beeline Loans, Inc.*,
666 F. Supp. 3d 328 (S.D.N.Y. 2023) ........ 11
*Boucher v. U.S. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ........ 6
*Daubert v. Merrell Dow*,
509 U.S. 579 (1993) ........ 1
*Deutsch v. Novartis Pharms. Corp.*,
768 F. Supp. 2d 420 (E.D.N.Y. 2011) ........ 8
*Diaz v. United States*,
602 U.S. 526 (2024) ........ 8, 11
*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) ........ 4
*In re Rezulin Prods. Liab. Litig.*,
309 F.Supp.2d 531 (S.D.N.Y.2004) ........ 3
*In re Term Commodities Cotton Futures Litig.*,
No. 12 Civ. 5126 (ALC), 2020 WL 5849142 (S.D.N.Y. Sept. 30, 2020) ........ 9, 11
*In re Zyperxa Prods. Liab. Litig.*,
489 F. Supp. 2d 230 (E.D.N.Y. 2007) ........ 3, 30
*Johnson & Johnson v. CIBA Vision Corp.*,
No. 04 Civ. 7369 (LTS) (HBP), 2006 WL 2128785 (S.D.N.Y. July 28, 2006) ........ 3, 4, 30
*Lickteig v. Cerberus Cap. Mgmt.*,
589 F. Supp. 3d 302 (S.D.N.Y. 2022) ........ 8
*McCullock v. H.B. Fuller Co.*,
61 F.3d 1038 (2d Cir. 1995) ........ 6
*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) ........ 3
*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
691 F. Supp. 2d 448 (S.D.N.Y. 2010) ........ 4
*Ray v. United States*,
146 S. Ct. 834 (2025) ........ 9
*Restivo v. Hesseman*,
846 F.3d 547 (2d Cir. 2017) ........ 6, 7
*S.E.C. v. Lek Securities Corporation*,
370 F. Supp. 3d 384 (S.D.N.Y. 2019) ........ 5
*S.E.C. v. Tourre*,
950 F. Supp. 2d 666 (S.D.N.Y. 2013) ........ 5
*S.E.C. v. U.S. Environmental, Inc.*,
No. 94 Civ. 6608 (AJP), 2002 WL 31323832 (S.D.N.Y. Oct. 16, 2002) ........ 10

*Sullivan v. Ford Motor Co.*,
No. 97 Civ. 0593 (RCC), 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000) .... 3
*United States v. Brown,*
776 F.2d 397 (2d Cir.1985) .... 3
*United States v. DiDomenico*,
985 F.2d 1159 (2d Cir. 1993) .... 9
*United States v. Eldridge*,
528 F. App'x 17 (2d Cir. 2013) .... 10
*United States v. Ferguson*,
676 F.3d 260 (2d Cir. 2011) .... 23
*United States v. Forbes*,
249 F. App'x 233 (2d Cir. 2007) .... 24
*United States v. Grady*,
645 F. App'x 1 (2d Cir. 2016) .... 11
*United States v. Joseph*,
542 F.3d 13 (2d Cir. 2008) .... 6, 31
*United States v. Lopez*,
547 F.3d 364 (2d Cir. 2008) .... 10
*United States v. Martoma*,
993 F. Supp. 2d 452 (S.D.N.Y. 2014) .... 24
*United States v. Phillips*,
No. 22 Cr. 138 (LJL), 2023 WL 6620146 (S.D.N.Y. Oct. 10, 2023) .... 4, 10
*United States v. Pollok*,
139 F.4th 126 (2d Cir. 2025) .... 9
*United States v. Schiff*,
538 F. Supp. 2d 818 (D.N.J. 2008) .... 23, 24
*United States v. Tin Yat Chin,*
371 F.3d 31 (2d Cir. 2004) .... 3
*United States v. Whitman*,
555 F. App'x 98 (2d Cir. 2014) .... 6
*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) .... 1

**Rules**

Fed. R. Evid. 702 .... 1, 3, 8

**Other Authorities**

*Securities Litigation: Low Power, Confounding Effects, and Bias*,
93 Wash. U.L. Rev. 583 (2015) .... 19

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the defendant's motion *in limine* to exclude testimony of the Government's expert witnesses, Professors Amin Shams and Terrence Hendershott (Dkt. No. 49 ("Expert Br.")). The defendant's motion lacks merit and should be denied.

## LEGAL STANDARD

Under Rule 702, where "specialized knowledge will help the trier of fact," an expert witness may give opinion testimony if "(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion offers a reliable application of principles and methods to the facts of the case." Fed. R. Evid. 702. The party proffering expert testimony bears the burden of demonstrating, by a preponderance of the evidence, that the expert testimony is admissible. *See United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007); Fed. R. Evid. 702 advisory committee notes (2000). The trial court must "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow*, 509 U.S. 579, 597 (1993); *see also Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002). "Pertinent evidence based on scientifically valid principles will satisfy those demands." *Daubert*, 509 U.S. at 597. To determine whether the expert testimony is reliable, "the district court should consider the indicia of reliability identified in Rule 702." *Amorgianos*, 303 F.3d at 265. Specifically, the district court "must focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached." *Id.* at 266.

## ARGUMENT

### I. The Defendant's Motion To Preclude Professor Shams's Opinion Should Be Denied.

The defendant objects to just one of Professor Shams's opinions: that based on Professor Shams's review of "overall trading activity" for each of the markets involving the 0x31a56e account,[1] the 0x31a56e "account owner may have been more knowledgeable than the average market participant about the probabilities of the real-word outcomes." (Dkt. 50-1 ¶ 8.) To reach this opinion, Professor Shams used blockchain data to examine "the timing of Polymarket Account 0x31a56e's purchases in the context of the activity in the entire market." (*Id.*) Indeed, Professor Shams plotted 0x31a56e transaction activity for each of the four markets in which that account traded. He contrasted the timing of the 0x31a56e account's trades against price spikes in each of the four markets. And he considered the behavior of the 0x31a56e account as compared to the other market participants.

The defendant contends that this opinion is inadmissible because Professor Shams is not qualified to offer it, it is not based on reliable methods, and it violates Rules 704 and Rule 403. The defendant is wrong.

#### A. Professor Shams is Qualified to Render His Opinion

Despite conceding that Professor Shams is qualified to offer opinions regarding an array of topics, the defendant's first attack on the challenged opinion is that Professor Shams is not qualified to offer it.

[1] Polymarket identifies many of its user accounts by their wallet address on the Polygon blockchain. The Government will prove at trial that the 0x31a56e account was controlled by Van Dyke and used by him to trade using material nonpublic Government information.

To be sure, an expert witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Fed. R. Evid. 702. "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony." *United States v. Tin Yat Chin,* 371 F.3d 31, 40 (2d Cir. 2004). "Courts in the Second Circuit have liberally construed expert qualification requirements when determining whether a witness can be considered an expert." *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 427 (S.D.N.Y. 2014) (citing *United States v. Brown,* 776 F.2d 397, 400 (2d Cir.1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); *In re Rezulin Prods. Liab. Litig.,* 309 F.Supp.2d 531, 559 (S.D.N.Y.2004) ("The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience.")).

In keeping with the "liberal" construction of the expert-qualification requirement, courts in the Second Circuit have emphasized that an "expert should not be required to satisfy an overly narrow test of his own qualifications." *Johnson & Johnson v. CIBA Vision Corp.*, No. 04 Civ. 7369 (LTS) (HBP), 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006). "If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent." *In re Zyperxa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007); *Sullivan v. Ford Motor Co.*, No. 97CIV 0593 (RCC), 2000 WL 343777, at *5 (S.D.N.Y. Mar. 31, 2000) ("One knowledgeable about a particular subject need not be precisely informed about all details of the issues raised in order to offer an opinion."). That is

because, in considering qualifications, the "only matter the court should be concerned with is whether the expert's knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Johnson & Johnson*, 2006 WL 2128785, at *5.

Professor Shams easily clears this threshold. Indeed, the defendant's motion essentially concedes this point. (*See* Expert Br. at 8 ("Shams's own personal website reveals he is familiar with the principles and methods that would be required to support the proffered opinion").) Professor Shams holds significant academic credentials: he has a Ph.D. in Finance from the McCombs School of Business at the University of Texas; a Master of Science in Finance also from the McCombs School; and an MBA from Sharif University of Technology. (Dkt. 50-1 at 24.) These credentials satisfy Rule 702. *See United States v. Phillips*, No. 22 Cr. 138 (LJL), 2023 WL 6620146, at *12 (S.D.N.Y. Oct. 10, 2023) ("[a] formal education in a particular field is sufficient to qualify a witness as an expert as a general matter, such that a lack of extensive practical experience directly on point does not necessarily preclude [the] expert from testifying." (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 466 (S.D.N.Y. 2018); *accord Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 691 F. Supp. 2d 448, 459-60 n.54 (S.D.N.Y. 2010).

Professor Shams is also an Assistant Professor of Finance at the Fisher College of Business at Ohio State, where he has taught since 2019. (*Id.*) Professor Shams teaches courses focused on Financial Technology, and is described as an expert on, *inter alia*, "Asset Pricing," "Financial Markets," and "Investments." *See* https://fisher.osu.edu/people/shams.22 (last accessed Nov. 4, 2026). His expertise in asset pricing, financial markets, and investments indicates he has the requisite level of knowledge to assess market participant behavior and information that market participants may be accessing when executing trades.

Not only has Professor Shams met the requisite knowledge threshold based on his credentials and teaching experience, but he has also researched and written on issues involving analysis of market participants. For example, in his paper, "Manipulation in the VIX?" Professor Shams investigates whether the volatility index is subject to manipulation by market participants, which includes studying market data similar to the work he performed to render the challenged opinion. *See* John M. Giffin and Amin Shams, May 3, 2017, available at https://www.absolem.info/trading/SSRN-id2972979.pdf, at 10-16 (last accessed Nov. 4, 2026); *id.* at 16 ("Because deep OTM SPX options are infrequently traded and have low liquidity, traders could be concentrating their trading around the settlement auction to take advantage of the higher liquidity of the options at that point."). In his article, "*Is Bitcoin Really Untethered?*" Professor Shams performed investigative analysis of pricing behavior of two assets—Bitcoin and Tether, which included analysis of their financial flows. *See* *https://onlinelibrary.wiley.com/doi/pdf/10.1111/jofi.12903* at 1937, 1957 (last accessed Nov. 4, 2026). In connection with that financial flow analysis, Professor Shams considered how market participants' "confidence" could impact pricing behavior. *Id.* at 1957. Thus, Professor Shams has experience rendering opinions similar to the one the defendant challenges.[2]

[2] The cases offered by the defendant are not applicable. In *SEC v. Tourre*, Judge Forrest precluded an opinion about collateralized debt obligations because the proposed expert "has no experience in the CDO industry apart from acting as an expert witness, yet he intend[ed] to opine about what information would and would not matter to CDO investors. He has no education, expertise, or experience in this area upon which to make such a statement." 950 F. Supp. 2d 666, 677 (S.D.N.Y. 2013). In *SEC v. Lek Sec. Corp.*, the proffered expert was precluded because he had no experience regarding the "market structures and trading practices at issue" in that case. 370 F. Supp. 3d 384, 408 (S.D.N.Y. 2019). Neither fit the circumstances here. Professor Shams has a Ph.D. in finance and experience studying the very subject about which he will testify: market participant behavior to assess reasons for trading activity. In *United States v. Whitman*, another case cited by the defendant, the Second Circuit affirmed exclusion of an expert that would have

In any event, "quibble[s] with [an expert's] academic training . . . and . . . other alleged shortcomings" are "properly explored on cross-examination." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995); *accord United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008). They are not a basis to preclude Professor Shams's opinion from trial.

**B. Professor Shams's Opinion Meets the Rule 702 Requirements**

Next, the defendant complains that Professor Shams's opinion about the 0x31a56e account is not based on reliable methods. Here too, he is wrong.

Rule 702 requires that expert testimony must be based on "reliable principles and methods" and "reflect[] a reliable application of th[ose] principles and methods to the facts of the case." Assessing reliability requires examining assumptions underlying expert testimony. The Second Circuit has consistently "held that a trial judge should exclude expert testimony" based on allegedly flawed assumptions only in the limited circumstances when the assumptions "are so unrealistic and contradictory as to suggest bad faith or [are] in essence an apples and oranges comparison." *Restivo v. Hesseman*, 846 F.3d 547, 577 (2d Cir. 2017). "By contrast, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.*; *accord Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996).

Professor Shams made reasonable decisions to analyze the market data and timing of the 0x31a56e trades to reach an opinion regarding information available to the 0x31a56e account. The defense's argument for exclusion does not show that the analyses are unreliable—much less "so

---

interpreted the defendant and a coconspirator's use of slang terms on Wall Street because, *inter alia*, "the jury could use common sense to unpack a double entendre, particularly where fact witnesses would testify about what they intended to convey." 555 F. App'x 98, 101–02 (2d Cir. 2014). In short, these cases involve issues not present here, where even the defendant effectively concedes that the expert has the relevant expertise.

unrealistic and contradictory as to suggest bad faith." *Restivo*, 846 F.3d at 577. Preclusion of the challenged opinion should be rejected on this basis alone.

The defendant's argument also relies on an inaccurate premise. The defendant asserts that Professor Shams "surveyed no data," and did not apply principles. (Expert Br. at 6.) Not so. Professor Shams analyzed the data of the markets in which the 0x31a56e account traded. (Dkt. 50-1 ¶ 8 ("Professor Shams used the Polygon blockchain and Polymarket API to account for overall trading activity in each market and then plotted Polymarket Account 0x31a56e's purchases, sales and redemptions.").) Indeed, the data Professor Shams surveyed was visually plotted into four graphs, which the defendant all but ignores. (*Id.*) The defendant next claims that Professor Shams did not define certain terms, which undermines his method. This is also wrong. Professor Shams uses "low probability" to describe "the market timing of Polymarket Account 0x31a56e purchases" that were made when the event "probability was between 3.9% and 15.1%." (Dkt. 50-1 ¶ 8.) He uses "sharply" and "shortly" to describe the temporal proximity of the plotted data, which terms appear in ¶¶ 8.a – 8.d of Prof Shams's expert notice. (Dkt. 50-1 ¶ 8.)

The defendant also ignores that Professor Shams's opinion is rooted in an analysis of market data. Professor Shams observes that the 0x31a56e account's purchases "were all placed in the same correlated direction regarding the real-word outcomes, most shortly before their probability and price sharply increased (sometimes to 100% certainty)." (*Id.*) To do this, Professor Shams compared the timing of the 0x31a56e account's trades to the overall market data set. This is not "interpretation of a party's conduct," Expert Br. at 8; it is analysis of market trading data, which Professor Shams is more than qualified to do. *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) ("The judge should only exclude the evidence if the flaw is large enough that the expert lacks 'good grounds' for his or her conclusions."). As Professor

Shams' method is sufficiently reliable, there is no particular test that he is required to perform. The defendant is wrong to suggest otherwise. (Expert Br. at 6-8); *see* Fed. R. Evid. 702, advisory committee's note to 2023 amendment ("[O]nce the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence."); *Deutsch v. Novartis Pharms. Corp.*, 768 F. Supp. 2d 420, 438 (E.D.N.Y. 2011) ("[A]rguments as to the reliability of non-controlled studies go to the weight, not the admissibility of these experts' opinions on preventative measures.").

The defendant may disagree with the methodology Professor Shams employed to reach his opinion. But that is a topic for cross-examination and a factual argument for the jury to weigh, not a fundamental defect in the expert analysis. *See Lickteig v. Cerberus Cap. Mgmt.*, 589 F. Supp. 3d 302, 333 (S.D.N.Y. 2022) ("[F]actual disagreements are to be resolved by the trier of fact as a matter of weight, not by the Court as a matter of admissibility.").

**C. Rule 704 Does Not Bar Professor Shams's Opinion**

Federal Rule of Evidence 704(a) sets out the general rule that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Rule 704(b) then provides an exception to this general rule; "[i]n a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." As the Supreme Court explained in *Diaz v. United States*, 602 U.S. 526, 533-34 (2024), however, this exception should be narrowly construed; 704(b) "covers a narrow set of opinions" and "proscribes only expert opinions in a criminal case that are about a particular person ('the defendant') and a particular ultimate issue (whether the defendant has 'a mental state or condition' that is 'an element of the crime charged or of a defense.)."

The Second Circuit has further explained that Rule 704(b) "does not prohibit all expert testimony that gives rise to an inference concerning a defendant's mental state. The plain language of the rule . . . means that the expert cannot expressly state the inference, but must leave the inference, however obvious, for the jury to draw." *United States v. Pollok*, 139 F.4th 126, 143 (2d Cir. 2025) (quoting *United States v. DiDomenico*, 985 F.2d 1159, 1165 (2d Cir. 1993), *cert. denied sub nom. Ray v. United States*, 146 S. Ct. 834 (2025)). "In other words, it is only as to the last step in the inferential process—a conclusion as to the defendant's actual mental state—that Rule 704(b) commands the expert to be silent." *Id.*

Rule 704 does not bar Professor Shams's challenged opinion. Indeed, Professor Shams does not opine on the defendant's mental state at all. Professor Shams merely offers an opinion about information that may have been known to the user of the 0x31a56e account. (*See* Dkt. 50-1 ¶ 8.) Rule 704 bars opinions about whether a defendant acted with a particular *mens rea*. An opinion, like the challenged opinion, that touches on *information* that may have been known to the defendant is not barred by Rule 704.

Courts in this District frequently admit expert opinions similar to Professor Shams's intended opinion. For example, in *In re Term Commodities Cotton Futures Litig.*, Judge Carter rejected the defendants' challenge to expert testimony as to the defendants' expected knowledge based on their actions. No. 12 Civ 5126 (ALC), 2020 WL 5849142, at *23 (S.D.N.Y. Sept. 30, 2020) (admitting expert testimony about "Defendants' knowledge in light of their actions—*e.g.*, that Defendants knew the possibility that there may be diminishing warehouse delays; that Defendants knew the March exports were materially inflated; that the Defendants knew of the logistical obstacles to increasing their positions at a late date," but excluding testimony regarding the defendants' motivation). Likewise, in *United States v. Phillips*, Judge Liman found that an

expert witness may testify to "whether particular portfolios or trades are consistent with" the typical market participants' "strategies, investment theses, and incentives." 2023 WL 6620146, at *14.

These cases apply the general principle that experts may opine on whether a defendant's conduct is or is not consistent with the Government's theory of guilt, including what they may have known, provided that the expert does not literally opine on whether *mens rea* was satisfied. The Second Circuit has routinely endorsed this principle, holding, for example, in cases charging possession with intent to distribute a controlled substance, that it is permissible for an expert to testify that a quantity of drugs, or certain paraphernalia, is "consistent with distribution" because "that testimony does not itself opine on the particular defendant's intent" to distribute drugs. *United States v. Eldridge*, 528 F. App'x 17, 19 (2d Cir. 2013); *United States v. Lopez*, 547 F.3d 364, 373 (2d Cir. 2008) (allowing expert testimony that the "drugs and paraphernalia found in Lopez's car were more consistent with distribution than personal use" because the "question—whether Lopez had the requisite intent to distribute—was clearly left to . . . the trier of fact"). The same is true in fraud cases. In *SEC v. U.S. Environmental, Inc.*, the court permitted expert testimony, which analyzed trading activity and "detail[ed] how those transactions were inconsistent with those of a lawful market maker." No. 94 Civ. 6608 (AJP), 2002 WL 31323832, at *2-3 (S.D.N.Y. Oct. 16, 2002). There the expert's opinions included "factual conclusions that embrace[d] an ultimate issue" but that did not render them improper under Rule 704 even if it "implie[d] manipulation" of pricing by the defendant. *Id.* at *5.

The challenged opinion is well within the bounds of what Rule 704 allows. Professor Shams will not testify that the defendant acted intentionally, knowingly or wrongfully;[3] rather, he will offer evidence regarding the quantum of information known to the 0x31a56e account based on a careful evaluation of the timing of its trades in the context of the broader market. The Government is permitted to introduce such evidence at trial. *See Better Holdco, Inc. v. Beeline Loans, Inc.*, 666 F. Supp. 3d 328, 375-76 (S.D.N.Y. 2023) (permitting expert testimony regarding the defendant's "use" of certain data even though it "goes to an ultimate issue in the case").

**D. Rule 403 Does Not Preclude the Opinion**

Nor does such testimony run afoul of Rule 403. Professor Shams will be subject to cross-examination, and the jury can decide for itself whether or not it agrees with his opinion. *See, e.g.*, *Diaz*, 602 U.S. at 534 (permitting expert testimony about the knowledge of most drug couriers under Rule 704(b) and noting that the same expert was cross-examined as to his knowledge of the facts of that case and awareness that there are unknowing couriers); *United States v. Grady*, 645 F. App'x 1, 4 (2d Cir. 2016) (holding that expert testimony that a certain amount of crack cocaine is consistent with distribution did not violate Rule 704(b) where the expert was subject to cross-examination and conceded that it is possible for that amount of crack cocaine to be for personal use); *In re Cotton Futures*, 2020 WL 5849142, at *24 (noting that "the weight and credibility of the experts can and should be explored on cross-examination"). In any event, the defendant's 403

[3] The defense conclusory claims that the challenged opinion is mere "semantic camouflage" designed to sneak in that the defendant "knowingly and intentionally traded" on nonpublic information. (Expert Br. at 12.) For one thing, leaning on a "camouflage" descriptor is tantamount to conceding that the testimony *does not* include statements about the defendant's *mens rea*. For another, claiming "camouflage" does not make it so. Nor does the opinion "tell" the jury what its result should be as the defendant claims. (Expert Br. at 13.)

argument is little more than a restatement of his other arguments and should be rejected for the same reasons.

## II. The Defendant's Motion to Preclude Professor Hendershott's Testimony Should Be Denied.

The defendant moves to preclude the testimony of the Government's expert, Professor Terrence Hendershott, principally for four reasons.[4] The defendant argues, first, Professor Hendershott's testimony concerning financial, economic, and commercial consequences of Operation Absolute Resolve is unreliable because he did not conduct an event study. (Expert Br. at 14-18). Second, Professor Hendershott's testimony that public announcements of U.S. military action have historically impacted financial markets is based on insufficient facts and data. (Expert Br. at 19). Third, Professor Hendershott is not qualified to testify about the hedging utility of the at-issue event contracts because he lacks private-sector experience, and that the testimony is unreliable and irrelevant because he does not point to actual examples of investors or institutions using the event contracts to hedge risk. And, fourth, Professor Hendershott's testimony is irrelevant because "whether each at-issue trade is a 'swap' . . . is an issue of law the Court should resolve."[5] (Expert Br. at 12).

These arguments, which are all premised on misapprehension of the law and Professor Hendershott's analysis, as well as a myopic view of Professor Hendershott's background, are not a basis to preclude any aspect of his testimony, particularly in light of the Circuit's permissive standards for assessing expert qualifications and the relevancy of evidence.

---

4 Professor Hendershott's expert disclosure is attached to the defendant's motion as Exhibit B ("Ex. B").

5 As the defendant acknowledges, the Court has already rejected this argument. (*See* Dkt. No. 47 (concluding that "Van Dyke fails to establish that the contracts at issue cannot constitute swaps as a matter of law"). The Court should do so again here.

## A. Background

### 1. Professor Hendershott's Educational Background and Experience

Professor Hendershott is the Willis H. Booth Chair in Banking and Finance at the Haas School of Business at the University of California, Berkeley, where he has been a faculty member since 2001. There, he teaches undergraduate and graduate-level courses on topics including trading, hedging, market making, and arbitrage. In addition to his teaching experience at UC Berkeley, Professor Hendershott was an assistant professor at the University of Rochester from 1998 to 2001 and served as a visiting professor at the Université Paris-Dauphine on various occasions from 2007 to 2013 and as a visiting scholar at the University of Sydney in 2010. Professor Hendershott holds a Ph.D. in Operations, Information, and Technology from Stanford University's Graduate School of Business and a Bachelor of Science in Mathematics and Statistics from Miami University.

At UC Berkeley, Professor Hendershott has served, since 2020, as Faculty Director of a Master of Financial Engineering ("MFE") program, in which he oversees the curriculum and teaches High-Frequency Finance. The MFE's required curriculum includes the following courses: 1) Investments and Derivatives; 2) Derivatives: Quantitative Methods; 3) Fixed Income Markets, which specifically covers bond pricing and its "uses for portfolio management or for hedging interest rate risk" and "covers derivative instruments (futures, swaps, options, exotic instruments)"; and 4) Financial Risk Measurement and Management, which specifically covers "market risk, credit risk, liquidity risk," and "counterparty risk in derivatives market."[6] MFE graduates go on to trading, structuring, portfolio management, quantitative research, and risk

[6] UC Berkeley Haas, Master of Financial Engineering, Curriculum, https://mfe.haas.berkeley.edu/academics/curriculum.

management roles at investment firms including Goldman Sachs, JPMorgan, Morgan Stanley, and BlackRock.[7]

Professor Hendershott is a distinguished academic and author of novel academic research. He has won numerous awards, including *Review of Financial Studies* Best Paper Award in 2015, *Financial Review* Outstanding Publication Award for 2014, New York Stock Exchange Euronext Award for best paper on equity trading in 2008, Nasdaq Award for best paper on market microstructure in 2007, and New York Stock Exchange Award for best paper on equity trading in 2007. His research appears in top finance journals including *Journal of Finance*, *Journal of Financial Economics*, *Review of Financial Studies*, and *Review of Economic Studies*. Per Google Scholar, his research has been cited over 13,000 times.[8] He has also served on the editorial boards of leading finance journals, including the *Journal of Finance*, *Journal of Financial Economics*, and *Journal of Financial Markets*. He is the recipient of a National Science Foundation Career Grant (2002–2006) and an Eminent Research Scholar at the University of Melbourne (2017, 2024, and 2026).

Professor Hendershott's research focuses on how information is incorporated into security prices and the interaction between trading and prices of various securities and financial instruments, and on how market participants, such as market makers, high-frequency traders, and institutional investors, affect price discovery and liquidity. His published research includes papers that model the use of hedging. In *Price Pressures*, published in a top finance journal, the *Journal of Financial Economics*, Professor Hendershott models how a risk-averse intermediary "trades off

---

[7] UC Berkeley Haas, Master of Financial Engineering, MFE Placement Report, https://mfe.haas.berkeley.edu/careers/mfe-placements.

[8] "Terrence Hendershott," *Google Scholar*, available at https://scholar.google.com/citations?user=DgK2BzgAAAAJ&hl=en.

revenue loss due to price pressure against price risk associated with staying in a nonzero inventory state." The analysis depends on which risks can and cannot be hedged: the authors explain that "systematic inventory risk can easily be hedged through offsetting positions in index futures or exchange traded funds," and that, in practice, other risks could be hedged "by taking an offsetting position in stocks in the same industry." In *Option Auctions*, published in another top finance journal, the *Review of Financial Studies*, Professor Hendershott and his coauthors measure options market makers' revenues after accounting for the costs of hedging the options positions they acquire. Another article co-authored by Professor Hendershott titled *Asset Price Dynamics with Limited Attention* and published in *The Review of Financial Studies* examines what drives pricing errors, finding that investors' varying exposures to private-value shocks "induce hedging motives to trade."[9]

Professor Hendershott has presented his research at numerous renowned academic conferences. He currently serves on the program committees of the Western Finance Association Conference; the SAFE Market Microstructure Conference; and the European Finance Association. His past service in conference program committees includes the International FinTech, InsurTech & Blockchain Forum; Napa Conference on Financial Markets; French Finance Association Paris December Conference; and Finance Down Under Conference.

Professor Hendershott's experience also extends beyond academia. He served on the University of California Retirement System Advisory Board from 2020 to 2024, including as its Chair in 2023 and 2024; served as a consultant to the Office of the Chief Economist of the Commodity Futures Trading Commission, the regulator of futures, swaps, and event contracts; has

---

[9] Hendershott, Terrence, et al., *Asset price dynamics with limited attention*, 35 Rev. Fin. Stud. 982 (2022), p. 963.

testified on behalf of commodity trading firms; and has consulted for investment firms. Also, as mentioned in his disclosure, Professor Hendershott has relevant private sector experience including positions as a visiting economist at the New York Stock Exchange from 2005 to 2006, as a member of the Nasdaq Economic Advisory Board from 2004 to 2007, and as chair of the Nasdaq Economic Advisory Board in 2007.

**2. Professor Hendershott's Proposed Testimony**

Professor Hendershott's testimony in this case will be grounded in his extensive experience researching and teaching about hedging and market microstructure, including how the prices of exchange-traded products incorporate information, and how market prices discover new information. Specifically, Professor Hendershott plans to testify about the following topics:

First, Professor Hendershott will provide an overview of relevant background concepts, including derivatives markets, hedging, and speculation. (Dkt. 50-2 ¶ 1).

Second, Professor Hendershott will testify that the at-issue event contracts "are associated with a range of potential financial, economic, or commercial consequences." (Dkt. 50-2 ¶ 2). He will explain how changes in the prices of Venezuelan bonds, Canadian and U.S. oil and gas equities, and Venezuelan oil exports and production all provide evidence of the consequences of the public announcement of Operation Absolute Resolve. (Dkt. 50-2 ¶ 3). Professor Hendershott's testimony will be based on his extensive experience researching and teaching about pricing of exchange-traded instruments and his review and analysis of dealer-to-dealer transaction data and trading data of Venezuelan sovereign and corporate bonds and trading data of securities of oil and gas companies. Specifically, Professor Hendershott will explain how the public announcement of Operation Absolute Resolve impacted offer and trading prices of Venezuela sovereign bonds, the

offer prices of Venezuela corporate bonds, and the trading prices of securities of oil and gas companies with exposure to Venezuela.

For example, Professor Hendershott will testify that the offer prices for eleven issuances of Venezuela sovereign bonds dramatically increased on January 5, 2026—the first trading day after the President announced the successful execution of Operation Absolute Resolve on January 3, 2026.[10] Depending on the series, the increases ranged from 29% to 35%. (Dkt. 50-2 at Slide 3). Likewise, the trading price data available for two series of Venezuela sovereign bonds reflected increases ranging from 33% to 41%. (Dkt. 50-2 at Slides 4A-4B). These sharp, single-day increases were considerably larger than any single-day increase in the months preceding the announcement and were sustained through September 2026. Professor Hendershott will testify that the corporate bond offer prices of Venezuela's state-owned oil company sharply increased on January 5, 2026, with increases ranging from 32% to 38%. (Dkt. 50-2 at Slide 5).

As to equities markets, Professor Hendershott will testify that the trading prices of securities of Canadian oil and gas companies generally reacted negatively, while the trading price of U.S. oil and gas companies generally reacted positively. (Dkt. 50-2. at 5-6, Slides 6-7). Professor Hendershott conducted a regression analysis to show that the divergent trading price responses were statistically significant and not due to random chance alone. Professor Hendershott will explain that the prospect of increased oil exports from Venezuela, hastened by the removal of Maduro, would introduce competition to Canadian oil and gas companies, which produce and refine heavy crude oil very similar to that exported by Venezuela. U.S. oil and gas companies, on

[10] There are no weekend trading data available.

the other hand, rely on Venezuelan exports and thus stand to benefit from Venezuela's increased production.

Professor Hendershott's analysis will provide evidence of the long-term consequences of Operation Absolute Resolve—changes in Venezuelan oil production and exports. (Dkt. 50-2 at 8). He will explain that there was a dramatic and steady increase in U.S. imports of Venezuelan crude oil following Maduro's removal. (Dkt. 50-2 at Slide 9).

Third, Professor Hendershott will testify that investors and institutions can use hedging to manage geopolitical risk, including military action.[11] Professor Hendershott will also testify as to the reasons why investors or traders might trade swaps and other derivatives tied to U.S. intervention in Venezuela and Maduro's removal from power. (Dkt. 50-2 at 9). For example, Professor Hendershott will testify that Canadian heavy crude oil producers had an economic incentive to hedge the risk of increased Venezuelan crude oil exports and increased competition from Venezuelan producers owing to U.S. intervention in Venezuela. By trading event contracts or other derivatives that would pay out upon the removal of Maduro from power, the Canadian oil companies would mitigate losses arising from increased competition from Venezuelan oil producers. As another example, Professor Hendershott will testify that holders of Venezuelan sovereign and corporate debt—which was in default and trading at deeply distressed prices—had an economic incentive to hedge the risk of Maduro staying in power. Event contracts or other derivatives that would pay out if Maduro remained in power could help mitigate investors' losses on Venezuelan sovereign and corporate debt holdings.

[11] The defendant does not appear to challenge Professor Hendershott's opinions about institutions and investors hedging geopolitical risk and military action generally.

### B. Discussion

The defendant's arguments for precluding Professor Hendershott's testimony lack merit. To the extent they are to be given any weight, they are matters for cross-examination, not admissibility. Professor Hendershott's testimony is admissible under Rules 401, 403, and 702.

#### 1. Professor Hendershott's Testimony Concerning Bond and Stock Prices Is Reliable.

The defendant argues that Professor Hendershott's testimony about price movement is unreliable because he failed to conduct an "event study . . . to disaggregate confounding factors that may have contributed to price changes." (Expert Br. at 14). The defendant is wrong both legally and factually.

First, there were no confounding events occurring between January 2, 2026 and January 5, 2026 that could have reasonably explained the stock and bond price movements. Professor Hendershott conducted a systematic search for news that may have affected Venezuela bond prices and U.S. and Canadian oil and gas stock prices from January 3, 2026 (the day Operation Absolute Resolve was executed and became public), and January 5, 2026 (the first trading day after Operation Absolute Resolve), and identified no confounding news events that could have reasonably explained the price movements.

Nor has the defendant identified any confounding events. Instead, the defendant points to three developments that were a direct consequence of U.S. military action in Venezuela and Maduro's ouster: 1) Venezuela's Supreme Court ordered Delcy Rodriguez to assume the role of interim president; 2) Rodriquez was sworn in as Venezuela's interim president; and 3) U.S. officials discussed increased oil exports from Venezuela. (Expert Br. at 15-16). But it is a basic principle of econometrics that the confounding effects that would be controlled through an event

study are *unrelated* to the event under study. *See, e.g.*, Alon Brav & J.B. Heaton, *Event Studies in Securities Litigation: Low Power, Confounding Effects, and Bias*, 93 Wash. U.L. Rev. 583, 605 (2015) (defining "confounding effects" as "[c]auses of price impacts unrelated to the event under study"). The defendant overlooks that these were follow-on events that would not have occurred but for the operation itself. Indeed, each of the news reports that the defendant cites in his motion focuses on the U.S. military action and Maduro's ouster, *i.e.*, the events underlying the at-issue event contracts.

| **Defendant's Brief:** | **Direct Quote from Source:** |
|---|---|
| "On January 3, 2026, Venezuela's Supreme Court ordered Delcy Rodríguez to assume the role of interim president of Venezuela." | "The Constitutional Chamber of Venezuela's Supreme Court ordered on Saturday that Vice President Delcy Rodríguez assume the role of acting president of the country **in the absence of Nicolás Maduro**, who was detained early Saturday morning in an **operation by U.S. forces**."[12] |
| "On January 4, 2026, news media reported that White House and State Department officials instructed U.S. oil executives to invest substantial capital in Venezuela if they wanted to recover assets expropriated in the 2000s." | "President Donald Trump said on Saturday that American companies were prepared to return to Venezuela and spend billions to reactivate the struggling oil sector, just hours after **President Nicolás Maduro was captured and removed by U.S. forces.**<br><br>In the recent U.S. administration discussions with **oil executives in the scenario that Maduro was out of power**, officials have said that U.S. oil companies would need to front the investment money themselves to rebuild Venezuela's oil industry. That would be one of the preconditions for them eventually |

[12] "Venezuela's Supreme Court Orders Delcy Rodríguez Become Interim President," *Reuters*, January 3, 2026, available at https://www.reuters.com/world/americas/venezuelas-supreme-court-orders-delcy-Rodríguez-become-interim-president-2026-01-04/.

| | |
|---|---|
| | recovering debts from the expropriations."[13] |
| "The same day [January 4, 2026], U.S. Secretary of State Marco Rubio told news media that the United States would use an "oil quarantine" as leverage over Venezuela." | "The **US raid on Saturday** suggests that the former US senator from Florida –long one of the most vocal policymakers on Venezuela– won out with his skepticism about negotiating with **Maduro,** whom the US considered an illegitimate president and accuses of "narco-terrorism" that killed Americans…<br><br>On Sunday, Rubio expanded on the administration's strategy of relying on an oil "quarantine" to bring about **change in Venezuela**, backed by a large US naval deployment. The US already interdicted at least three large oil tankers in the Atlantic and Caribbean waters around Venezuela and surrounding countries in December."[14] |
| "In addition, [on January 4, 2026] President Trump threatened that Rodríguez would fare "probably worse" than Maduro if she failed to give U.S. oil companies "total access." | "President Donald Trump stated late Sunday that 'we're in charge' of Venezuela, while warning its interim leader Delcy Rodríguez that she will far 'probably worse' than **captured President Nicolás Maduro** if she does not cooperate."[15] |
| "On January 5, 2026, Rodríguez was sworn in as Venezuela's interim president." | "Venezuela's vice president and oil minister Delcy Rodríguez was formally sworn in on Monday as the country's interim president, as **U.S.-deposed President Nicolás Maduro** appeared in a New York court on drug charges, after the Trump administration removed him from power in a dramatic weekend military |

[13] "US Pushes Oil Majors to Invest Big in Venezuela if They Want to Recover Debts," *Reuters*, January 5, 2026, available at https://www.reuters.com/business/energy/us-pushes-oil-majors-invest-big-venezuela-if-they-want-recover-debts-2026-01-04/.
[14] "Rubio Seizes Chance to Remake Latin America in Venezuela Gambit," *Bloomberg*, January 4, 2026, available at https://www.bloomberg.com/news/articles/2026-01-04/rubio-says-oil-quarantine-gives-us-sway-in-post-maduro-venezuela.
[15] Trump Says U.S. is 'in charge' of Venezuela and Warns Interim Leader to Cooperate," *The National Broadcasting Company*, January 4, 2026, available at https://www.nbcnews.com/politics/white-house/venezuela-trump-maduro-rcna252177.

| | |
|---|---|
| | action."[16] |
| "President Trump also announced [on January 5, 2026] it would meet with U.S. oil executives to boost Venezuelan production." | "The administration of President Donald Trump is planning to meet with executives from U.S. oil companies later this week to discuss boosting Venezuelan oil production after **U.S. forces ousted its leader Nicolás Maduro,** according to a source familiar with the matter."[17] |

Moreover, asset prices do not react to an event in isolation from its direct outcomes. Asset markets are fundamentally forward-looking. Market prices not only reflect shocks and immediate outcomes but also incorporate anticipated future implications. Because Rodriguez's succession was an immediate outcome of the U.S. military's removal of Maduro, attributing any portion of the bond price movement between Friday, January 2, and Monday January 5, 2026, to Rodriguez's assumption of power—as if it were an independent event—would be incorrect. Rodriguez's assumption of power was an outcome of Maduro's removal, rendering its price effects economically indistinguishable from those of Operation Absolute Resolve.

For those reasons, treating Rodriguez's succession as a confounding factor in an event study would amount to controlling for a variable that is itself a consequence of the very event being studied. Econometrically, that is a paradigmatic "bad control": a post-event outcome that lies on the causal pathway from Operation Absolute Resolve to asset prices. *See* Carlos Cinelli, Andrew Forney & Judea Pearl, *A Crash Course in Good and Bad Controls* 2, 17-18 (2022), https://ftp.cs.ucla.edu/pub/stat_ser/r493.pdf ("bad controls are variables that are themselves

[16] "Delcy Rodríguez Formally Sworn in as Venezuela's Interim President," *Reuters*, January 5, 2026, available at https://www.reuters.com/world/americas/delcy-Rodríguez-formally-sworn-venezuelas-interim-president-2026-01-05/.
[17] "Trump Administration Sets Meetings with Oil Companies Over Venezuela, Source Says," *Reuters*, January 6, 2026, available at https://www.reuters.com/business/energy/trump-administration-has-not-consulted-us-oil-majors-about-venezuela-oil-execs-2026-01-05/.

outcome variables in the notional experiment at hand," and controlling for such variables can bias estimates by blocking or distorting the very causal effect the analyst seeks to measure). Accordingly, any event study that attempted to "control for" Rodriguez's accession to power would risk removing part of the market impact of Maduro's ouster rather than isolating it.

Moreover, while event studies are sometimes used in fraud cases to establish materiality of a defendant's misstatement, *i.e.*, to calculate the stock price movement caused by a misstatement or corrective disclosure, those cases involve independent, confounding events that do not exist here. Take, for example, one of the cases cited by the defendant, *United States v. Schiff*, 538 F. Supp. 2d 818 (D.N.J. 2008). The defendant in *Schiff* was accused of making false statements to the public about the finances of his pharmaceutical company. To prove the materiality of those misstatements, the Government offered evidence of stock price drops on the days there were corrective disclosures. *Id.* at 834-35. The court precluded the stock-drop evidence because there were "facially *unrelated* adverse events" at the company that "coincided" with the corrective disclosures, and the prosecution failed to disaggregate those unrelated adverse events. *Id.* at 836 (emphasis added). The developments cited by the defendant—Rodriguez's assumption of power and the discussion of increased oil exports—are direct consequences of, and directly related to, Operation Absolute Resolve. They are not "unrelated" or independent confounding events requiring disaggregation.

*United States v. Ferguson*, 676 F.3d 260 (2d Cir. 2011), is of accord. In *Ferguson*, the Second Circuit held that the district court abused its discretion in admitting as evidence of materiality charts showing single-day stock price drops in the aftermath of the publication of articles about the alleged fraudulent transaction, not because of a general failure to provide an event study, but because, in that case, the corrective disclosures publicized not only the fraudulent

transaction but also "[u]nrelated allegations of bid-rigging, improper self-dealing, earnings manipulations, and more." *Id.* at 273-74. As a result, the charts admitted unfairly made it appear that all of the price change was attributed to the only event that the jury was permitted to learn about, whereas, in fact, it resulted from the disclosure of multiple forms of misconduct. *Id.* at 273-75. Here, by contrast, the developments cited by the defendant are all related to, and in fact stem from, Operation Absolute Resolve.

Second, to the extent the defendant suggests that evidence of price changes cannot be admitted at a trial without an event study, he is wrong and his argument should be rejected. The Second Circuit has affirmed the admission of stock-drop materiality evidence presented by lay witnesses. *See, e.g.*, *United States v. Forbes*, 249 F. App'x 233, 236 (2d Cir. 2007) ("The District Court correctly ruled that references to the decline in . . . stock price or investor losses were probative on the issue of materiality and permissible under [Rule 403]."). Indeed, *Schiff*, which the defendant relies on, noted that expert testimony may be unecessary altogether if the relationship between an event and stock price movement is "common sense." 538 F. Supp. 2d at 835; *see also id.* at 838 ("If there are no confounding factors in the disclosure or the market that would also cause a stock price drop, then causality is presumed by the efficient market hypothesis"). And the single case the defendant relies on for the proposition that an "event study is necessary to analyze whether 'events can be linked in a statistically significant way to variations in stock price,'" holds no such thing. (Expert Br. at 14 citing *United States v. Martoma*, 993 F. Supp. 2d 452 (S.D.N.Y. 2014)). Rather, the court in *Martoma* simply explained what an event study is. *Id.* at 458.

Aside from misapprehending the law and the facts, the defendant ignores the regression analysis—a type of event study—that Professor Hendershott conducted as part of his opinions on the U.S. and Canadian oil and gas company stock price trends. As explained above, Professor

Hendershott will testify that the stock prices of U.S. and Canadian oil and gas companies tend to move in tandem, but on January 5, 2026, they moved in opposite directions. (Dkt. 50-2 ¶ 3(k), Slides 6-8). To reach that opinion, Professor Hendershott first constructed value-weighted indices of the largest U.S. and Canadian oil and gas companies and measured the difference between the two indices' daily returns. (Dkt. 50-2 ¶¶ 3(j)-(k); Slides 6–8). Because both indices consist of North American oil and gas companies that are measured over the same trading days, Professor Hendershott's value-weighted indices controlled for broad equity market movements and news affecting the oil sector as a whole. Professor Hendershott then used regression analysis, which he described as "a standard and widely accepted statistical technique," to confirm that the difference in returns on January 5, 2026, is statistically significant and "not driven by random chance alone." (Dkt. 50-2 ¶ 3(k)). This methodology is a type of event study, which inherently controls for "confounding factors" that occur in both the Canadian and U.S. oil and gas company prices.

The method that Professor Hendershot used for his analysis is common in his field. It is a type of event study, and a methodology described in the foundational textbook *The Econometrics of Financial Markets*.[18] In their foundational study of stock returns, Professors Jegadeesh and Titman measure the return on a portfolio of one group of stocks minus the return on a portfolio of another group of stocks and use a statistical test to determine whether that difference is significant.[19] Professor Eberhart and coauthors follow a similar approach.[20] By employing the

---

[18] John Y. Campbell, Andrew W. Lo, & A. Craig MacKinlay (1997), The Econometrics of Financial Markets, Princeton University Press ("Campbell et al. (1997)"), pp. 149–180.

[19] Narasimhan Jegadeesh and Sheridan Titman, "Returns to Buying Winners and Selling Losers: Implications for Stock Market Efficiency," *The Journal of Finance*, 48(1), 1993, pp. 68–69.

[20] Allan Eberhart, William Maxwell, and Akhtar Siddique, "An Examination of Long-Term Abnormal Stock Returns and Operating Performance Following R&D Increases," *The Journal of Finance*, 59(2), 2004, pp. 623–650.

same statistical frameworks established in these peer-reviewed publications, Professor Hendershott relies on a methodology that is standard and accepted in his field.

In short, none of the defendant's arguments justify the exclusion of Professor Hendershott's opinions, and at most, the defense's points should be made on cross-examination. However, if the Court disagrees, the Government respectfully requests leave to supplement its expert disclosure and briefing here to include an event study showing the performance of the Venezuelan bonds against the broader bond market. (*See* Ex. 1 (Supplemental Disclosure of Terrence Hendershott)). Specifically, Professor Hendershott plotted the Venezuelan bonds against a widely used benchmark for similar emerging market debt (the J.P. Morgan EMBI Global Diversified Index). His analysis controlled for both changes in the risk-free rate and movements in the broader emerging-market bond market, allowing him to isolate the effect of Operation Absolute Resolve on Venezuelan bond values. The results showed that Venezuelan sovereign bonds gained approximately 31.2% and corporate bonds approximately 35.5% on January 5, 2026, while the broader emerging-market bond index experienced only ordinary market movement. The statistical analysis found that nearly all of the bond-price increase remained unexplained by general market factors or random chance. Professor Hendershott's event study therefore provides further evidence that the sharp increase in Venezuelan bond prices was caused by the market's reaction to Operation Absolute Resolve rather than by broader bond-market trends or other identifiable factors.[21]

---

[21] If the Court determines that supplementation is necessary, the Government does not intend to offer the results of the event study as a separate merits opinion in its case-in-chief. Rather, it would be offered solely to demonstrate, for *Daubert* purposes, that Professor Hendershott's conclusions are robust and reliable as analyzed through an event-study methodology. The Government would present the results of the event study to the jury only if the defense opens the door by challenging on cross-examination the robustness of Professor Hendershott's analysis or suggesting that a traditional event study was not performed and would have yielded a different result.

Finally, the defendant critiques Professor Hendershot's expected testimony about the "dramatic and steady increase in crude oil products in Venezuela" immediately following Operation Absolute Resolve. (Dkt. 50-2 ¶¶ 3(m)-(n), Slides 9-12). The defendant argues that Professor Hendershott did not account for "additional events . . . that may have contributed to the long-term consequences." (Expert Br. 16). The defendant then cites to news developments from January 6, 2026, through March 18, 2026, "that may have contributed" to the dramatic change in oil exports starting immediately after Operation Absolute Resolve, *e.g.*, the U.S. government urged oil executives to invest $100 billion in Venezuela; the U.S. Treasury Department's Office of Foreign Asset Control eased Venezuelan oil sanctions; the U.S. government authorized U.S. oil companies to do business with Venezuela's state owned oil company, PDVSA. (Expert Br. at 16-17).

The defendant's argument is not a basis to preclude Professor Hendershott's testimony. The defendant does not and cannot seriously dispute a causal link between Operation Absolute Resolve and the sudden increase in oil exports. That "additional events"—mostly flowing from Operation Absolute Resolve—"may have contributed" to the increased oil exports is beside the point. (Expert Br. at 16). Professor Hendershott does not claim that the increase in oil exports was solely caused by the Operation and will not testify to the specific quantum of increases attributable solely to Operation Absolute Resolve. Rather, as set forth in his disclosure, he will only testify that an increase in oil exports from Venezuela was one of the potential financial, economic, or commercial consequences associated with Maduro's ouster.[22]

---

[22] Academic literature finds that increases in the supply of oil have "very persistent and highly significant" effects on oil production, including in other oil producing countries. See Ronald A. Ratti & Joaquin L. Vespignani, OPEC and non-OPEC oil production and the global economy, 50

**2. Professor Hendershott's Testimony Concerning the Impact of Announcements of U.S. Military Action Is Well Founded and Supported.**

The defendant seeks to preclude Professor Hendershott from testifying that public announcements of U.S. military action have historically impacted equity and commodity markets because the disclosure fails to provide specific examples. Professor Hendershott's unremarkable and uncontroverted observation is based on Professor Hendershott's decades of experience monitoring, researching, and teaching about financial markets. This experience encompasses his knowledge of academic literature, which confirms that the proposition has been empirically tested and examined in research.

There have been many studies measuring the impact of U.S. military action on financial markets. One study examined the prospect of the 2003 U.S.-led invasion of Iraq in the months before it began. Leigh, Wolfers, and Zitzewitz used the price of a contract traded on an online trading platform that paid out only if Saddam Hussein was ousted to measure how changes in the probability of U.S. military action moved financial markets. They found that "a ten percent rise in the probability of war with Iraq raises oil prices by about $1 per barrel (or 3-4 percent)," and that a 10 percentage point rise in that probability "lowers the S&P 500 by about 1½ percent," implying that war would raise oil prices by about $10 per barrel and reduce U.S. equity values by about 15 percent, respectively.[23] The same study places these results in historical context, noting that "the

---

Energy Economics 364 (2015), p. 368 ("The effect of an unanticipated supply increase on growth in OPEC oil production [which includes Venezuela] is very persistent and highly significant."; Carlos Pestana Barros, Luis A. Gil-Alana & James E. Payne, An analysis of oil production by OPEC countries: Persistence, breaks, and outliers, 39 Energy Policy 442 (2011), p. 451 ( "Thus, shocks affecting the structure of OPEC oil production [which includes Venezuela] will have persistent effects in the long run for all countries, and in some cases the effects are expected to be permanent.").

[23] Andrew Leigh, Justin Wolfers & Eric Zitzewitz, *What Do Financial Markets Think of War in*

S&P 500 fell by 7.6, 6.5, and 5.5 percent in the first two trading days after the Pearl Harbor bombing, the outbreak of the Korean War, and September 11, respectively."[24]

The literature also confirms that the effects of military action vary with the kinds of factors Professor Hendershott identifies, including "the targets and objectives of the military action, the length and scope of the military action, the popularity of military action, and the potential consequences of the military action, such as impacts on supply chains." (Dkt. 50-2 ¶ 2). Leigh et al. explain that "assessments of the effect of war on oil prices depend on many variables, including the length and intensity of war, how Iraq's neighbors react, and the relationship of post-Saddam Iraq with OPEC."[25]

The literature likewise supports Professor Hendershott's qualification that "the durability of those impacts depends on many factors." (Dkt. 50-2 ¶ 2). Research on the 2022 Russia–Ukraine conflict found a short-term positive effect on the S&P 500 immediately after the outbreak of the conflict but a negative effect over a longer time frame.[26] Recent peer-reviewed research in the field's leading journals confirms that war risk is priced in financial markets over long historical periods. Using a textual analysis of 7 million *New York Times* articles spanning 160 years, Hirshleifer, Mai, and Pukthuanthong find that media discussion of war predicts stock market excess returns, an effect they call the "war return premium." Over the full sample, a one-standard-

---

*Iraq?* (Stanford Inst. for Econ. Pol'y Rsch., Discussion Paper No. 02-28, Mar. 17, 2003) ("Leigh et al."), pp. 1, 35.

[24] Leigh et al., p. 21.

[25] Leigh et al., p. 11.

[26] Zhengzhong Wang, Shuihan Liu, Yunjie Wei & Shouyang Wang, Estimating the Impact of the Outbreak of Wars on Financial Assets: Evidence from Russia-Ukraine Conflict, 9 Heliyon 21380 (2023), pp. 10–11.

deviation increase in war coverage predicts a "3.80% increase in annualized excess returns in the next month."[27]

Professor Hendershott's statement is not a "sweeping historical claim[]" treated "as self-evident." (Expert Br. at 19). It is a summary of generally accepted academic findings that an expert in how financial markets incorporate information would be expected to know.

**3. Professor Hendershott's Testimony About Hedging Utility is Admissible.**

The defendant seeks to preclude Professor Hendershott's testimony concerning the hedging utility of "swaps and other derivatives tied to U.S. intervention in Venezuela and Maduro's removal from power" (Dkt. 50-2 ¶ 6), arguing that Professor Hendershott is unqualified to opine on investors and institutions' incentives because he "lacks any work in the private sector, including in treasury, financial risk management, or investment portfolio roles." (Expert Br. at 20). The defendant's proposed "overly narrow test" is contrary to the Second Circuit's "liberal" construction of the expert-qualification requirement." *Johnson & Johnson*, 2006 WL 2128785, at *5. As discussed in detail above in response to the motion to preclude Professor Sham's testimony, an expert qualifies if they have "educational and experiential qualifications in a general field closely related to the subject matter in question." *In re Zyperxa Prods. Liab. Litig.*, 489 F. Supp. 2d at 282. Professor Hendershott easily meets that test.

Professor Hendershott's academic and professional experience, which extensively covers the mechanics of derivative trading and risk hedging, uniquely qualify him to assist the jury in understanding the utility of hedging geopolitical swaps, irrespective of whether he gained that

---

[27] David Hirshleifer, Dat Mai & Kuntara Pukthuanthong, *War Discourse and Disaster Premium: 160 Years of Evidence from the Stock Market*, 38 Rev. Fin. Stud. 457 (2025) ("Hirshleifer et al. (RFS)"), pp. 457, 461.

knowledge in the private sector. As noted above, Professor Hendershott teaches undergraduate and graduate-level courses at UC Berkeley on topics including trading, hedging, market making, and arbitrage. The MFE program at Berkeley that he has overseen since 2020, includes courses that cover "hedging interest rate risk," and "derivative instruments (futures, swaps, options, exotic instruments)," and "counterparty risk in derivatives market."[28] His published research includes papers that model the use of hedging. As the defendant concedes, Professor Hendershott's qualifications are "impressive." (Expert Br. at 1). To the extent the defendant "quibble[s] with [Professor Hendershott's] academic training" and experience, they go to weight, not admissibility. *Joseph*, 542 F.3d 21-22.

The defendant next claims that Professor Hendershott's testimony about hedging utility is based on insufficient data because "he does not point to a single example where any company or institutional investor actually" traded swaps tied to U.S. intervention in Venezuela. (Expert Br. at 21). The defendant misconstrues Rule 702's requirement that expert testimony be based on "sufficient facts or data." Rule 702 does not require an expert to identify historical examples that perfectly mirror the precise conduct at issue. Rather, it requires that the expert's opinions rest on an adequate factual foundation and reliable economic principles. Professor Hendershott's opinion satisfies that standard. He explains how market participants use derivative instruments to hedge exposure to future events and analyzes the economic characteristics of the contracts at issue to determine whether they could serve that function. That analysis relies on established principles of financial economics, not on the existence of prior trades involving the exact same underlying event. Indeed, requiring an expert to identify prior instances of precisely the same transaction

[28] UC Berkeley Haas, Master of Financial Engineering, Curriculum, https://mfe.haas.berkeley.edu/academics/curriculum.

would improperly conflate reliability with factual certainty and would exclude expert analysis whenever a market innovation or uncommon financial instrument is at issue. Rule 702 imposes no such requirement.

The remainder of the defendant's critiques—including that Professor Hendershott failed to sufficiently consider Polymarket's terms of service, the terms of the at-issue event contracts, and Polymarket's resolution process—go to the weight of his testimony and not admissibility. To the extent the defendant believes that questioning Professor Hendershott on those topics would be fruitful or persuasive to a jury, and the questions themselves are proper and would yield relevant testimony, the defendant is free to cross-examine him.

## CONCLUSION

For the reasons set forth above, the Court should deny the defendant's motion.

Dated: New York, New York
November 9, 2026

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

By: /s/

Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, New York 10278
Telephone: (212) 637-1247 / 6612 / 2314

**CERTIFICATION**

The undersigned hereby certifies that the memorandum of law in support of the Government's opposition to the defendant's motion *in limine* to exclude portions of the proposed expert testimony of Amin Shams and Terrence Hendershott is 9,656 words. Earlier today, the Government sought permission to file an oversized brief, which the defendant did not oppose.

Respectfully submitted,

SEAN S. BUCKLEY
Deputy United States Attorney
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515

By: ______________________________
Nicholas W. Chiuchiolo
Ryan B. Finkel
Juliana N. Murray
Assistant United States Attorneys
26 Federal Plaza, 37th Floor
New York, New York 10278
Telephone: (212) 637-1247 / 6612 / 2314